EXHIBIT 1

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

**State of South Carolina )**
**County of Charleston )**

**IN THE COURT OF COMMON PLEAS**
**NINTH JUDICIAL CIRCUIT**

**JAMES M. HUGHES,**

*Plaintiff,*

*v.*

**DRAFTKINGS INC.;**
**GUS III LLC (D/B/A DRAFTKINGS PREDICTIONS, F/K/A GUS III INC.);**
**RAILBIRD EXCHANGE, LLC (D/B/A DKEX);**
**BLOCKRATIZE, INC.;**
**QCL QUAD CODE USA CORP.;**
**QCX LLC (D/B/A POLYMARKET US);**
**QC CLEARING LLC (D/B/A/ POLYMARKET CLEARING);**
**CHICAGO MERCANTILE EXCHANGE INC.;**
**NORTH AMERICAN DERIVATIVES EXCHANGE, INC. (D/B/A CRYPTO.COM DERIVATIVES NORTH AMERICA);**
**BITNOMIAL CLEARINGHOUSE, LLC;**
**WINTERMUTE TRADING LTD.;**
**JUMP TRADING LLC;**
**DRW HOLDINGS LLC;**
**IMC-CHICAGO, LLC;**
**GALAXY DIGITAL TRADING, LLC;**
**VIRTU FINANCIAL INC.; and**
**JOHN DOES 1-10,**

*Defendants*.

Case No. 2026-CP-10-____________

## COMPLAINT

Plaintiff James M. Hughes brings this action against DraftKings Inc.; GUS III LLC (d/b/a DraftKings Predictions, f/k/a GUS III Inc.); Railbird Exchange, LLC (d/b/a DkeX); Blockratize, Inc.; QCL Quad Code USA Corp.; QCX LLC (d/b/a Polymarket US); QC Clearing LLC (d/b/a Polymarket Clearing); Chicago Mercantile Exchange Inc.; North American Derivatives Exchange, Inc. (d/b/a Crypto.com Derivatives North America); Bitnomial Clearinghouse, LLC; Wintermute

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

Trading Ltd.; Jump Trading LLC; DRW Holdings LLC; IMC-Chicago, LLC; Galaxy Digital Trading, LLC; Virtu Financial Inc.; and John Does 1-10 (collectively, "Defendants") to recover gambling losses under the Statute of Anne, S.C. Code Ann. § 32-1-20. Plaintiff alleges as follows:

**INTRODUCTION**

1. Sports betting is illegal in South Carolina. It has been illegal in South Carolina since 1912. The state's laws are unambiguous. "Any person within this State who [e]ngages in betting at any race track, pool selling or bookmaking, with or without writing, at any time or place," shall be "guilty of a misdemeanor" and faces a prison sentence of up to six months. S.C. Code Ann. § 16-19-130. The same goes for any person who "[r]ecords or registers bets or wagers or sells pools or makes books" based on "the result of any … contest of skill, speed or power of endurance of man or beast"—or, for that matter, any "unknown or contingent event whatsoever." *Id*.

2. Given both the specificity and the history of South Carolina criminal law concerning sports betting, it would seem catastrophically foolish to set up such an operation in this state. The hubris required to stare over a century of law in the face and say "but not as to me" would seem unthinkable to most.

3. Enter the defendants, who—flouting wisdom, common sense, and South Carolina law—have delivered the vice of online sports betting to the smartphones of residents across the Palmetto State.

4. The defendants in this case fall into four groups. Each group plays an essential role in the unlawful facilitation of sports gambling in South Carolina.

5. First, there are the "brokers." These are the companies that operate the websites and apps through which South Carolinians are enticed (and allowed) to place illegal wagers on the outcomes of sporting events. The first broker in this case is GUS III LLC (d/b/a DraftKings

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

Predictions, f/k/a GUS III Inc.), a wholly owned subsidiary of DraftKings Inc., which operates the DraftKings app and website. The second broker is QCL Quad Code USA Corp., a wholly owned subsidiary of Blockratize, Inc., which operates the Polymarket app. The two brokers identified in this paragraph are collectively referred to in this complaint as the "Broker Defendants."

6. Second, there are the "exchanges." These are the companies that actually run the markets in which bets are placed. Some of these markets are large and diverse, permitting not only illegal sports wagers but also lawful and legitimate trades on things like commodity futures and stocks. That is true of the exchanges run by Chicago Mercantile Exchange Inc. and North American Derivatives Exchange, Inc. (d/b/a Crypto.com Derivatives North America). Other markets are dedicated almost exclusively to sports gambling. That is true of the exchange run by Railbird Exchange, LLC (d/b/a DkeX), a wholly owned subsidiary of DraftKings Inc., as well as the exchange run by QCX LLC (d/b/a Polymarket US), a wholly owned subsidiary of Blockratize, Inc. These relatively new exchanges have allowed their parent companies to vertically integrate their illegal sports betting operations. The four exchanges identified in this paragraph are collectively referred to in this complaint as the "Exchange Defendants."

7. Third, there are the "clearinghouses." These are the companies that accept and hold customer funds and clear and settle trades after the outcome of a wager is established. Clearinghouses are, ultimately, the buyer to every seller and the seller to every buyer. They are the novated contractual counterparties to the sports bets placed by South Carolina residents on the exchanges operated by the Exchange Defendants. As such, they play an integral role in ensuring that South Carolina residents lose the money they have wagered on sports (or—far, far less frequently—receive their winnings). The clearinghouses in this case are Chicago Mercantile Exchange Inc. (through the division it operates called CME Clearing); North American Derivatives Exchange, Inc. (d/b/a Crypto.com Derivatives

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

North America); QC Clearing LLC (d/b/a Polymarket Clearing); and Bitnomial Clearinghouse, LLC. The clearinghouses identified in this paragraph are collectively referred to in this complaint as the "Clearinghouse Defendants."

8. Fourth, and finally, there are the "market makers." These are sophisticated financial companies that provide liquidity to the Exchange Defendants by ensuring there is a counterparty available for every wager offered on their exchanges. If a Charleston resident wishes to bet $20 on DkeX that Naomi Osaka will win the U.S. Open, they can only do so if someone is ready to take the other side of that bet. That someone is usually a market maker. The market makers in this case include Wintermute Trading Ltd.; Jump Trading LLC; DRW Holdings LLC; IMC-Chicago, LLC; Galaxy Digital Trading, LLC; and Virtu Financial Inc. Recent reporting also indicates that DraftKings Inc. and Blockratize, Inc. have established in-house trading desks to serve as market makers to their subsidiaries' exchanges as well as those run by other Exchange Defendants. On information and belief, there are additional undisclosed market makers who have taken the other side of sports bets placed by South Carolina residents on the Exchange Defendants' exchanges. Accordingly, Plaintiff also names defendants John Does 1 through 10. The market makers identified in this paragraph are collectively referred to in this complaint as the "Market Maker Defendants."

9. At this point, a reasonable reader might ask how such a robust ecosystem of corporate entities openly supporting illegal sports gambling could exist in South Carolina. The answer? According to the defendants, the sports bets they offer, facilitate, and consummate are not "sports bets" at all. They are a new species of financial instrument—a sports futures contract (not a wager!) through which a retail investor (not a gambler!) can hedge risk (not bet!) by predicting the outcome of an uncertain event (not a game!). And where there is no gambling, they maintain, there are no state gambling laws to apply. If anything, certain defendants have insisted, application of state gambling

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

laws to their so-called "event contracts" is preempted by the federal Commodity Exchange Act and subject to the exclusive regulatory oversight of the Commodity Futures Trading Commission. *See e.g.*, *North American Derivatives Exchange, Inc. v. Nevada*, 815 F. Supp. 3d 1169, 1175 (D. Nev. Oct. 14, 2025) (hereinafter *Crypto*) ("Crypto contends that its contracts are legal under federal law and that Nevada law is preempted due to the CFTC's exclusive jurisdiction over transactions.").

10. This lawsuit is premised on a straightforward thesis: The rhetorical set dressing of "prediction markets" and "event contracts" doesn't change reality. And reality is quite simple. Defendants incite, offer, and collect winnings from illegal wagers placed by South Carolinians on the outcome of sporting events. These wagers are functionally identical to those found in casinos, sportsbooks, and other traditional gambling establishments. This is apparent simply by looking at the Broker Defendants' online offerings.

11. The website displayed in Figure 1 below, https://predictions.draftkings.com/en/, was accessed from a South Carolina based IP address in July 2026.

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

**Figure 1: DraftKings website**




As is clear from this screenshot, the homepage of the DraftKings Predictions website defaults to a tab labeled "Sports." It entices new customers to "spend $5 to get $150," next to an image of a baseball. It opens to an "MLB" section offering not only "game lines" but bets on "home runs," "strikeouts," "1st inning," and "total bases." And that is only the beginning. Bets on tennis, soccer, golf, basketball, and motorsports are all a click away.

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

12. Figure 2 below depicts the results of searching for "draftkings predictions" in the Apple App Store. The screenshot was obtained by a smartphone based in South Carolina accessing the App Store from a South Carolina based IP address in July 2026.

**Figure 2: Apple App Store**




As is clear from this screenshot, DraftKings advertises itself on the Apple App Store as "DraftKings Predictions," encouraging prospective users to "Start Predicting Today" and advertising markets for "MLB, MMA, PGA, Crypto, and more."

13. The app displayed in Figure 3 below, DraftKings, was accessed from a South Carolina based IP address in July 2026.

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

**Figure 3: DraftKings app**




Here, DraftKings offers South Carolina users a variety of gambling options for sports including Baseball, Tennis, Women's Basketball, and Soccer. It even encourages South Carolinians to "refer friends" in exchange for "$25 in Predictions Dollars."

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

14. Figure 4 below depicts the results of searching for "polymarket" in the Apple App Store. The screenshot was obtained by a smartphone based in South Carolina accessing the App Store from a South Carolina based IP address in July 2026.

**Figure 4: Apple App Store**



ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

Like DraftKings, Polymarket advertises itself on the Apple App Store as a place to "Trade sports, politics, & more" and prominently features logos for sports teams ranging from the Los Angeles Dodgers to the Pittsburgh Pirates.

15. The app displayed in Figure 5 below, Polymarket, was accessed from a South Carolina based IP address in July 2026.

**Figure 5: Polymarket app**



ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

Similarly, the Polymarket app defaults to presenting users with a variety of sports bets, including tennis, table tennis, soccer, cricket, and "Esports." It also displays a "Live" tab depicting all "live" sporting events occurring worldwide on which bets can be placed.

16. Figures 1-5 make plain that Defendants' so-called "event contracts" are nothing more than sports bets under a different name. They certainly do not accomplish what one might expect of traditional financial derivatives contracts—allowing economic actors to discover prices or hedge existing market risk. To the contrary, like sports gambling has done for centuries, Defendants' offerings create financial risk where none existed before. They are exactly what they appear to be: The vice that South Carolina has long made illegal.

17. Unsurprisingly, Defendants' lexical gambit has come under sustained legal fire. State Attorneys General and regulators in at least 14 States—Arizona, Illinois, Maryland, Montana, Nevada, New Jersey, Ohio, Connecticut, Wisconsin, Rhode Island, Kentucky, Minnesota, Michigan, Washington—have filed lawsuits or sent cease and desist letters to prediction-market operators, including Polymarket and its competitors Kalshi and Robinhood (the latter two who are already subject to a South Carolina civil action and therefore are not named in this complaint). That skepticism of Defendants' business model is widely shared. Legal commentators and sports executives have publicly expressed their view that Defendants' products constitute illegal gambling.

18. Multiple courts have preliminarily reached the same conclusion. *See e.g.*, *KalshiEx, LLC v. Schuler*, 2026 WL 657004, at *7 (S.D. Ohio Mar. 9, 2026) (denying Kalshi's motion for a preliminary injunction because it "fail[ed] to clearly show that its sports-event contracts are subject to the CFTC's exclusive jurisdiction and thus fail[ed] to establish a likelihood of success on the merits"), *aff'd by KalshiEx LLC v. Schuler*, 2026 WL 1295806 (6th Cir. Apr. 24, 2026); *KalshiEx LLC v. Martin*, 793 F. Supp. 3d 667, 686 (D. Md. Aug. 1, 2025) ("Kalshi has not shown how

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

obtaining a license in Maryland and otherwise complying with Maryland law would prevent it from complying with federal law."); *Crypto*, 815 F. Supp. 3d at 1187-88 (same).

19. Fortunately, South Carolina residents are not without recourse. Since the separation of the Province of Carolina in 1712, South Carolina law has included a provision deputizing "any person" to recover illegal gambling losses. The recovery is split evenly. The individual suing receives half, for their efforts in suing and for their contribution towards enforcing public policy against illegal gambling. The other half goes to the county in which the illegal bets were placed.

20. The statute has two relevant parts. First, S.C. Code Ann. § 32-1-10 allows any person who loses $50 or more through an illegal bet to recover those losses within three months:

> Any person who shall at any time or sitting, by playing at cards, dice table or any other game whatsoever or by betting on the sides or hands of such as do play at any of the games aforesaid, lose to any person or persons so playing or betting, in the whole, the sum or value of fifty dollars and shall pay or deliver such sum or value or any part thereof shall be at liberty, within three months then next ensuing, to sue for and recover the money or goods so lost and paid or delivered or any part thereof from the respective winner or winners thereof, with costs of suit, by action to be prosecuted in any court of competent jurisdiction.

21. Second, S.C. Code Ann. § 32-1-20 deputizes individuals within the state to recover those losses if the loser does not exercise their rights within the three-month period:

> In case any person who shall lose such money or other thing as aforesaid shall not, within the time aforesaid, really and bona fide and without covin or collusion sue and with effect prosecute for the money or other things so by him or them lost and paid and delivered as aforesaid, it shall be lawful for any other person, by any such action or suit as aforesaid, to sue for and recover the same and treble the value thereof, with costs of suit, against such winner or winners as aforesaid, the one moiety thereof to the use of the person that will sue for the same and the other moiety to the use of the county in which the offense shall have been committed.

22. The statute has an even longer provenance than South Carolina laws criminalizing sports betting. It pre-dates online prediction markets, the Internet, the telephone, the changing of the name Charles Town to Charleston, and indeed the Four Corners of Law. Scholars pin the statute's

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

origin to a 1710 British law passed during the reign of Queen Anne and then enshrined in the Colony's royal charter. For this reason, the law has come to be known as the "Statute of Anne."

23. This case is brought by Plaintiff James M. Hughes, a resident of South Carolina. Mr. Hughes seeks to recover the losses from South Carolina residents won by the Defendants through the illegal sports betting operations they facilitate. In addition, and as expressly contemplated by the statute, Mr. Hughes seeks three times the amount of the losses as well as the costs of his suit.

24. How much this amounts to is presently unclear. But that fact itself is contemplated by the statute. S.C. Code Ann. § 32-1-30 provides that "[a]ny person who, by virtue of the provisions herein contained, shall or may be liable to be sued for such moneys or other things so won shall be obliged and compellable to answer, upon oath, such order as shall be made against him for discovering the sum of money or other things so won at play as aforesaid." So Mr. Hughes additionally seeks such an order compelling the defendants to provide this information.

25. There is no doubt the losses at issue in this case are significantly greater than the $50 threshold set out in the Statute of Anne. Upon information and belief, South Carolina residents have regularly gambled (and lost) over $50 at a single time or sitting on the prediction markets operated and facilitated by Defendants, and have not sued to recover those monies "within three months next ensuing." Meanwhile, Defendants win big. The Broker Defendants and the Exchange Defendants take a transaction fee every time an illegal sports bet is traded. The Clearinghouse Defendants take a transaction fee when the bet is settled. And the Market Maker Defendants take the remainder of the winnings from the bets to which they are counterparties.

## PARTIES

**Plaintiff**

26. **Plaintiff James M. Hughes** is a natural person and a citizen and resident of

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

Charleston County, South Carolina, where he has lived at all times relevant to this action. Mr. Hughes has suffered no direct or indirect injury traceable to the Defendants' conduct—he has personally experienced no gambling losses on account of the Defendants and, indeed, has never even bet on sports. His standing to sue derives exclusively from S.C. Code Ann. § 32-1-20, and his sole interest in this lawsuit is his desire to enforce that law and the public policies animating it.

27. Mr. Hughes does not bring this case as a class action, nor does he seek to serve as a class representative. The class action mechanism is inapt given the structure of the Statute of Anne, which already allows Mr. Hughes "to sue for and recover" losses sustained by others. S.C. Code Ann. § 32-1-20. That is what Mr. Hughes seeks to accomplish through this lawsuit.

**DraftKings Defendants**

28. **Defendant DraftKings Inc.** is a Nevada corporation headquartered at 222 Berkeley St., 5th Floor, Boston, MA 02116. DraftKings Inc. operates a vertically integrated illegal sports betting enterprise in South Carolina.

29. DraftKings Inc. is the sole and beneficial owner of **Defendant GUS III LLC (d/b/a DraftKings Predictions, f/k/a GUS III Inc.) ("DraftKings Predictions")**, a Nevada limited liability company headquartered at 222 Berkeley St., 5th Floor, Boston, MA 02116. This subsidiary operates the DraftKings Predictions app and website, where illegal sports wagers in the form of event contracts ("sports bets") are brokered for South Carolinians.

30. DraftKings Inc. is also the sole and beneficial owner of **Defendant Railbird Exchange, LLC (d/b/a DkeX) ("DkeX")**, a Nevada limited liability company headquartered at 757 Third Ave, Suite 2006, New York, NY 10022. This subsidiary operates the exchange on which the illegal sports bets brokered by DraftKings Predictions are executed.

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

31. DraftKings Inc. further operates as a market maker by providing liquidity to DkeX's exchange to ensure there is always a counterparty to its users' bets. DraftKings CEO Jason Robins has called this in-house market making operation "one of our fastest to profitability business lines we've ever launched." On information and belief, DraftKings Inc. also acts as a market maker on the exchanges operated by the other Exchange Defendants as well.

32. On information and belief, in the last year, South Carolina residents have periodically lost over $50 at a single time or sitting on sports bets facilitated by DraftKings Inc., brokered by DraftKings Predictions, and/or executed on DkeX's exchange. On information and belief, in the last year, South Carolina residents have periodically lost over $50 at a single time or sitting on sports bets to DraftKings Inc. where DraftKings Inc. serves as the market-making counterparty. On information and belief, no South Carolina residents have sued these Defendants to recover these losses.

33. The defendants identified in bold in this subsection will be referred to collectively as "DraftKings."

**<u>Polymarket Defendants</u>**

34. **Defendant Blockratize, Inc. ("Blockratize")** is a Delaware corporation headquartered at 1280 Lexington Ave., Suite 1448, New York, NY 10028. Blockratize operates a vertically integrated illegal sports betting enterprise in South Carolina.

35. Blockratize is the sole and beneficial owner of **Defendant QCL Quad Code USA Corp. ("QCL")**, a Delaware corporation headquartered at 251 Little Falls Drive, Wilmington, DE 19808. This subsidiary operates the Polymarket app, where sports bets are brokered for South Carolinians.

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

36. QCL is the sole member of **Defendant QCX LLC (d/b/a Polymarket US) ("Polymarket US")**, another subsidiary of Blockratize. Polymarket US is a Delaware limited liability company headquartered at 251 Little Falls Drive, Wilmington, DE 19808. This subsidiary operates the exchange on which the illegal sports bets brokered by QCL are executed.

37. QCL is also the sole member of **Defendant QC Clearing LLC ("Polymarket Clearing")**, another subsidiary of Blockratize. Polymarket Clearing is a Delaware limited liability company headquartered at 7251 W. Palmetto Park Rd., Suite 102, Boca Raton, FL 33433. Polymarket Clearing operates a clearinghouse used to settle sports bets brokered by QCL on the exchange operated by Polymarket US. For a time, Polymarket Clearing was also used to settle sports bets brokered by DraftKings Predictions on the exchange operated by DkeX.

38. Blockratize further operates as a market maker by providing liquidity to Polymarket US's exchange to ensure there is always a counterparty to users' bets. On information and belief, Polymarket US also acts as a market maker on exchanges operated by the other Exchange Defendants as well.

39. On information and belief, in the last year, South Carolina residents have periodically lost over $50 at a single time or sitting on sports bets facilitated by Blockratize, brokered by QCL, and/or executed on Polymarket US's exchange. On information and belief, in the last year, Polymarket Clearing has contracted with and/or served as the counterparty to South Carolina residents in the course of settling sports bets in which $50 or more was lost at a single time or sitting. On information and belief, in the last year, South Carolina residents have periodically lost over $50 at a single time or sitting to Blockratize where Blockratize serves as the market-making counterparty. On information and belief, no South Carolina residents have sued these Defendants to recover these losses.

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

40. The defendants identified in bold in this subsection will be collectively referred to as "Polymarket."

**Additional Exchange and Clearinghouse Defendants**

41. **Defendant Chicago Mercantile Exchange Inc. ("CME")** is a Delaware corporation headquartered at 20 South Wacker Drive, Chicago, Illinois 60606. CME operates an exchange that has allowed South Carolina residents to place sports bets offered by DraftKings Predictions. CME's website identifies DraftKings Predictions in a list of broker partners and encourages consumers "to get in on the action" and "sign up with a broker that is offering Prediction Markets." The same website hosts a "daily bulletin" that reflects the total volume of trading on a variety of sports bets, related to teams including the "Carolina Football Team," the "Georgia Tech College Football Team," and the "US Men's National Team." Thus, on information and belief, Defendant CME has offered and executed sports events contracts in which South Carolina residents have lost over $50 at a single time or sitting.

42. CME also operates a clearinghouse that has been used to settle sports bets offered by DraftKings Predictions. On information and belief, in the last year, CME has contracted with and/or served as the counterparty to South Carolina residents in the course of settling sports bets in which $50 or more was lost at a single time or sitting. On information and belief, no South Carolina residents have sued CME to recover these losses.

43. **Defendant North American Derivatives Exchange, Inc. (d/b/a Crypto.com Derivatives North America) ("Crypto.com")** is a Delaware corporation headquartered at 200 West Jackson Boulevard, Suite 1400, Chicago, IL 60606. Crypto.com operates an exchange that has allowed South Carolina residents to place sports bets brokered by DraftKings Predictions. In February 2026, Crypto.com reached an agreement with DraftKings Inc. to offer so-called "sports

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

event contracts" for the NFL, the NBA, Soccer, and the Winter Olympics. Crypto.com's Global Head of Predictions described the partnership as "an important milestone" that allowed it to "expand access to prediction markets in sports." Thus, on information and belief, Crypto.com has offered and executed sports bets in which South Carolina residents have lost over $50 at a single time or sitting in the last year.

44. Crypto.com also operates a clearinghouse that has been used to settle sports bets brokered by DraftKings Predictions. On information and belief, in the last year, Crypto.com has contracted with and/or served as the counterparty to South Carolina residents in the course of settling sports bets in which $50 or more was lost at a single time or sitting. On information and belief, no South Carolina residents have sued Crypto.com to recover these losses.

45. **Defendant Bitnomial Clearinghouse, LLC ("Bitnomial")** is a Delaware limited liability company headquartered at 318 W. Adams Street, Chicago, IL 60606. Bitnomial operates a clearinghouse that, on information and belief, is used to settle sports bets brokered by DraftKings Predictions on the exchange operated by DkeX. On information and belief, Bitnomial has contracted with and/or served as the counterparty to South Carolina residents in the course of settling sports bets in which $50 or more was lost at a single time or sitting in the last year. On information and belief, no South Carolina residents have sued Bitnomial to recover these losses.

**<u>Additional Market Maker Defendants</u>**

46. **Defendants John Doe 1 through John Doe 10 (the "Doe Defendants")** serve as market makers for sports bets placed on the exchanges operated by the Exchange Defendants. On information and belief, in the last year, South Carolina residents have periodically lost over $50 at a single time or sitting to the Doe Defendants through sports bets.

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

47. **Defendant DRW Holdings LLC ("DRW")** is a Delaware limited liability company headquartered at 540 W Madison St., Suite 2500, Chicago IL 60661. As recently as May 28, 2026, DRW served as a market maker for sports bets placed on the exchange operated by Polymarket US, building dedicated trading desks for that market. On information and belief, DRW also serves as a market maker for sports bets offered by the other Exchange Defendants. On information and belief, in the last year, South Carolina residents have periodically lost over $50 at a single time or sitting to DRW through illegal sports bets. On information and belief, no South Carolina residents have sued DRW to recover these losses.

48. **Defendant Wintermute Trading Ltd. ("Wintermute")** is a foreign corporation headquartered at 41 Lothbury London, EC2R 7HF United Kingdom. As recently as May 28, 2026, DRW served as a market maker for sports bets placed on the exchange operated by Polymarket US, building dedicated trading desks for that market. On information and belief, Wintermute also serves as a market maker for sports bets offered by the other Exchange Defendants. On information and belief, South Carolina residents have periodically lost over $50 at a single time or sitting to Wintermute through sports bets. On information and belief, no South Carolina residents have sued Wintermute to recover these losses.

49. **IMC-Chicago, LLC ("IMC")** is an Illinois limited liability company headquartered at 233 S. Wacker Dr., Suite 4300, Chicago, IL 60606. As recently as May 28, 2026, IMC served as a market maker for sports bets placed on the exchange operated by Polymarket US, building dedicated trading desks for that market. On information and belief, IMC also serves as a market maker for sports bets offered by the other Exchange Defendants. On information and belief, in the last year, South Carolina residents have periodically lost over $50 at a single time or sitting

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

to IMC through sports bets. On information and belief, no South Carolina residents have sued IMC to recover these losses.

50. **Defendant Jump Trading LLC ("Jump Trading")** is a Delaware limited liability company headquartered at 600 West Chicago Ave., Suite 600, Chicago, IL 60654. Jump Trading serves as a market maker for sports bets placed on the exchange operated by Polymarket US. Indeed, Jump Trading agreed to provide market-making services in exchange for a stake in Polymarket's business. On information and belief, Jump Trading also serves as a market maker for sports bets offered by the other Exchange Defendants. On information and belief, in the last year, South Carolina residents have periodically lost over $50 at a single time or sitting to Jump Trading through sports bets. On information and belief, no South Carolina residents have sued Jump Trading to recover these losses.

51. **Defendant Galaxy Digital Trading, LLC ("Galaxy")** is a Delaware limited liability company headquartered at 300 Vesey Street, 13th Floor, New York, NY 10282. On information and belief, Galaxy serves as a market maker for sports bets placed on the exchange operated by Polymarket US. On information and belief, Galaxy also serves as a market maker for sports bets offered by the other Exchange Defendants. On information and belief, in the last year, South Carolina residents have periodically lost over $50 at a single time or sitting to Galaxy through sports bets. On information and belief, no South Carolina residents have sued Galaxy to recover these losses.

52. **Defendant Virtu Financial Inc. ("Virtu**") is a Delaware corporation headquartered at 1633 Broadway, 41st Floor, New York, NY 10019. Virtu serves as a market maker for sports bets placed on the exchange operated by CME. On information and belief, Virtu also serves as a market maker for sports bets offered by the other Exchange Defendants. On

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

information and belief, in the last year, South Carolina residents have periodically lost over $50 at a single time or sitting to Virtu through sports bets. On information and belief, no South Carolina residents have sued Virtu to recover these losses.

**JURISDICTION AND VENUE**

53. This case arises under S.C. Code Ann. § 32-1-20.

54. This Court has jurisdiction over the subject matter of this case pursuant to S.C. Const. art. V, §11 and the common and statutory laws of the State of South Carolina.

55. Plaintiff is a citizen and resident of Charleston County, South Carolina. His claims arise out of, relate to, and have a substantial connection with business purposefully transacted by Defendants in South Carolina; statutory torts committed by Defendants in South Carolina; and/or contracts entered into by Defendants with South Carolina residents.

56. Venue is proper pursuant to S.C. Code Ann. § 15-7-20 because the recovery sought is provided for by statute. In addition, venue in the Charleston Court of Common Pleas is proper pursuant to S.C. Code Ann. § 15-7-30 because this is a civil matter and Plaintiff is a resident of Charleston County. Additionally, on information and belief, venue is proper pursuant to S.C. Code Ann. § 15-7-30 because certain of the sports bets at issue were made by residents of Charleston County within Charleston County.

57. This Court has personal jurisdiction over the Defendants pursuant to S.C. Code Ann. § 36-2-803(A)(1)-(3), (7), (8). Courts interpreting this statute have held that the statute is "coextensive with the due process clause" such that its application hinges on "whether the exercise of personal jurisdiction would violate due process." *Cockrell v. Hillerich & Bradsby Co.*, 363 S.C. 485, 491, 611 S.E.2d 505, 508 (2005) (citations omitted). Due process requires (1) "sufficient minimum contacts with the forum state" such that a defendant "could reasonably anticipate being

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

haled into court there" and (2) "exercise of jurisdiction is reasonable or fair." *Id.* at 491-92, 611 S.E.2d at 508 (citations and quotations omitted).

58. DraftKings conducts continuous activity in South Carolina in various forms: (1) by soliciting South Carolinians to participate in its exchange by offering "bonuses" to new users of the platform; (2) by offering sports bets to state residents through its exchange; and (3) by acting as a market maker counterparty to sports bets on its exchange as well as those of other Exchange Defendants. Because DraftKings transacts substantial business in the State, has purposefully directed its activities at residents of the State, and has purposefully availed itself of the benefits of the State's laws, South Carolina's long arm statute authorizes personal jurisdiction over each of the DraftKings Defendants. Additional allegations establishing the Court's jurisdiction over each of the DraftKings Defendants follow.

59. DraftKings Inc. is the parent corporation of the other DraftKings Defendants. As such, it oversees, conducts, and promotes the operations of those defendants, including their operations directed at and transpiring in South Carolina. For instance, DraftKings Inc. is responsible for advertisements specifically designed to induce South Carolinians to use DraftKings to engage in illegal sports bets. *See* Fig. 6 (claiming that "All Markets including Sports" are "NOW LIVE" in South Carolina); Fig. 7 (claiming "New DraftKings customers will receive $200 Prediction Dollars after opting-in and making a trade for $5+"). As an additional example, DraftKings offered new users in South Carolina a reward promising they would "get $150" if they "spend $5" betting on baseball. *See* Fig 8. Yet another promotion extended to South Carolina residents promises a "20% trade match up to $50" on a player's "first trade from 12-7pm ET." *See* Fig. 9. All of the advertisements displayed in Figures 6-9 were presented to a smartphone

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

physically located in and using an IP address in South Carolina. DraftKings has transacted business within South Carolina for purposes of the long arm statute. S.C. Code Ann. § 36-2-803(A)(1).

60. In addition, DraftKings Inc. acts as a market maker counterparty to illegal sports bets placed by South Carolina residents. As such, DraftKings Inc. has entered into contracts to be performed in whole or in part in South Carolina, and has committed tortious acts in whole or in part in South Carolina, for purposes of the long arm statute. *Id.* § 803(A)(3), (7).

61. DraftKings Predictions is the DraftKings entity that acts as a broker. It allows South Carolinians to create accounts on the DraftKings app or website in order to place sports bets. *See* Fig. 1. Notably, DraftKings Predictions' platform defaults to presenting users with a variety of sports bets, including Major League Baseball, NBA, NHL, College Football, and more. In fact, of the 17 categories of markets in which users can place wagers, the 11 listed first are types of sports. *Id*. By brokering illegal sports bets, DraftKings Predictions has transacted business in South Carolina and committed tortious acts in whole or in part in South Carolina for purposes of the long arm statute. *Id*. § 803(A)(1), (3).

62. DkeX is the DraftKings entity that runs its exchange. By creating a market in which South Carolinians can, and do, place illegal sports bets, DkeX has transacted business in South Carolina, and committed tortious acts in whole or in part in the state, for purposes of the long arm statute. *Id.*

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

**Figure 6: DraftKings Map Advertisement Shown to South Carolina Users**




**Figure 7: Deposit Bonus Offered to South Carolina Users**




**Figure 8: Spend $5 Get $150 Bonus to South Carolina Users**




**Figure 9: 20% Trade Match Bonus to South Carolina Users**



ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

63. Polymarket conducts continuous activity in South Carolina in various forms: (1) by soliciting South Carolinians to participate in its exchange by offering "bonuses" to new users of their platform; (2) by offering sports bets to state residents through its exchange; (3) by becoming a party to those contracts via clearing; and (4) by acting as a market maker counterparty to sports bets on its exchange as well as those of other Exchange Defendants. Because Polymarket transacts substantial business in the State, has purposefully directed its activities at residents of the State, and has purposefully availed itself of the benefits of the State's laws, South Carolina's long arm statute authorizes personal jurisdiction over each of the Polymarket Defendants. Additional allegations establishing the Court's jurisdiction over each of the Polymarket Defendants follow.

64. Blockratize is the parent corporation of the other Polymarket Defendants. As such, it oversees, conducts, and promotes the operations of those defendants, including their operations directed at and transpiring in South Carolina. For instance, Blockratize is responsible for advertisements specifically designed to induce South Carolinians to use Polymarket to engage in illegal sports bets. *See* Fig. 10 (claiming that Polymarket is "Legal in all 50 states" other than Nevada); Fig. 11 (inviting South Carolinians to "Livetrade every game"). Blockratize also offered new users in South Carolina a "$50 sign-up bonus on their first $20 deposit" ahead of the NHL Eastern Conference Finals between the Carolina Hurricanes and Montreal Canadiens. *See* Fig. 12. Similar "deposit bonus" promotions are extended to South Carolinians today. *See* Fig. 13. All of the ads displayed in Figures 10-13 were presented to a smartphone physically located in and using an IP address in South Carolina. Blockratize has transacted business within South Carolina for purposes of the long arm statute. S.C. Code Ann. § 36-2-803(A)(1).

65. In addition, Blockratize acts as a market maker counterparty to illegal sports bets placed by South Carolinians. As such, Blockratize has entered into a contract to be performed in whole or in part in South Carolina, and has committed tortious acts in whole or in part in South Carolina, for purposes of the long arm statute. *Id*. § 803(A)(3), (7).

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

**Figure 10: Polymarket Advertisement**




**Figure 11: Polymarket Advertisement**




**Figure 12: Deposit Bonus Offered to South Carolina Users**

$50 Polymarket invite code "CUSE" upgraded in NC, SC for Hurricanes, Knights NHL Finals Game 6

Published: Jun. 14, 2026, 9:45 a.m.




Updated Polymarket Invite Code delivers a $50 bonus for sports betting odds in July, 2026. Polymarket.

A new Polymarket code is active ahead of one of the biggest sports days of the week. The **Polymarket code CUSE** is a verified registration code that unlocks a $50 trading bonus for new users who deposit $20 on sign-up — giving them $70 in total starting funds to trade Polymarket's NHL and MLB prediction markets before Sunday, June 7th gets underway.

**Figure 13: Deposit Bonus Offered to South Carolina Users**



ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

66. QCL is the Polymarket entity that acts as a broker. It allows South Carolinians to create accounts on the Polymarket app in order to place sports bets. Notably, the Polymarket app defaults to presenting users with a variety of sports bets, including "live" sporting events. *See* Fig. 5. By brokering illegal sports bets, QCL has transacted business in South Carolina and committed tortious acts in whole or in part in South Carolina for purposes of the long arm statute. S.C. Code Ann. § 36-2-803(A)(1), (3).

67. Polymarket US is the Polymarket entity that runs its exchange. By creating a market in which South Carolinians can, and do, place illegal sports bets, Polymarket US has transacted business in South Carolina, and committed tortious acts in whole or in part in the state, for purposes of the long arm statute. *Id.*

68. QC Clearing LLC is the Polymarket entity that operates its clearinghouse. By serving as the contractual counterparty to South Carolina residents who have placed illegal sports bets, QC Clearing LLC has transacted business in the state, entered into contracts to be performed in whole or in part in the state, committed tortious acts in whole or in part in the state, and distributed goods (any monies earned through illegal wagers) in the state, for purposes of the long arm statute. *Id.* § 803(A)(1), (3), (7), (8).

69. CME and Crypto.com both act as exchanges for sports bets brokered by DraftKings Predictions and entered into by South Carolina residents. By creating a market in which South Carolinians can, and do, place illegal sports bets through DraftKings Predictions, CME and Crypto.com have transacted business in South Carolina and have committed tortious acts in whole or in part in the state for purposes of the long arm statute. *Id.* § 803(A)(1), (3).

70. CME and Crypto.com both also operate clearinghouses. By serving as the contractual counterparty to South Carolina residents who have placed illegal sports bets, they have

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

transacted business in the state, entered into contracts to be performed in whole or in part in the state, committed tortious acts in whole or in part in the state, and distributed goods (any monies earned through illegal wagers) in the state, for purposes of the long arm statute. *Id.* § 803(A)(1), (3), (7), (8).

71. Bitnomial Clearinghouse, LLC operates a clearinghouse, through which it serves as the contractual counterparty to South Carolina residents who have placed sports bets on DkeX. By doing so, Bitnomial Clearinghouse, LLC has transacted substantial business in the state, entered into contracts to be performed in whole or in part in the state, committed tortious acts in whole or in part in the state, and distributed goods (any monies earned through illegal wagers) in the state, for purposes of the long arm statute. *Id.*

72. Finally, the Market Maker Defendants transact substantial business in the State, have purposefully directed their activities at residents of the State, and have purposefully availed themselves of the benefits of the State's laws. By acting as contractual counterparties to illegal sports bets with South Carolina residents, on the exchanges operated by the Exchange Defendants, they have entered into contracts to be performed in whole or in part in South Carolina, have transacted business in South Carolina, and have committed tortious acts in whole or in part in South Carolina, for purposes of the long arm statute. *Id.* § 803(A)(1), (3), (8).

73. In short, all of the Defendants intentionally act to solicit business from and/or transact business with South Carolina residents to effectuate sports bets in violation of state law, including S.C. Code Ann. §§ 16-19-40, 50, and 130. In doing so, Defendants have unlawfully entered into contracts with, played with, and won sums greater than $50 in a single sitting from South Carolina residents in the last year. The state has a vested interest in exercising jurisdiction

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

over Defendants, not only to protect its citizens but also to maintain its near century-long prohibition on sports betting.

## STATEMENT OF THE FACTS

### I. IN SOUTH CAROLINA, PRIVATE PARTIES CAN SUE OVER ILLEGAL GAMBLING

74. While the specific conduct giving rise to this lawsuit is recent, the cause of action is not. It traces its roots to the twilight of the House of Stuart, when Queen Anne adopted what would become known as the Statute of Anne of 1710. That law had two main elements. The first declared a wide range of gambling transactions void (in effect, freeing the losing party from any obligation to pay the winner). The second created causes of action to claw back gambling gains. Those who lost at least "the Sum or Value of ten Pounds" could sue the winner to recover the amount they lost, along "with Costs of Suit." Should the losing party fail to initiate that recovery suit within three months without just cause, "any other person" could bring a suit against the winning party for treble damages, with half going to the person suing and "the other Moiety to the use of the Poor of the Parish." Resembling the modern qui tam action, this last provision deputized the public to serve as private Attorneys General. It also offered a financial incentive to investigate and pursue claims against gambling winners.[1]

75. It did not take long for the Statute of Anne to cross the Atlantic and seed itself in the laws of many British Colonies.[2] In 1712, South Carolina adopted its own version of the Statute

[1] The Statute of Anne as originally codified can be viewed here: https://code.dccouncil.gov/uk/parliament/docs/9-Anne-ch14.pdf.

[2] South Carolina's English common law heritage continues to this day with the General Assembly providing that: "All, and every part, of the common law of England, where it is not altered by the Code or inconsistent with the Constitution or laws of this State, is hereby continued in full force and effect in the same manner as before the adoption of this section." S.C. Code Ann. § 14-1-50.

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

of Anne, nearly identical to the British version.[3] That version has "changed very little since"—save for occasional updates to the monetary threshold for claims. *Proctor v. Whitlark & Whitlark, Inc.*, 414 S.C. 318, 327, 778 S.E.2d 888, 893 (2015) (quoting *Justice v. The Pantry*, 335 S.C. 572, 577 n. 2, 518 S.E.2d 40, 43 n. 2 (1999)).

76. Today, South Carolina's Statute of Anne provides that if any person, at "any time or sitting," loses more than the "value of fifty dollars" either by playing "any . . . game whatsoever or by betting on the sides" of those who play games, that person may sue within three months to "recover the money or goods" plus the "costs of suit." S.C. Code Ann. § 32-1-10. Should those three months expire, a separate provision states that "any other person" may "sue for and recover the same and treble the value" of that gambler's losses, plus the "costs of suit, against such winner or winners," with "the one moiety" going to "the person that will sue" and "the other moiety" going to "the county in which the offense shall have been committed." *Id*. § 32-1-20.

77. While the purpose of Section 32-1-10 is to "protect a citizen and his family from the gambler's uncontrollable impulses," *Berkebile v. Outen*, 311 S.C. 50, 55, 426 S.E.2d 760, 763 (1993), the purpose of Section 32-1-20 is to "punish excessive gaming." *Trumbo v. Finley*, 18 S.C. 305, 310 (1882); *see also* Statutes at Large, Appendix to the English Statutes Made of Force (purpose of law is "further preventing of all excessive and deceitful gaming").

78. Despite its colonial provenance, the Statute of Anne has remained relevant in the Internet era. In 2000, the General Assembly extended the State's gambling ban to video gambling and clarified the scope of damages recoverable by a plaintiff suing under the statute. *See generally*

---

[3] Statutes at Large, Appendix to the English Statutes Made of Force (1712) (with Anno Nono Anne c. VII (Chap. 1, 7 of Statutes of Queen Anne, Ninth Year) (1711)), *available at* https://www.carolana.com/SC/eBooks/The_Statutes_at_Large_of_South_Carolina_Volume_II_Thomas_Cooper_1837.pdf.

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

*Proctor*, 414 S.C. at 328, 778 S.E.2d at 893. Notably, this amendment did not limit the Statute of Anne's reach. Indeed, "the Legislature purposefully retained sections 32-1-10 and 32-1-20," confirming that it "clearly intended for gamblers or third parties to recover losses sustained by illegal . . . gambling." *Id.* (emphasis added).

## II. SPORTS BETTING IS ILLEGAL GAMBLING

79. South Carolina's Statute of Anne applies equally to legal and illegal gambling. *Berkebile*, 311 S.C. at 55 ("In reading § 32-1-10, it is clear that no requirement for an illegal game exists as an element for recovery of a fifty dollar or greater gambling debt."). Nonetheless, it bears noting that Defendants' conduct is flatly illegal under South Carolina law.

80. In South Carolina, not much gambling is "authorized by law." The State permits some social games of cards, tiles, or dice to be played in a "club or other social organization," but only if they do not involve any "mechanical or electronic devices," involve no "betting, wagering, or gambling of any kind," and result in no person "receiv[ing] any direct or indirect economic, financial, or monetary benefit of any kind." *Id.* § 16-19-60. That is all the State tolerates.

81. The State prohibits setting up lotteries (other than the lottery it owns and operates following voters approving it in a 2000 referendum), *id.* § 10, betting on games, *id.* § 16-19-40, and "keeping" (*i.e.*, operating) gaming tables, *id.* § 16-19-50.

82. The State also prohibits nearly all betting, pool selling, and bookmaking. *Id.* § 16-19-130. It states that any person "shall be guilty of a misdemeanor" who "[r]ecords or registers bets or wagers … upon the result of any … trial or contest of skill, speed or power of endurance of man or beast," "lot, chance, casualty," or any other "unknown or contingent event whatsoever." *Id.* § 16-19-130(3). It also criminalizes the receiving, registering, recording, or forwarding of "any money, thing[,] or consideration of value bet or wagered[,] or offered for the purpose of being bet

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

or wagered[,] by or for any other person”—or the selling of “pools upon any such result.” *Id.* § 16-19-130(4). Finally, it prohibits “aid[ing], assist[ing] or abet[ting] in any manner in any of the aforesaid acts.” *Id.* § 16-19-130(6).

83. Defendants in this case openly flout the State’s restrictions, by encouraging, facilitating, and permitting South Carolina residents to wager on sports and other types of non-financial “events.” Defendants individually and collectively “receive, register, record, or forward” money from users for betting and “sell[] pools” on such outcomes. Likewise, they “aid[], assist[], and abet[]” one another in making and offering illegal gambling markets to the State’s residents. Since there is no substantive difference between event contracts on sports and bets offered by sportsbooks, Defendants’ conduct is patently illegal in South Carolina.

84. Defendants’ conduct is fueling a well-documented epidemic of gambling addiction. Some commentators have already noted that prediction markets like Polymarket and DraftKings “blur the already hazy line between betting and other financial activities,” as “the ability to place one bet after another” on those platforms “encourages a hallmark behavior of problem gamblers—when deep in the red, instead of walking away, they bet bigger.” One analysis found that, of 57 analyzed risk factors, the single strongest predictor of gambling related harm was gambling online.

85. Problem gambling is especially prevalent among young sports bettors. According to one industry study, roughly 58% of 18- to 22-year-olds gamble on sports each year. Of those, nearly 10% gamble on sports each week and 4% do so daily. While sports gambling can begin as early as age 10, some studies have found that between 4% to 8% of Americans suffer from problem gambling.

86. But problem gambling is just one of the harms caused by Defendants’ illegal conduct. Even bettors who do not struggle with problem gambling face serious financial

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

ramifications from placing bets in a system that is fundamentally rigged against them. When online sports betting arrives in a state, household savings, credit scores, and investment rates go down; debt and bankruptcy go up. Horrifyingly, intimate partner violence following an upset loss by the home team is nearly ten percent more prevalent in states with sports betting than without. It is precisely these risks to the stability and wellbeing of the community that South Carolina's Statute of Anne is intended to combat, by ensuring that bookmaking crime does not pay.

## III. DEFENDANTS FACILITATE SPORTS BETTING

87. The two platforms at issue in this lawsuit, DraftKings and Polymarket, share roughly the same structure. Each offers a user interface through which gamblers can place sports bets. These are the apps (and, in the case of DraftKings, a website as well) run by the Broker Defendants. Brokers facilitate the entry of orders, just like retail betting shops phoning in orders to sportsbooks. They do not handle customer funds.

88. The Exchange Defendants are the entities that specify the terms of the bets that brokers make available. They specify the subject of each "contract," establish how the winner will be determined, codify how disputes will be resolved, and provide price information to the parties. Once a bet is placed, the Exchange Defendants establish the actual contract between bettors. In addition, the Exchange Defendants enforce rules regarding who can participate in the market, surveil trades for violations of exchange rules, determine who is eligible to be a market maker, and use their own funds to provide trading incentives.

89. Finally, after the bets are executed, one of the Clearinghouse Defendants steps in to handle the mechanics of settling up—the storing and transferring of customer funds. As soon as a bet is placed, it goes to a clearinghouse for a process called novation. Through novation, the contract between the maker and taker of the bet is dissolved and each side seamlessly enters into

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

a new contract with the clearinghouse. The clearinghouse becomes the contractual counterparty to each bettor and assumes all the rights that each party had, with the maker and taker no longer bearing any obligations to one another. Hence, the clearinghouse (not the maker or taker) is owed money by the loser. In short, the clearinghouse serves as the ultimate legal counterparty to every bet, collecting losses from the losers and paying the winners.

**A. Polymarket**

90. Polymarket was founded in 2020 as a platform for betting on world events. It has been banned in more than a dozen countries as nothing more than illegal gambling by another name.

91. When Polymarket was founded, it was a single entity available both in the U.S. and overseas. Less than two years later, following an investigation by the CFTC for operating an illegal options exchange, it shut down U.S. operations and relocated to Panama.

92. Or so it appeared. While Americans were technically banned from placing bets on the newly-minted "Polymarket Global," the reality was very different. Americans could (and still can) easily access Polymarket Global by using a VPN. One analysis of trading data found that Americans likely account for about a third of Polymarket Global's trading volume. On information and belief, for sports specifically, approximately half of all trading volume comes from the U.S.

93. Just like Americans didn't stay away from Polymarket, Polymarket didn't stay away from America. Employees report that although Polymarket Global is incorporated in Panama, many employees work from the United States and there is no practical division between Polymarket US and Polymarket Global. At the end of 2025, Polymarket resurrected its (official) business in the United States, launching the Polymarket US app.

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

94. Polymarket US describes itself as a finance app, but—like its international counterpart—its core business is sports betting. *See* Figs. 4-5. As of July 2026, the economy category of Polymarket US had just 43 bets, more than half of which related to Elon Musk or his companies. Conversely, there are 28 separate sports-related "markets," each with multiple bets available. These range from who will win the US Open to who will win the next Setka match.[4]

95. Through the Polymarket US app, QCL brokers sports bets that are executed on the Polymarket US exchange and cleared via Polymarket Clearing. As the broker, QCL offers takers a variety of bets on sports outcomes. As the exchange, Polymarket US matches makers with takers, executes the contracts, and pockets a fee for each transaction. As the clearinghouse, Polymarket Clearing novates the contracts and assumes the position of the bettors.

96. Polymarket US's involvement is not limited to executing transactions and pocketing the fees. Polymarket US also actively recruits and rewards bettors. For one program, users who deposit $20 into their wallet for the platform will receive $50. But there's a catch: The $50 is actually a credit that can only be redeemed if you both use it to place a bet and win the bet. And just like that, what was perhaps meant to be a single casual bet when out with friends has turned into a much larger bet or series of bets. An example of this program that specifically targets South Carolinians—particularly those who are fans of the Carolina Hurricanes—is shown at Figure 12.

[4] If you are not seriously addicted to sports betting, you have probably never heard of Setka. Setka is an Eastern European ping pong league run by a company called, appropriately, Beter. Beter describes Setka as "table tennis content designed to maximise sportsbooks' revenues and increase bettors' engagement." Apart from providing some exercise for the players, the sole purpose of Setka is generating a 24/7 stream of games to bet on. Setka has no fans. Setka has no spectators. The matches can only be watched on YouTube and are typically viewed by well under 100 people. It's as close as you can get to flipping a coin while still having the bare minimum aesthetic trappings of a sport. And every single day, a Polymarket US user can place over 100 bets on Setka games.

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

97. This program targets new users. But high-volume takers, those who are routinely betting large amounts of money, get rewards of their own, with Polymarket promising that the more you bet "the more you earn." For example, Polymarket US offered a $100,000 pool of rewards to large volume takers for each NBA Playoff game.

98. What these programs boil down to is this: Polymarket does not just passively host sports betting, it pays bettors to gamble. It does not just provide infrastructure for markets, it creates those markets.

**B. DraftKings**

99. DraftKings was founded in 2012 as a fantasy sports app. Since then, it has grown into a goliath of online sports betting, commanding approximately a third of that market. However, its growth was necessarily limited by the fact that not all states permit online sports betting. Even states that do permit online sports betting usually limit it to people over the age of 21, require a host of addiction prevention measures, and heavily tax gambling revenue.

100. As discussed in more detail below, "prediction markets" like Polymarket claim to be exempt from state gambling laws and offer their products in all fifty states without such nasty annoyances as state and local taxes or real time monitoring of risky behavior. DraftKings saw their competitors' prediction markets take off while their own stock was falling. DraftKings wanted their cut.

101. So, in late 2025, DraftKings launched its own prediction market app, DraftKings Predictions. As soon as DraftKings Predictions launched, DraftKings began running ads proclaiming that DraftKings was "now live in all 50 states!" *See* Fig. 14. In states where online sports betting was legal, sports bets could only be placed through DraftKings' conventional online

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

sportsbook. But in states that did not have legal online gambling, like South Carolina, customers could place sports "predictions."

**Figure 14: DraftKings Advertisement**




102. As the post announcing the launch of DraftKings Predictions explained, DraftKings is a "digital sports entertainment and gaming company created to be the Ultimate Host and fuel the competitive spirit of sports fans," and the goal of DraftKings Predictions was to use that experience to run a product that "moves at the speed of sports." At launch, some finance markets were also available alongside sports markets. But sports was clearly favored, with a special trading

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

bonus just for users in states—including South Carolina—where sports predictions were available. There was no such promotion for financial market focused trades.

103. Sports has continued to drive DraftKings Predictions' business. The app store description for the DraftKings Predictions app promises that it is "built for sports fans" with a "sports focus." DraftKings Predictions is also available through the general DraftKings app, DraftKings: Sports & Casino. The app store description for DraftKings: Sports & Casino likewise trumpets that it's "Live in All 50 States" and users should "[g]et in on the action" because "[t]he court's hot." Unsurprisingly, given this sports focus, DraftKings has cited the 2026 FIFA World Cup as a "key demand driver," with a single week during the competition generating more than $11 billion in annualized volume.

104. To actually execute bets, DraftKings Predictions funnels users to several different exchanges: CME, Crypto.com, and DkeX. All three partnerships emphasize sporting event contracts.

105. DraftKings' first foray into prediction markets began in mid- to late-2025 through a partnership with its initial exchange partner, CME. Although CME historically has focused on prediction markets relating to commodities futures, it rapidly expanded its sports offerings to accommodate DraftKings' burgeoning predictions business. Then, in early 2026, DraftKings partnered with Crypto.com, a move specifically intended to increase the range of sports prediction markets it could offer to would-be bettors.

106. Most recently, in June 2026, DraftKings launched its own exchange through DkeX. Unlike the more traditional exchanges operated by CME and Crypto.com, DkeX's exchange is almost entirely focused on offering sports bets. In fact, the first batches of contracts certified by

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

DkeX were all sports related. Today, nearly all of the "trades" on DkeX are sports related and nearly 70% of those bets were placed in states where gambling is illegal.

107. On information and belief, CME, Crypto.com and DkeX all collect fees from bettors placing bets through DraftKings Predictions, with the fee increasing as the size of the bet increases. DraftKings Predictions also collects a transaction fee for acting as the broker. Additional fees are taken by the clearinghouses utilized to clear the sports bets placed through DraftKings Predictions, which are CME, Crypto.com, and Bitnomial Clearinghouse, LLC.

108. To draw in users, DraftKings Predictions offers several incentives. For example, users who refer friends can get $25 for each friend who signs up and deposits money. Like Polymarket's promotions, this money can only be redeemed if it is first used to place bets. Other promos reward the act of placing bets. A July 2026 promo promised users $200 if they bet $5. But not only can the $200 reward only be redeemed through betting, only the first $50 is issued immediately. The rest is issued in weekly increments over the next few weeks—another way to turn one bet into a habit.

## IV. WHILE SOUTH CAROLINIANS LOSE, DEFENDANTS WIN BIG

109. Sports bets on Polymarket and DraftKings are framed as questions about future events. For example, bets may be offered about the following question: "Will the Gamecocks win the next College Football Playoff?" Users can either bet "Yes" or bet "No," at a variable price ranging from $0.01 to $0.99. The price reflects the odds. Taking a $0.60 contract for "Yes" is equivalent to taking 60% odds that the Gamecocks will win.[5]

---

[5] Traditional American sportsbooks express odds in terms of a "moneyline" rather than a percentage. These are economically equivalent and, indeed, one can be converted to the other through a fixed formula.

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

110. Let's suppose a user is offered the chance to bet "Yes" for $0.60 and then does so. In this example, the user is the taker of the bet. The maker of the bet is the counterparty—who, necessarily, will have $0.40 on "No." The two sides to every bet must add up to $1.00 in order for the contract to be executed.

111. As reflected in the term "taking a bet," every bet involves a maker and a taker. The guy standing outside a racetrack quoting odds is a maker—he is making open offers of bets at certain prices. The takers are the spectators who hear the odds, like their chances, and agree to wager. Makers make the offer, takers take it. The same is true for online prediction markets. Makers' constant stream of offers is what lets users (takers) come to a prediction market and immediately place a bet on virtually any contest they want. Market makers in the prediction market context are typically large institutions, while market takers are typically individual retail bettors.

112. Returning to the bet on the Gamecocks' championship prospects, users will see offers to take either the "Yes" side of the bet *and* offers to take the "No" side of the same bet. Importantly, those offers are independent from each other. So someone who takes "Yes" and someone who takes "No" are not betting against each other. Instead, each user is usually betting against a market maker.

113. As a result, while it may feel intuitive for the prices of the "Yes" and "No" bets to be perfect inverses of each other, that is not always the case. In our example, a "Yes" bet might be offered to users for $0.60 (in which case the market maker to that bet would have $0.40 on "No," behind the scenes). However, a "No" bet might be offered to users for $0.42 (in which case the market maker would have $0.58 on "Yes," again behind the scenes).

114. At some point, the question at the heart of the bet will be answered—the College Football Playoff will happen, and the Gamecocks will either win or lose. If "Yes" wins, then the

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

taker to that bet will receive $1—their initial $0.60 bet plus the $0.40 that the maker put up. If "No" wins, then the taker to that bet will receive $1—their initial $0.42 bet plus the maker's $0.58.

115. Needless to say, users of the Polymarket and DraftKings platforms rarely wager less than a dollar on a given bet. So what happens if a taker bets a larger amount—say, $15 on the $0.60 "Yes" contract? In this example, the taker may feel like she is putting $15 down at 60% odds. Economically and practically speaking, that is precisely what's happening. But mechanically speaking (and regardless of whether the taker realizes it or not) she is actually buying 25 of the $0.60 contracts ($15 / $0.60 = 25). If the Gamecocks win, the taker receives the value of the contracts she purchased—$25 ($1 for each of the 25 contracts). That is, the taker wins back her $15 plus a profit from what the maker put up ($0.40 x 25 contracts = $10). If the Gamecocks lose, then of course the taker is just out the $15 she put up to buy the 25 contracts.

116. This may sound straightforward enough, but there is an important wrinkle—the fees charged by the Broker, Exchange, and Clearinghouse Defendants. Because of these fees, if a user wants to purchase 25 of these hypothetical contracts (that is, if the user actually wants to bet $15), she will have to put up *more* than $15.

117. Although prediction markets term these costs "transaction fees," they are functionally identical to the "rake," "vig," "cut"," or "juice" charged by traditional sportsbooks. Both are mechanisms through which the house collects its share of the winnings. Both equate to a percentage of the bets placed, with larger bets resulting in larger fees. Both tilt the odds even further away from consumers, requiring them to be net positive in order to recover what they've spent, not just break even in their trading. In practice, this often means someone who wins 50% of their bets will end up with less money than they had when they started; but the brokers, exchanges, and clearinghouses will have more.

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

118. Polymarket does its best to conceal its rake, but it becomes apparent once you carefully check the math. Let's imagine a user wants to bet $5 that the Mariners will beat the Rangers, with 55% odds. As noted, the odds are the price of the contract, meaning each contract will cost $0.55. It would therefore be reasonable to assume that putting up $5 would buy 9.09 of these contracts (since $5 ÷ $0.55 = 9.09). It would further be reasonable to assume that, should the Rockies win, a $5 bet would yield $9.09 in winnings (that is, $1 for each of the 9.09 contracts).

119. This is not what happens on Polymarket. Instead, when a user tries to place that $5 bet, Polymarket says it will yield $8.77 in winnings. Why? Hitting the tiny "i" symbol next to the projected payout provides some clues (though not a transparent explanation). *See* Fig. 15.

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

**igure 15: Polymarket Predictions Odds Explanation**




Examine this closely. The user put down $5, but for that money receives only 8.77 contracts—*not* 9.09 contracts. Because the odds are 55%, we know that each contract costs $0.55. That allows us to calculate the total value of these contracts, which is $4.82 (= 8.77 x $0.55). This is shy of the $5 the user thought she was betting. Somewhere, $0.18 has gone missing. That $0.18 is the rake. In short, placing a $5 bet on Polymarket *actually* means placing a $4.82 bet and ceding the rest to some combination of the Broker, Exchange, and/or Clearinghouse Defendants.

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

120. Though the numbers are presented differently, the same logic applies over at DraftKings. Suppose the gambler puts down the same $5, this time picking the Rangers to win at 45% odds. This ought to buy her 11.11 worth of contracts ("shares" in DraftKings parlance), since 5 ÷ 0.45 =11.11. However, DraftKings Predictions says that the potential "payout" is only $10, not $11.11. Like Polymarket, it provides a tiny "i" symbol with some information. *See* Fig. 16.

**Figure 16: DraftKings Predictions Odds Explanation**



ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

As the screenshot illustrates, the user who wagers $5 receives only 10 shares, not 11.11. We know the total value of these 10 contracts is $4.50 (= 10 x $0.45). Once again, this is shy of the $5 the user thought they were betting. The missing $0.50 appears to be going to "$0.20 in fees" and $0.30 that is "not charged" (presumably because DraftKings (unlike Polymarket) does not allow the purchase of fractional contracts). In short, placing a $5 bet on DraftKings *actually* means placing a $4.50 bet and ceding $0.20 to some combination of the Broker, Exchange, and/or Clearing Defendants.

121. Upon information and belief, the "transaction fee" charged to South Carolinians by DraftKings is distributed among the parent company owner (DraftKings Inc.) and its Broker, Exchange, and Clearinghouse Defendant partners. Likewise, the "transaction fee" charged to South Carolina gamblers by Polymarket is distributed among the parent company that owns that platform (Blockratize Inc.), and the Broker, Exchange, and Clearinghouse Defendants that it does business with. This way of making money is as old-school as a backroom card game. Blockratize Inc., DraftKings Inc., and the Broker, Exchange, and Clearinghouse Defendants take a rake for every bet placed. By operating illegal prediction markets in South Carolina, and directly profiting from each illegal sports bet made by South Carolina residents, these Defendants are gambling "winners" for purposes of the State's Statute of Anne.

122. There are two other groups of gambling winners. The Clearinghouse Defendants that clear bets placed through the Broker and Exchange Defendants are also "winners" in another way. Every loss a State resident sustains on an illegal prediction market is ultimately a win by one of the Clearinghouse Defendants. That's because the Clearinghouse Defendants are the ultimate legal counterparties to all bets and collect and distribute State residents' losses.

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

123. The final group of "winners" under the Statute of Anne is the institutional market makers. For prediction markets to successfully offer event contracts, they need sufficient liquidity. If you want to bet a Blenheim Ginger Ale on the Gamecocks winning their next game, you need to find a friend willing to bet they'll lose the next game. The same is true of bets placed through prediction markets. For an ordinary user to place a bet, there needs to be someone to take the other side.

124. In the story spun by Polymarket and DraftKings, the other side is being taken by another user just like you, no shadowy house or faceless corporation to take you for a sucker. Polymarket claims to "empower you to trade based on your own knowledge and research, without going up against a 'house' with potentially unfair advantages."

125. That's the advertising. In reality, if bettors could take a peek at the other side of their wagers, they would not see a peer, or even a person at all. Instead, the other side of consumer bets is often a sophisticated, large-scale market participant—an institutional "market maker." To quote Polymarket's website, "market makers are essential to [the prediction market] ecosystem," because they "provide liquidity across markets, tighten spreads for better user experience, enable price discovery through continuous quoting, and absorb trading flow from retail and institutional users."

126. Market makers, including the Market Maker Defendants, differ significantly from ordinary users of the prediction markets. Makers set the odds, use well-resourced teams to guide their betting strategy, and benefit from a wide array of incentives and perks from prediction markets who want their business. For consumers who use these markets it's like going to a pickup basketball game at the park and finding yourself facing off against the New York Knicks. Of course, for the market makers, this inequity is precisely what makes prediction markets attractive.

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

As one professional bettor recently observed, "[w]e all want to be on the other side of the public; that's the dream. Being a market maker is highly attractive."

127. Here's how the Market Maker Defendants make money. Market makers act as always-willing counterparties, continuously offering to both buy and sell in order to meet the demands of customers. This allows them to pocket the difference in prices they set between the two sides of a bet, known as the bid-ask spread.

128. Return to the Gamecocks example. Under our hypothetical, a prediction market offers takers a $0.60 contract that the Gamecocks will win the next College Football Playoff ("Yes") and a $0.42 contract that they will lose ("No"). This means a market maker stands ready to "make" the other side of these bets. For the taker of a $0.60 "Yes" contract, the maker will buy the "No" side of the contract at $0.40. And for the taker of a $0.42 "No" contract, the maker will buy the "Yes" side of the contract at $0.58.

129. Clearly, both outcomes cannot resolve in the maker's favor. So, assuming the market has equal exposure on both sides of the bet, it might seem logical that the maker just breaks even. But this is not the case.

130. Assume for simplicity that the maker has offered and found a taker for just one "Yes" contract and one "No" contract. The maker will net a profit regardless of whether the Gamecocks win or lose:

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

| | **Contract:**<br>- $0.60 **Yes** (taker)<br>- $0.40 **No** (maker) | **Contract:**<br>- $0.42 **No** (taker)<br>- $0.58 **Yes** (maker) | **Maker's profits** |
|---|---|---|---|
| **Gamecocks win** | Maker loses $0.40 | Maker wins $1.00 | $0.02 (= $1.00 - $0.58 + $0.40) |
| **Gamecocks lose** | Maker wins $1.00 | Maker loses $0.58 | $0.02 (= $1.00 - $0.58 + $0.40) |

To spell this out a bit more: The maker will have purchased two contracts, one for $0.40 and one for $0.58 (so, $0.98 total). After the game ends, the maker will win $1.00 from one of those two contracts. Therefore, the maker will profit $0.02 regardless of how the Gamecocks fared.

131. Needless to say, while the profits in this example are modest, the returns scale proportionally with the maker's level of investment. Even still, many prediction market makers, particularly for sports, have not been willing to accept small but reliable profits. Instead, they rely on dedicated research teams, proprietary statistical models, and superior data and software to actively favor one side of the ledger, giving them an edge betting against consumers. This allows them to estimate future events with greater accuracy than any individual bettor could hope to match.

132. Market makers' advantages are even more pronounced for "parlay" or "combo" bets—*e.g.*, "the Gamecocks will win *and* their running back will score a touchdown *and* their quarterback will throw for over 200 passing yards." Parlay bets make up approximately a quarter of all sports bets and generate approximately half of all sportsbook revenue. Parlay bets even more strongly favor market makers over individuals, as takers are far more likely to lose them and they often have significantly wider bid-ask spreads than traditional bets.

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

133. Unsurprisingly, given that the odds are literally in their favor, empirical studies have found that market makers consistently outperform market takers on prediction markets. Gross profit margins for market making approach 95%. One study found that the top 0.1% of earners on a prediction market spent nearly fifty percent of their trading volume market making. By contrast, only about 3% of takers who participate in sports betting profit.

134. If the business model of the Market Maker Defendants looks familiar, it's because it's identical to that of "the house" in traditional sportsbooks. Just like traditional sportsbooks, Market Maker Defendants can secure risk-free profits by arbitraging the bid-ask spread. Just like traditional sportsbooks, market makers are large institutional investors with large teams, sophisticated models, and extensive resources. Just like traditional sportsbooks, Market Maker Defendants enjoy privileged status as a result of their contractual and technological integration with the platforms themselves. And just like traditional sportsbooks, Market Maker Defendants will sometimes risk their own capital by committing it to one side of the ledger, putting them in direct competition with individual gamblers.

135. Underscoring the essential nature of market makers are the many rewards and advantages exchanges offer them. Like the ability to set spreads, these perks greatly reduce market makers' financial exposure.

136. Polymarket US offers rewards for market makers. Some of the fees that Polymarket US collects are then given to makers as a rebate to compensate them for "maintain[ing] two-side markets." Polymarket US also offers additional cash rewards for providing liquidity for specific markets, almost all of which are sports-related. Its justification for these rewards is simple: "market makers are essential to Polymarket's ecosystem" because they "provide liquidity across markets,

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

tighten spreads for better user experience, enable price discovery through continuous quoting, and absorb trading flow from retail and institutional users."

137. Crypto.com offers market makers a superior interface, fee rebates, a VIP program offering lower fees, "crucial updates from the Crypto.com Research & Insights Team," "exclusive trading features," and—specifically for sports bets—a three-second head start over retail traders. CME offers volume incentives for event contracts, and a separate event contract incentive program specific to market makers. DkeX has an incentive program for market makers.

138. On information and belief, the State's residents have repeatedly placed sports wagers directly supported by the liquidity provided by the Market Maker Defendants. Additionally, many of those residents have lost over $50 at a single time or sitting on wagers where those Defendants' funds constituted a substantial portion of the funds on the opposite side of the ledger. Because the residents' funds flowed to these market makers, they are "winners" for purposes of the Statute of Anne. When the State's residents lose, it is almost always a market maker who wins. Plaintiff may therefore sue to recover the money they have taken from the State's residents.

139. Because all Defendants facilitate illegal gambling and because all Defendants are individually and collectively the "winners" of gambling competitions played by the State's residents, Plaintiff may sue for the losses Defendants have collected from the State's residents within the statute of limitations.

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

## V. THE LANGUAGE OF "EVENT CONTRACTS" AND "PREDICTION MARKETS" IS A FIG LEAF

140. Polymarket and DraftKings claim that their offerings are legal because they are "prediction markets," which allow for the purchase and sale of "sports event contracts."[6] They insist they do not offer sports bets, but instead "agreements, contracts, transactions, or swaps in excluded commodities" (commodities that do not have intrinsic cash value and that are not traded on a stock market) "that are based upon the occurrence, extent of an occurrence, or contingency," "other than a change in the price, rate, value, or levels of a commodity." 7 U.S.C. § 7a-2(c)(5)(C)(i).[7] In this telling, the Broker Defendants are "Introducing Brokers," *id.* § 1a(31); the Exchange Defendants are "Designated Contract Markets," *id.* § 7(d)(1); and the Clearinghouse Defendants are "Derivatives Clearing Organizations," *id.* § 1a(15).

141. Defendants take refuge in this legal arcana in the hope of convincing the public, the government, and the courts that they are in the business of high finance rather than street gambling. Like the magician stepping into a box and disappearing right in front of the audience's eyes, Defendants hope their rhetorical costuming will transform them from illegal gambling businesses into federally-regulated, and only federally-regulated, financial enterprises. But the magician always reappears at the end of the show. And the idea that sports event prediction contracts are a bona fide financial instrument is an illusion.

---

[6] To the extent Plaintiff refers to Defendants as prediction markets, or to the products they offer as event contracts, this is solely for the ease of the reader and should not be a misinterpreted as a concession that such nomenclature is appropriate, let alone legally salient.

[7] Plaintiff disputes that Defendants' "event contracts" are swaps; that they would be permissible under the Commodity Exchange Act even if they were swaps; and that the Commodity Exchange Act preempts state law.

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

142. From a user perspective, sportsbooks wagers and sports "event contracts" are nearly indistinguishable. That has been acknowledged by no less an authority than the CEO of DraftKings, who assured investors on a recent earnings call that the company was well positioned to grow its sports predictions business because "[s]ports predictions and Sportsbook serve the same customers in the same live moments and leverage a shared underlying infrastructure." Indeed, a growing number of gambling addicts are blocking themselves from sportsbooks only to relapse on prediction markets. In the words of a doctor running gambling treatment programs, sportsbooks and sports predictions are "like different doors into the same room. The label on the door may change, but once someone's inside, the experience can feel very familiar."

143. While the "sports events contracts" offered by Defendants are essentially the same as sportsbook wagers, they are fundamentally different from genuine financial derivatives contracts. Kalshi, a key competitor of DraftKings and Polymarket, has admitted as much. It explained to the D.C. Circuit in 2023 that "contracts relating to games – again, activities conducted for diversion or amusement – are unlikely to serve any 'commercial or hedging interest.'" Appellee's Br. at 45, *KalshiEX LLC v. CFTC*, No. 24-5205, 2024 WL 4802698, at *45 (D.C. Cir. Nov. 15, 2024)).

144. Indeed, there is little evidence that "event contracts" harness the wisdom of crowds to create informed financial markets, as Defendants' CEO's have breathlessly claimed.[8] Just three percent of users seem to be able to reliably make correct predictions. The other 97% of takers "suppl[y] most of the volume but little information," relying on luck and hope alone rather than any informed position and actually distorting prices away from the actual outcome.[9] The few who actually turn a profit on prediction markets do so not by correctly forecasting events but by acting as institutional market makers in a market that structurally favors them.

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

145. The zero-sum nature of prediction markets further sets them apart from actual financial markets. In financial markets, it is possible for the buyer, the seller, and the market maker to all come out ahead. The seller makes a return on their investment, the market maker profits from the spread, and the buyer has purchased stock that may yet increase in value and generate a profit for them. This is not the case with prediction markets. On prediction markets, market makers win because consumers lose. Every dollar of profit they make in the State is a dollar that a South Carolinian has lost.

146. Finally, *even if* Defendants' "sports prediction contracts" were financial instruments governed by the Commodities Exchange Act, that does *not* mean that statute preempts South Carolina gambling laws. Federal courts in the Sixth and Ninth Circuits have rejected Defendants' position on preemption. *Crypto*, 815 F. Supp. 3d 1169, 1185 (D. Nev. Oct. 14, 2025) ("The CEA's language and legislative history show that Congress . . . did *not* want gambling to take place on CFTC-designated exchanges.") (emphasis added); *see also KalshiEX, LLC v. Schuler*, 2026 WL 657004, at *9 (S.D. Ohio Mar. 9, 2026) (quoting Provisions Common to Registered Entities, 76 Fed. Reg. 44776-001, 44786 (July 27, 2011)). Indeed, the CFTC currently prohibits Designated Contract Markets from listing swaps based on excluded commodities that "involve[], relate[] to, or reference[] . . . gaming," or "an activity that is similar to" gaming. 17 C.F.R. § 40.11(a).

---

[8] *See, e.g.*, Anderson Cooper, *Meet Polymarket CEO Shayne Coplan, the college dropout turned billionaire behind the online betting platform*, CBS NEWS (Nov. 30, 2025), https://www.cbsnews.com/news/polymarket-ceo-shayne-coplan-online-betting-platform-60-minutes-transcript/ ("It's the most accurate thing we have as mankind right now, until someone else creates some sort of a super crystal ball.").

[9] Roberto G. Cram, et. al., *Prediction Market Accuracy: Crowd Wisdom or Informed Minority?* (Apr. 20, 2026), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=6617059.

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

## COUNT I

## (Claim under S.C. Code Ann. § 32-1-20)

147. Plaintiff hereby incorporates by reference Paragraphs 1 through 146.

148. Plaintiff brings this count against all Defendants under the Statute of Anne, S.C. Code Ann. § 32-1-20.

149. Upon information and belief, thousands of individuals within South Carolina have lost—and continue to lose—more than $50 at any time or sitting by playing at games of chance (i.e., gambling) with Defendants, and have not sued to recover those losses within three months of payment to Defendants. The identity and precise number of such gamblers ("Gambling Victims") is within the unique possession of Defendants.

150. For all the reasons discussed above, Defendants are gambling "winner[s]" within the meaning of S.C. Code Ann. § 32-1-20.

151. Plaintiff qualifies as a "[p]erson" authorized to sue for the recovery losses at gaming within the meaning of S.C. Code Ann. § 62-1-201(32). Plaintiff has not colluded with any Gambling Victims in bringing this action.

152. Plaintiff has conducted an independent search of publicly available sources. To Plaintiff's knowledge, no other "person" has sued under S.C. Code Ann. § 32-1-20 in connection with the conduct of Defendants within this case.

## DEMAND FOR JURY TRIAL

153. Pursuant to Rule 38(d), SCRCP, Plaintiff hereby demands a trial by jury of any issue triable of right.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment against Defendants and respectfully requests

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

that the Court grant the following relief:

A. Declaring that the Defendants are liable under the Statute of Anne, S.C. Code Ann. § 32-1-20;

B. Ordering that the Defendants provide an accounting to Plaintiff of all illegal winnings pursuant to S.C. Code Ann. § 32-1-30, with such accounting to be broken out by the gambling victims' county of residence, and with such accounting to be updated on a quarterly basis until such time as Defendants cease their illegal operations in the state;

C. Awarding as damages four times that value, with one-half to the use of the Plaintiff and the remainder to the use of the counties where such losses were sustained;

D. Awarding the costs of prosecuting this action, including reasonable attorney's fees, experts' fees, and litigation costs together with interest;

E. Awarding pre- and post-judgment interest as allowed by law; and

F. Granting such other relief as the Court deems proper, including injunctive relief enjoining Defendants from continuing their illegal operations in the state.

ELECTRONICALLY FILED - 2026 Jul 29 10:46 AM - CHARLESTON - COMMON PLEAS - CASE#2026CP1004063

Respectfully submitted,

**MOTLEY RICE LLC**
/s/ T. David Hoyle
T. David Hoyle (S.C. Bar No. 74055)
28 Bridgeside Blvd.
Mt. Pleasant, S.C. 29464
dhoyle@motleyrice.com
(843) 216-9000
(843) 216-9450 (fax)

William H. Narwold (S.C. Bar No. 73977)
20 Church St., 17th Floor
Hartford, CT 06103
bnarwold@motleyrice.com
(860) 733-6471
(860) 882-1682 (fax)

Previn Warren*
Abigail Burman*
Nelson Drake*
401 9th Street NW Suite 630
Washington, DC 20004
pwarren@motleyrice.com
aburman@motleyrice.com
ndrake@motleyrice.com
(202) 232-5504
(202) 232-5513 (fax)

*Attorneys for Plaintiff*

* *Pro hac vice* applications forthcoming

Dated: July 29, 2026.
Mt. Pleasant, South Carolina