**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**

JAMES M. HUGHES,

*Plaintiff*,

v.

DRAFTKINGS INC.; GUS III LLC (d/b/a DRAFTKINGS PREDICTIONS, f/k/a GUS III INC.); RAILBIRD EXCHANGE, LLC (d/b/a DKEX); BLOCKRATIZE, INC.; QCL QUAD CODE USA CORP.; QCX LLC (d/b/a POLYMARKET US); QC CLEARING LLC (d/b/a POLYMARKET CLEARING); CHICAGO MERCANTILE EXCHANGE INC.; NORTH AMERICAN DERIVATIVES EXCHANGE, INC. (d/b/a CRYPTO.COM DERIVATIVES NORTH AMERICA); BITNOMIAL CLEARINGHOUSE, LLC; WINTERMUTE TRADING LTD.; JUMP TRADING LLC; DRW HOLDINGS LLC; IMC-CHICAGO, LLC; GALAXY DIGITAL TRADING, LLC; VIRTU FINANCIAL INC.; and JOHN DOES 1-10,

*Defendants*.

Case No.: 2:26-cv-03838-RMG

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION TO REMAND**

# TABLE OF CONTENTS

**Page**


INTRODUCTION ....................................................................................................1

BACKGROUND ....................................................................................................4

A. Congress Vested The CFTC With Exclusive Jurisdiction Over Event Contracts Traded On Federally Designated Exchanges. ..................4

B. Plaintiff Files Suit Under South Carolina's Statute of Anne, And Defendants Remove To Federal Court. ......................................................6

LEGAL STANDARDS ..........................................................................................7

ARGUMENT ........................................................................................................8

I. Plaintiff Has Article III Standing. .............................................................8

A. History And Tradition Establish That Federal Courts May Adjudicate Third-Party Statute Of Anne Litigation....................................8

B. Third Parties Who Are Assigned Claims By Operation Of Law Have Article III Standing. ..........................................................12

1. Plaintiff has standing as the statutory assignee of the purported sovereign injury identified in the Complaint................13

2. Alternatively, Plaintiff has standing as the statutory assignee of the bettors' claims to recover their alleged losses. ..........................................................................17

II. This Court Has Diversity Jurisdiction Under 28 U.S.C. § 1332...........................19

III. This Court Has Federal-Question Jurisdiction Because Plaintiff's Claim Turns On Whether Federal Law Authorizes The Challenged Event Contracts. ..............21

A. Plaintiff's Claim Necessarily Raises A Federal Issue...............................21

B. The Other *Grable* Requirements Are Easily Satisfied..............................27

CONCLUSION .....................................................................................................30

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*,
977 F.2d 1147 (7th Cir. 1992) ....29

*AU Optronics Corp. v. South Carolina*,
699 F.3d 385 (4th Cir. 2012) ....20

*Bates v. Mortgage Electronic Registration System, Inc.*,
694 F.3d 1076 (9th Cir. 2012) ....20

*Bauer v. Elrich*,
8 F.4th 291 (4th Cir. 2021) ....28, 29

*Berkebile v. Outen*,
426 S.E.2d 760 (S.C. 1993) ....3, 22, 23

*United States ex rel. Bunk v. Gosselin World Wide Moving, N.V.*,
741 F.3d 390 (4th Cir. 2013) ....2, 15, 16

*Burt v. Playtika, Ltd.*,
132 F.4th 398 (6th Cir. 2025) ....11, 12, 18

*Cayce v. VGW, Ltd.*,
832 F. Supp. 3d 744 (W.D. Ky. 2026) ....11

*Cohen v. Gibbes*,
19 S.C.L. 206 (S.C. Ct. App. 1833) ....18

*Cole v. Applebury*,
136 Mass. 525 (1884) ....10

*Cole v. Smith*,
4 Johns. 193 (N.Y. Sup. Ct. 1809) ....10

*Coliseum Cartage Co., Inc. v. Rubbermaid Statesville, Inc.*,
975 F.2d 1022 (4th Cir. 1992) ....19

*Commonwealth v. Richards*,
3 Va. 133 (1803) ....10

*Compton v. Alton Steamship Co.*,
608 F.2d 96 (4th Cir. 1979) ....24, 25

*Cunningham v. Cornell University*,
604 U.S. 693 (2025)........................................................24, 25

*Davidson v. Blunt*,
16 Ky. 128 (1811)........................................................10

*DC Gambling Recovery LLC v. Am. Wagering, Inc.*,
2026 WL 850330 (D.D.C. Mar. 26, 2026)........................................1, 11, 12, 13, 15, 18

*Ellenburg v. Spartan Motors Chassis, Inc.*,
519 F.3d 192 (4th Cir. 2008)........................................................7

*Empire Healthchoice Assurance, Inc. v. McVeigh*,
547 U.S. 677 (2006)........................................................28

*Evans qui tam v. Stevens*,
100 Eng. Rep. 986 (1791)........................................................9

*Frederick, Bart v. Lookup*,
98 Eng. Rep. 51 (1767)........................................................9

*In re Fresenius Granuflo/NaturaLyte Dialysate Prods. Liab. Litig.*,
76 F. Supp. 3d 268 (D. Mass. 2015)........................................................21

*Ga. Gambling Recovery LLC v. Kalshi Inc.*,
2026 WL 279375 (M.D. Ga. Feb. 3, 2026)........................................................26

*Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*,
545 U.S. 308 (2005)........................................................3, 21, 28, 29

*Gunn v. Minton*,
568 U.S. 251 (2013)........................................................21, 27, 29

*Indiana ex rel. Harmeyer v. Kroger Co.*,
2017 WL 2544111 (S.D. Ind. June 13, 2017)........................................................21

*Hill v. Ibarra*,
954 F.2d 1516 (10th Cir. 1992)........................................................24

*Hoffeld v. United States*,
186 U.S. 273 (1902)........................................................13, 18

*Hoyt v. Wickham*,
25 F.2d 777 (8th Cir. 1928)........................................................27

*Johnson v. Collins Ent. Co.*,
199 F.3d 710 (4th Cir. 1999)........................................................29

*Joytime Distribs. & Amusement Co. v. State*,
528 S.E.2d 647 (S.C. 1999) ....................23

*Justice v. The Pantry*,
518 S.E.2d 40 (S.C. 1999) ....................7

*KalshiEX LLC v. CFTC*,
2024 WL 4164694 (D.D.C. Sept. 12, 2024) ....................4

*KalshiEX LLC v. Flaherty*,
172 F.4th 220 (3d Cir. 2026) ....................6

*Keeler Brass Co. v. Cont'l Brass Co.*,
862 F.2d 1063 (4th Cir. 1988) ....................25

*Key Corp. Cap., Inc. v. Cnty. of Beaufort*,
644 S.E.2d 675 (S.C. 2007) ....................23

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*,
543 U.S. 111 (2004) ....................24

*Krebbs' Assignees v. Miller*,
15 S.C.L. 406 (S.C. Ct. App. 1827) ....................18

*Ky. Gambling Recovery LLC v. Kalshi Inc.*,
2026 WL 596107 (E.D. Ky. Mar. 4, 2026) ....................25

*Ky. Gambling Recovery LLC v. Underdog Sports Holdings, Inc.*,
2026 WL 2406103 (E.D. Ky. Aug. 18, 2026) ....................11, 12

*Martin v. Stewart*,
499 F.3d 360 (4th Cir. 2007) ....................29

*Marvin v. Trout*,
199 U.S. 212 (1905) ....................1, 10

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982) ....................4

*Messer v. Am. Gems, Inc.*,
612 F.2d 1367 (4th Cir. 1980) ....................2, 19, 20

*Mo., Kan. & Tex. Ry. Co. of Kan. v. Hickman*,
183 U.S. 53 (1901) ....................20

*United States ex rel. Mohajer v. Omnicare, Inc.*,
525 F. Supp. 3d 447 (S.D.N.Y. 2021) ....................21

*Moor v. Alameda Cnty.*,
411 U.S. 693 (1973)....................2, 20

*Mullinax v. J.M. Brown Amusement Co.*,
508 S.E.2d 848 (S.C. 1998)....................22

*NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*,
770 F.3d 1010 (2d Cir. 2014)....................26

*Nat'l Am. Ins. Co. v. Ruppert Landscaping Co.*,
187 F.3d 439 (4th Cir. 1999)....................13

*New Mexico ex rel. Nat'l Educ. Ass'n of N.M., Inc. v. Austin Cap. Mgmt. Ltd.*,
671 F. Supp. 2d 1248 (D.N.M. 2009)....................21

*Navarro Sav. Ass'n v. Lee*,
446 U.S. 458 (1980)....................2, 19

*Netro v. Greater Balt. Med. Ctr., Inc.*,
891 F.3d 522 (4th Cir. 2018)....................12, 15

*Nichol v. Batton*,
11 Tenn. 469 (1832)....................10

*O'Melveny & Myers v. FDIC*,
512 U.S. 79 (1994)....................14

*O'Neal v. Carolina Farm Supply of Johnston, Inc.*,
309 S.E.2d 776 (S.C. Ct. App. 1983)....................24

*Ohio Gambling Recovery, LLC v. Kalshi Inc.*,
2026 WL 865788 (N.D. Ohio Mar. 30, 2026)....................25

*Old Dominion Electric Cooperative v. PJM Interconnection, LLC*,
24 F.4th 271 (4th Cir. 2022)....................26, 27, 28, 29

*PCS Nitrogen, Inc. v. Cont'l Cas. Co.*,
871 S.E.2d 590 (S.C. 2022)....................18

*Plummer v. Gray*,
74 Mass. 243 (1857)....................17

*Prior v. Lucas*,
6 Ky. 96 (1813)....................10

*Proctor v. Whitlark & Whitlark, Inc.*,
778 S.E.2d 888 (S.C. 2015)....................3, 7, 9, 23, 24, 25

*Rodriguez v. Compass Shipping Co.*,
451 U.S. 596 (1981) .......... 17

*Rorrer v. P.J. Club, Inc.*,
556 S.E.2d 726 (S.C. Ct. App. 2001) .......... 17, 23

*Salomon Forex, Inc. v. Tauber*,
8 F.3d 966 (4th Cir. 1993) .......... 26, 27

*California ex rel. Servs. Disabled Veterans Telecomm. v. MCI Telecomm. Corp.*,
185 F.3d 868 (9th Cir. 1999) .......... 21

*Sprint Commc'ns Co. v. APCC Servs., Inc.*,
554 U.S. 269 (2008) .......... 2, 8, 9, 11, 12, 13, 17, 18

*Stauffer v. Brooks Bros., Inc.*,
619 F.3d 1321 (Fed. Cir. 2010) .......... 16

*Thole v. U.S. Bank N.A.*,
590 U.S. 538 (2020) .......... 13, 14

*Town of Mount Pleasant v. Chimento*,
737 S.E.2d 830 (S.C. 2012) .......... 23

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 8, 12

*United States v. Aetna Cas. & Sur. Co.*,
338 U.S. 366 (1949) .......... 18

*United States v. Minnesota*,
2026 WL 2150211 (D. Minn. July 27, 2026) .......... 6

*United States v. S.C. State Highway Dep't*,
171 F.2d 893 (4th Cir. 1948) .......... 14

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens*,
529 U.S. 765 (2000) .......... 2, 8, 9, 12, 14, 15

*World Fuel Servs. Trading, DMCC v. Hebei Prince Shipping Co.*,
783 F.3d 507 (4th Cir. 2015) .......... 26

**CONSTITUTIONAL PROVISIONS**

U.S. Const. Art. III, § 2 .......... 8

**STATUTES**

7 U.S.C. § 1a .......... 5, 26

7 U.S.C. § 2 .......... 1, 4, 5, 29

7 U.S.C. § 7a-2 .......... 5, 26

11 U.S.C. § 541 .......... 13

12 U.S.C. § 1821 .......... 14

28 U.S.C. § 1332 .......... 19

28 U.S.C. § 1446 .......... 7

31 U.S.C. § 5362 .......... 5

9 Ann., c. 14, § 2 (Eng.) .......... 9

1999 S.C. Acts No. 125, § 18 .......... 7, 22

1999 S.C. Acts No. 125, § 23 .......... 7

D.C. Code § 16-1702 .......... 11

S.C. Code Ann. § 4-1-10 .......... 20

S.C. Code Ann. § 32-1-10 .......... 7, 17

S.C. Code Ann. § 32-1-20 .......... 2, 7, 9, 13, 14, 16, 17, 18, 19, 20, 22, 24, 25

S.C. Code Ann. § 32-1-30 .......... 21

S.C. Code Ann. § 32-1-60 .......... 3, 7, 22, 23, 24, 25, 26, 28, 29

S.C. Code Ann. § 39-73-40 .......... 6

**REGULATIONS**

*Concept Release on the Appropriate Regulatory Treatment of Event Contracts*, 73 Fed. Reg. 25669 (May 7, 2008) .......... 5

*Further Definition of "Swap" To Exclude Casino-Style Gambling Products*, 91 Fed. Reg. 65969 (Oct. 19, 2026) .......... 4, 28

*Prediction Markets: Public Interest Determinations*, 91 Fed. Reg. 35806 (2026) .......... 6

*Provisions Common to Registered Entities*, 76 Fed. Reg. 44776 (2011) .......... 6

**OTHER AUTHORITIES**

H.R. Rep. No. 97-626, pt. 1 (June 24, 1982) .......... 5

## INTRODUCTION

This case challenges the legality of federally regulated derivatives traded on federally designated exchanges. It belongs in federal court. Plaintiff James Hughes invokes S.C. Code Ann. § 32-1-20, a statute derived from the 1710 English Statute of Anne, which permits "any other person" to recover a bettor's losses from illegal gambling "and treble the value thereof" if the bettor fails to sue within three months. Plaintiff seeks to recover the alleged losses of thousands of South Carolina residents and to enjoin continued trading in event contracts, a kind of derivative. But Congress placed derivatives trading within the "exclusive jurisdiction" of the Commodity Futures Trading Commission ("CFTC") under the Commodity Exchange Act ("CEA"). 7 U.S.C. § 2(a)(1)(A). Defendants DraftKings Inc., GUS III LLC (d/b/a DraftKings Predictions), and Railbird Exchange, LLC (d/b/a DKeX), one of the federally regulated exchanges Plaintiff sued, removed this action with the consent of all other named Defendants still party to the case. ECF 1 ("Notice").

Plaintiff moves to remand, but his objections to federal jurisdiction fail. Article III permits suits based on assigned claims, including assignments made by statute. And this case independently satisfies both diversity and federal-question jurisdiction.

**Plaintiff has Article III standing.** English and American courts heard third-party actions under the Statute of Anne and its successors both before and after the Founding. The Supreme Court has recognized that these kinds of informer statutes "have been in existence for hundreds of years in England, and in this country ever since the foundation of our government." *Marvin v. Trout*, 199 U.S. 212, 225 (1905). Applying a materially identical statute, the U.S. District Court for the District of Columbia recently held that "[t]hird-party Statute of Anne lawsuits" are "'cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process.'" *DC Gambling Recovery LLC v. Am. Wagering, Inc.*, 2026 WL 850330, at *5 (D.D.C. Mar. 26, 2026)

(quoting *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 285 (2008)). Thus, third parties like Plaintiff have "standing to pursue a [Statute of Anne] claim in federal court." *Id.* at *4.

Settled assignment principles independently establish standing. An assignee may assert the injury suffered by the assignor, including a government claim partially assigned by statute. *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773–74 (2000). Section 32-1-20 follows that model. According to Plaintiff, the statute assigns him a claim to redress the State's alleged sovereign injury, reserving half the recovery for the county in which the wagering losses occurred. Plaintiff insists that only a proprietary injury can support such an assignment, but the Fourth Circuit has already rejected that "novel dissection" of precedent. *United States ex rel. Bunk v. Gosselin World Wide Moving, N.V.*, 741 F.3d 390, 403 (4th Cir. 2013). Alternatively, section 32-1-20 assigns Plaintiff the bettors' claims once they fail to sue within three months. Either way, the assignment supplies standing even if Plaintiff himself has not suffered a cognizable injury.

**Diversity jurisdiction exists.** Plaintiff does not dispute the amount in controversy or the completely diverse citizenship of the named parties. He argues only that South Carolina is a real party in interest, destroying diversity, because section 32-1-20 resembles a *qui tam* statute. But diversity turns on the "real and substantial parties to the controversy," *Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 460 (1980), and an entity with "nothing to gain" and "nothing to lose" from a lawsuit does not qualify as a real party in interest, *Messer v. Am. Gems, Inc.*, 612 F.2d 1367, 1370 (4th Cir. 1980). South Carolina has nothing to gain and nothing to lose here. If Plaintiff were to prevail, he would not split his recovery with the State, but with the counties in which supposed wagering losses occurred. Both Plaintiff and any relevant counties are citizens of South Carolina for diversity purposes, *see Moor v. Alameda Cnty.*, 411 U.S. 693, 717–18 (1973), thus preserving complete diversity. Nor does South Carolina have any "control" over Plaintiff's lawsuit. *Navarro*,

446 U.S. at 465. In short, South Carolina's assignment of its purported sovereign injury under section 32-1-20 establishes Plaintiff's standing; it does not make South Carolina a party.

**Federal-question jurisdiction exists.** Federal courts may hear state-law claims that necessarily raise disputed and substantial federal questions without disrupting Congress's allocation of judicial responsibilities. *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005). Plaintiff's claim qualifies. Under S.C. Code Ann. § 32-1-60, South Carolina's loss-recovery provisions "apply only to those gambling activities not authorized by law." To recover, Plaintiff must therefore establish, as a necessary element of his claim, that the wagering underlying his claim was unlawful. He cannot make that showing without resolving whether the CEA authorizes the challenged event contracts.

The statute's text and history foreclose Plaintiff's effort to recast illegality as an affirmative defense. By providing that the recovery provisions "apply only to" unauthorized wagering, section 32-1-60 makes unlawfulness a prerequisite to recovery. The history confirms that reading. In *Berkebile v. Outen*, the South Carolina Supreme Court allowed a bettor's recovery action to proceed because the Statute of Anne previously imposed no illegality requirement. 426 S.E.2d 760, 762–63 (S.C. 1993). The General Assembly then enacted section 32-1-60, restricting the statute to overturn *Berkebile*. As the court later explained in *Proctor v. Whitlark & Whitlark, Inc.*, section 32-1-60 "limited [the recovery provisions'] application to losses sustained by illegal gambling." 778 S.E.2d 888, 893 (S.C. 2015). Illegality is a necessary element of Plaintiff's claim.

Federal law is thus part of Plaintiff's claim, too. The CEA defines the transactions subject to federal regulation and establishes the process for listing event contracts on designated markets. Plaintiff himself disputes whether these contracts are covered by the CEA and whether federal regulations permit them. *E.g.*, ECF 1-1 ("Compl.") ¶ 140 n.7. Resolving those questions is

necessary to establish the unlawfulness that Plaintiff's claim requires. And the consequences of that resolution extend well beyond this case: Plaintiff asks a state court to declare an entire category of exchange-traded derivatives unlawful, impose statutory damages, and enjoin trading that Congress placed under the CFTC's exclusive authority. The scope of that authority presents a substantial federal question, and resolving it in a federal forum respects Congress's regulatory design.

Plaintiff has Article III standing, and diversity and federal-question jurisdiction independently sustain removal. The motion to remand should be denied.

## BACKGROUND

### A. Congress Vested The CFTC With Exclusive Jurisdiction Over Event Contracts Traded On Federally Designated Exchanges.

This case involves the marketplace for derivatives. "A derivative is a financial instrument or contract whose price is directly dependent upon (*i.e.*, derived from) the value of one or more underlying assets." *KalshiEX LLC v. CFTC*, 2024 WL 4164694, at *1 (D.D.C. Sept. 12, 2024) (internal quotation marks omitted; alteration adopted). Derivatives exchanges are known as "contract market[s]." 7 U.S.C. § 2(a)(1)(A); *see* Compl. ¶ 140. Contract markets like Defendant DKeX, along with other industry participants—including Defendants DraftKings Inc. and GUS III LLC (d/b/a DraftKings Predictions) (together, the "DraftKings Defendants")—are subject to CFTC oversight under the "comprehensive regulatory structure" of the CEA. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982).

Customers on DKeX's contract market trade a kind of derivative known as event contracts. "[M]any event contracts, including those based on sports-related events, are . . . swap[s]"—derivative contracts in which parties agree to exchange payments based on a specified rate, price, or event. *Further Definition of "Swap" To Exclude Casino-Style Gambling Products*, 91 Fed.

Reg. 65969, 65970 (Oct. 19, 2026); *see* 7 U.S.C. § 1a(47)(A)(ii)–(iii). In the case of event contracts, the payment "may be based on eventualities and measures as varied as the world's population in the year 2050, the results of political elections, or the outcome of particular entertainment events." *Concept Release on the Appropriate Regulatory Treatment of Event Contracts*, 73 Fed. Reg. 25669, 25669 (May 7, 2008).

Plaintiff is not the first to attempt to treat exchange trading as wagering. States once made similar efforts, too. That is one reason Congress, in 1974, created the CFTC and gave it "exclusive jurisdiction" over derivatives traded on federally regulated exchanges, 7 U.S.C. § 2(a)(1)(A), "thereby preempting state anti-gaming . . . laws, as well as other state laws." H.R. Rep. No. 97-626, pt. 1, at 9 (June 24, 1982) (Conf. Rep.). Congress again drew a dividing line between CFTC-regulated exchange trading and wagering when it enacted the Unlawful Internet Gambling Enforcement Act of 2006. This law prohibits the acceptance of payment for "a bet or wager" over the internet if the "bet or wager is unlawful under any applicable Federal or State law." 31 U.S.C. § 5362(10)(A); *see id.* § 5363. But it excludes from "bet or wager" a "transaction conducted on or subject to the rules of a registered entity . . . under the Commodity Exchange Act." *Id.* § 5362(1)(E)(ii).

Most recently, Congress addressed the overlap between wagering and trading through what is known as the Special Rule. Enacted as part of Dodd-Frank in 2010, the Special Rule addresses "event contracts" and other "swaps contracts" based on certain underlying events, including "terrorism," "assassination," "war," "gaming," and any "activity that is unlawful under any Federal or State law." 7 U.S.C. § 7a-2(c)(5)(C)(i). The provision permits—but does not require—the CFTC to ban the listing and trading of these contracts if the CFTC determines that they "are contrary to the public interest." *Id.* The corresponding regulation anticipates that the agency will

make that determination "on a case-by-case basis." *Provisions Common to Registered Entities*, 76 Fed. Reg. 44776, 44785–86 (2011). Exercising that authority, the CFTC has proposed rules to supply additional guidance about the kinds of sports-event contracts that may be traded on a contract market. *Prediction Markets: Public Interest Determinations*, 91 Fed. Reg. 35806, 35830–32 (2026). In the meantime, the agency has sought to prevent state regulators from attempting to interfere with the trading of such contracts. *See, e.g.*, *United States v. Minnesota*, 2026 WL 2150211, at *1 (D. Minn. July 27, 2026). And the Third Circuit has agreed that regulatory authority over event contracts belongs to the CFTC, not the States. *See KalshiEX LLC v. Flaherty*, 172 F.4th 220, 228 (3d Cir. 2026).

South Carolina, too, has respected the CFTC's authority over exchange trading. In 1993, the General Assembly adopted a State Commodity Code excluding from its trading prohibition "an account, an agreement, or a transaction within the exclusive jurisdiction of the Commodity Futures Trading Commission as granted under the Commodity Exchange Act." S.C. Code Ann. § 39-73-40(A)(1).

### B. Plaintiff Files Suit Under South Carolina's Statute of Anne, And Defendants Remove To Federal Court.

On July 29, 2026, Plaintiff brought this suit in the Charleston County Court of Common Pleas against the DraftKings Defendants and other event contract market participants, including other federally regulated exchanges. The Complaint asserts a single count under S.C. Code Ann. § 32-1-20 to recover alleged "gambling losses" sustained by "thousands of individuals within South Carolina" who traded event contracts on federally designated contract markets. Compl. ¶¶ 19, 147–52. The Complaint asserts that event contracts are "illegal wagers" and sports-related event contracts "illegal" "sports betting" because the contracts are "functionally identical to those found in casinos, sportsbooks, and other traditional gambling establishments." *Id.* ¶¶ 1, 5, 10.

Plaintiff insists that the legality of federally regulated exchange trading is determined not by the CEA or CFTC but by South Carolina's wagering laws. *See id.* ¶ 73; *see also id.* ¶ 141 (describing the CEA as mere "legal arcana").

Plaintiff invokes South Carolina's Statute of Anne, which the State "originally adopted in 1712." *Justice v. The Pantry*, 518 S.E.2d 40, 43 n.2 (S.C. 1999). It allows a person to recover if he lost at least $50 during one "sitting" "playing or betting" on "cards, dice table or any other game whatsoever." S.C. Code Ann. § 32-1-10. If the loser does not sue within three months of the loss, any other person can sue and "recover the same and treble the value thereof," with half the recovery reserved for the county where the loss occurred. S.C. Code Ann. § 32-1-20. In 1999, the General Assembly added section 32-1-60, which limits these recovery provisions to losses from unlawful wagering. 1999 S.C. Acts No. 125, §§ 18, 23(A); *Proctor*, 778 S.E.2d at 893.

Plaintiff "has personally experienced no gambling losses on account of the Defendants." Compl. ¶ 26. Instead, he sues on behalf of "thousands of individuals within South Carolina," *id.* ¶ 149, "to enforce that law and the public policies animating it," *id.* ¶ 26. Plaintiff seeks four times the alleged losses, an accounting, and an injunction. Compl., Prayer for Relief ¶¶ B–C, F.

The DraftKings Defendants timely removed this action with the consent of all other named Defendants still party to the lawsuit. Notice ¶¶ 50–51.

## LEGAL STANDARDS

A notice of removal need only provide a "short and plain statement" of the grounds for removal. 28 U.S.C. § 1446(a). The notice need not meet "a higher pleading standard than the one imposed on a plaintiff in drafting an initial complaint." *Ellenburg v. Spartan Motors Chassis, Inc.*, 519 F.3d 192, 200 (4th Cir. 2008).

## ARGUMENT

History and tradition and settled principles of statutory assignment confirm Plaintiff has Article III standing. Diversity jurisdiction exists because the named parties are completely diverse, the amount in controversy is satisfied, and South Carolina is not a real party in interest. Federal-question jurisdiction independently exists because Plaintiff must establish unlawful wagering to recover, and that showing requires resolving the challenged contracts' status under the CEA. Plaintiff's motion to remand should be denied.

### I. Plaintiff Has Article III Standing.

Plaintiff's overarching theory is that he has a statutory right to sue but neither a personal injury nor an assigned claim sufficient to support Article III standing. Plaintiff's theory is wrong. History and tradition confirm that federal courts may hear third-party Statute of Anne suits, and settled principles of statutory assignment establish standing here.

#### A. History And Tradition Establish That Federal Courts May Adjudicate Third-Party Statute Of Anne Litigation.

Article III extends the federal judicial power only to "Cases" and "Controversies." U.S. Const. art. III, § 2. The Supreme Court has understood these terms to encompass "cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process." *Vt. Agency*, 529 U.S. at 774. For that reason, the Court has "often said that history and tradition offer a meaningful guide to the *types of cases* that Article III empowers federal courts to consider," *Sprint*, 554 U.S. at 274 (emphasis added), as well as the kinds of "harm" that are "concrete for purposes of Article III," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021). *Contra* Mot. 4 (asserting that history is relevant *only* as to "the type of harm").

Take just two examples. In *Vermont Agency of Natural Resources*, the Supreme Court treated the centuries-long "history" of "*qui tam* actions" as "well nigh conclusive with respect to

the question" whether those actions are "cases and controversies" that may be brought in federal court. 529 U.S. at 777. *Contra* Mot. 4–5 (insisting that history had little bearing on the Court's analysis). And in *Sprint*, a review of "[l]egal practice . . . [i]n the latter half of the 18th century and throughout the 19th century" was similarly "well nigh conclusive" of the proposition that "[a]ssignees of a claim, including assignees for collection," "satisfy the Article III standing requirements." 554 U.S. at 275, 277–78, 285.

By Plaintiff's own account, third-party claims under section 32-1-20 have at least as impressive a historical pedigree. That provision has its "origin" in "a 1710 British law passed during the reign of Queen Anne." Compl. ¶ 22. The English Statute of Anne authorized "any Person or Persons" to sue "in any of her Majesty's Courts of Record" when a wagering loser failed to bring a timely action, with half the recovery going to the informer and half "to the use of the Poor of the Parish" where the wager occurred. 9 Ann., c. 14, § 2 (Eng.); *accord* Compl. ¶ 74. South Carolina adopted its own version "in 1712," Compl. ¶ 19, and the statute has "changed very little since," *id.* ¶ 75 (quoting *Proctor*, 778 S.E.2d at 893). Section 32-1-20 preserves the same basic arrangement: If the loser fails to sue within three months, third parties may sue wagering "winners" to recover treble penalties, divided equally between the third-party plaintiff and the county in which the wager took place. S.C. Code Ann. § 32-1-20.

English courts entertained those third-party suits before and around the Founding. In *Frederick, Bart v. Lookup*, for instance, a wagering loser's brother brought an action "as a common informer" under the Statute of Anne. 98 Eng. Rep. 51, 52 (1767) (Ex. A). Likewise, *Evans qui tam v. Stevens* involved "a *qui tam* action on the Gaming Act" brought by the informer "for himself as well as for the poor of the parish of St. Paul Covent Garden." 100 Eng. Rep. 986, 988 (1791)

(Ex. B). These actions were brought by statutory claimants who had not themselves sustained the underlying wagering losses.

American jurisdictions followed suit. Many colonies and early States adopted the English statute's provisions. *See*, *e.g.*, *Cole v. Applebury*, 136 Mass. 525, 528 (1884) (tracing Massachusetts legislation to the Statute of Anne and identifying provisions "exactly copied" in colonial enactments); *Nichol v. Batton*, 11 Tenn. 469, 471 (1832) (describing the 1799 act as "almost a literal copy"). Courts in the early Republic adjudicated informer actions under those statutes. *See Commonwealth v. Richards*, 3 Va. 133, 136–37 (1803); *Cole v. Smith*, 4 Johns. 193, 193, 197–98 (N.Y. Sup. Ct. 1809). Other cases involved the same informer-and-county allocation found in South Carolina's statute. *Davidson v. Blunt* described the action as "*qui tam*, and not in the plaintiff's own right," with "one-half to the informer, and the other to the county." 16 Ky. 128, 128 (1811). *Prior v. Lucas* likewise described a *qui tam* action to recover wagering losses "for the use of the informer and in aid of the county levy." 6 Ky. 96, 97 (1813).

More than a century ago, the Supreme Court recognized this precise tradition in *Marvin*, a 1905 case involving wagering-loss legislation. The Court explained that "[s]tatutes providing for actions by a common informer, who himself had no interest whatever in the controversy other than that given by statute, have been in existence for hundreds of years in England, and in this country ever since the foundation of our government." 199 U.S. at 225. Limiting recovery to the person who lost the money, the Court observed, would effectively invalidate legislation authorizing *qui tam* proceedings. *Id.* Although *Marvin* did not decide the modern Article III question presented here, its account of the historical practice directly refutes Plaintiff's suggestion that an informer's lack of original personal injury places this kind of suit outside the traditional judicial role. *See* Mot. 4–6.

In short, "courts—both before and after the founding—have" adjudicated third-party suits under the Statute of Anne and successor statutes. *Sprint*, 554 U.S. at 285. For that reason, the U.S. District Court for the District of Columbia—faced with a suit under a D.C. third-party loss-recovery statute much like the one in section 32-1-20, *see* D.C. Code § 16-1702—recently concluded that "[t]hird-party Statute of Anne lawsuits" are "'cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process.'" *DC Gambling Recovery*, 2026 WL 850330, at *5 (quoting *Sprint*, 554 U.S. at 285). The court reached that conclusion after raising standing on its own initiative, requesting supplemental briefing, and examining the historical practice against the Supreme Court's standing precedents. *Id.* at *3–5.

Plaintiff's attempt to undermine *DC Gambling Recovery* ends up undermining his own argument. According to Plaintiff, this Court should follow decisions from within the Sixth Circuit holding that third-party plaintiffs lacked standing to recover the gambling losses of others. Mot. 3. The problem for Plaintiff, though, is that even if those decisions were correct, "*DC Gambling* is not at odds with" them. *Ky. Gambling Recovery LLC v. Underdog Sports Holdings, Inc.*, 2026 WL 2406103, at *9 (E.D. Ky. Aug. 18, 2026). Those courts have reached different conclusions under different laws: D.C. law, like South Carolina law, requires that a governmental entity receive some of the recovery; Kentucky and Tennessee law do not. *See id.* (Kentucky); *Burt v. Playtika, Ltd.*, 132 F.4th 398, 404 (6th Cir. 2025) (Tennessee); *Cayce v. VGW, Ltd.*, 832 F. Supp. 3d 744, 751 (W.D. Ky. 2026) (Kentucky). By omitting this requirement, the Kentucky court reasoned, Kentucky's and Tennessee's laws "depart[ed]" too far from "tradition." *Ky. Gambling*, 2026 WL 2406103, at *8 (quoting *Cayce*, 832 F. Supp. 3d at 752). And that omission was dispositive: "If Kentucky's statute contained such language"—as South Carolina's statute does—

"it could, under [Sixth Circuit case law], plausibly be considered a traditional . . . statute" actionable in federal court. *Id.* at *9.

In any event, the decisions within the Sixth Circuit also share a methodological flaw. Instead of asking whether "history and tradition" suggest that third-party claims under the Statute of Anne are among the "types of cases that Article III empowers federal courts to consider," *Sprint*, 554 U.S. at 274, the Sixth Circuit courts asked whether Statute of Anne claims resemble modern "*qui tam* statute[s]," *Burt*, 132 F.4th at 403. Standing in this context, however, turns on a "close historical . . . analogue . . . in American history and tradition," not a close analogue to a *qui tam* statute. *TransUnion*, 594 U.S. at 424.

Regardless of methodology, all cases point to the same result here. The District Court for the District of Columbia found that third-party claims under a statute materially identical to section 32-1-20 fit within the historical tradition. *DC Gambling Recovery*, 2026 WL 850330, at *5. And the Kentucky court, applying Sixth Circuit precedent, recognized that a statute reserving part of the recovery for a governmental entity could "plausibly be considered a traditional . . . statute" actionable in federal court. *Ky. Gambling*, 2026 WL 2406103, at *9. Under either approach, therefore, plaintiffs like Mr. Hughes have Article III standing in federal court to sue under Statute of Anne provisions like South Carolina's.

### B. Third Parties Who Are Assigned Claims By Operation Of Law Have Article III Standing.

Modern assignment doctrine independently confirms Plaintiff's Article III standing. It is well established that third parties (like Plaintiff) who receive a "partial assignment of the Government's damages claim" have "standing to assert the injury in fact suffered by the assignor." *Vt. Agency*, 529 U.S. at 773; *see Netro v. Greater Balt. Med. Ctr., Inc.*, 891 F.3d 522, 527 (4th Cir. 2018) (statutory "assignment of government claims fits into a long tradition of courts entertaining

suits by assignees and subrogees"). It is similarly well established that third parties assigned a claim by a *private* party "ha[ve] standing to assert the injury in fact suffered by the assignor," even where the third parties did not originally suffer the injuries and are obligated to remit "*all* [the] proceeds" to their assignors. *Sprint*, 554 U.S. at 279, 286 (emphasis added).

Here, assignment supplies two alternative grounds for standing, both of which also bolster the already-dispositive historical analysis. *First*, section 32-1-20 assigns a claim to redress an alleged sovereign injury, with half the recovery reserved for the county. *Second*, the statute assigns a qualifying third-party plaintiff the claim to recover a bettor's alleged losses after the bettor fails to sue within three months. Either way, assignment—like the long history of third-party Statute of Anne claims—is fatal to Plaintiff's assertion that he lacks standing because he personally "has not been injured and does not represent anyone who has." Mot. 1; *see id.* at 6–7 (similar). *See DC Gambling Recovery*, 2026 WL 850330, at *5 ("Here, all agree that the D.C. Code effects an assignment of either the loser's injury (her gambling losses) or the District's sovereign injury to the plaintiff who elects to pursue a claim.").

**1. Plaintiff has standing as the statutory assignee of the purported sovereign injury identified in the Complaint.**

Plaintiff has Article III standing because section 32-1-20 partially assigns an alleged sovereign injury. Assignments need not arise from a private agreement. To the contrary, courts recognize standing not only where a right to sue has been "contractually" assigned, but also where it has been "legally . . . assigned," *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 543–44 (2020)—that is, "by operation of law," *Hoffeld v. United States*, 186 U.S. 273, 277 (1902). The Supreme Court and the Fourth Circuit have recognized such standing, including for: (1) bankruptcy trustees, who succeed to claims belonging to the estate, *see Nat'l Am. Ins. Co. v. Ruppert Landscaping Co.*, 187 F.3d 439, 441 (4th Cir. 1999); 11 U.S.C. § 541(a)(1); (2) the FDIC as receiver, *see O'Melveny &*

*Myers v. FDIC*, 512 U.S. 79, 86 (1994); 12 U.S.C. § 1821(d)(2)(A)(i); (3) legal representatives like "guardians . . . and executors," *Thole*, 590 U.S. at 544; and (4) equitable subrogees, including insurers, *see United States v. S.C. State Highway Dep't*, 171 F.2d 893, 897–98 (4th Cir. 1948). Statutory *qui tam* assignments fall in that same tradition. *Vt. Agency*, 529 U.S. at 773–74.

Analogous to a *qui tam* assignment, section 32-1-20 effects a partial statutory assignment of the claim to redress the alleged sovereign injury identified in Plaintiff's Complaint. When a wagering loser fails to sue within three months to recover losses of at least $50 in a single sitting, section 32-1-20 authorizes a third party to sue the winner for treble penalties, with recovery split between the third-party plaintiff and "the county in which the offense shall have been committed." S.C. Code Ann. § 32-1-20. That structure follows the traditional *qui tam* informer arrangement: The legislature authorizes a private plaintiff to pursue a public enforcement claim, reserves a public share of the recovery, and gives the plaintiff the remaining share as an incentive to sue. Early Statute of Anne decisions recognized precisely that arrangement. *See supra* p.10 (describing *Davidson*, *Prior*, and *Marvin*).

Plaintiff's allegations confirm that he invokes this public-enforcement mechanism. His Complaint identifies the government's asserted enforcement interest; describes the original Statute of Anne provision as "[r]esembling the modern *qui tam* action" and having "deputized the public to serve as private Attorneys General"; and traces South Carolina's statute directly to that original statute. Compl. ¶¶ 73–76. He likewise emphasizes that his section 32-1-20 action serves a penal purpose distinct from the loser's remedial action. *Id.* ¶ 77; Mot. 8–9. Under Plaintiff's own allegations, then, Plaintiff seeks the statutory recovery for an alleged sovereign injury, retaining one half while securing the other half for the relevant county.

By authorizing a plaintiff to pursue a claim and share in any recovery, section 32-1-20

effects a partial assignment of a sovereign injury, which the Supreme Court deemed sufficient for Article III standing over 25 years ago in *Vermont Agency*. *See Vt. Agency*, 529 U.S. at 773–74 (holding that a *qui tam* plaintiff as "the assignee of a claim has standing to assert the injury in fact suffered by the assignor"—there, the United States). The alleged injury is traceable to Defendants' challenged conduct, and the requested statutory judgment supplies the prescribed redress. That is Article III standing; nothing more is required. Indeed, "[w]ithout this kind of partial assignment, parties invoking *qui tam* statutes . . . would lack Article III standing, rendering a dead letter the oldest and most well-established private enforcement provisions in Anglo-American law." *Netro*, 891 F.3d at 526. That is why *DC Gambling Recovery* concluded that modern assignment doctrine provided an additional, independent basis for Article III standing under the District's materially identical third-party enforcement provisions. 2026 WL 850330, at *5.

Plaintiff's principal response is one the Fourth Circuit has already rejected. Plaintiff acknowledges that, in *Vermont Agency*, the Supreme Court identified the government's "sovereign[]" and "proprietary injuries" and held—without separating the two—that "the United States' injury in fact suffices to confer standing" on the relator. 529 U.S. at 771, 774; *see* Mot. 10. But, he theorizes, the assignment solely of a "sovereign injury" "could not confer standing." Mot. 11. In other words, Plaintiff argues that assignment confers standing only if it involves the transfer of a "*proprietary* injury," which is not alleged here. *Id.* at 10 (emphasis added). The defendant in *Bunk* pressed an identical argument: "that only the proprietary injury [mentioned in *Vermont Agency*] is an injury in fact for standing purposes." 741 F.3d at 403. The Fourth Circuit, however, rejected this "novel dissection" of *Vermont Agency*. *Id.* "[I]t [was] 'the United States' injury in fact,' without reference to the source of that injury, that the [Supreme] Court has said 'suffices to confer standing.'" *Id.* (quoting *Vt. Agency*, 529 U.S. at 774). As the Federal Circuit has put it, the

assignee's standing "does not depend upon the alleged injury to the United States being proprietary, as opposed to sovereign." *Stauffer v. Brooks Bros., Inc.*, 619 F.3d 1321, 1326 (Fed. Cir. 2010).

Plaintiff attempts to distinguish *Bunk* on the ground that "[a] false claim always inflicts a proprietary injury, regardless of what remedies are pursued." Mot. 11 n.2. But *Bunk* did not find standing on that basis, and Plaintiff cannot escape binding precedent by inventing reasoning a court *could have* adopted but didn't. Plaintiff's revisionist theory also fails to account for *Bunk*'s and *Vermont Agency*'s discussion of historical informer statutes addressing piracy, privateering, and horse thievery—statutes where the government would have lacked a proprietary interest. *See Bunk*, 741 F.3d at 403. The Fourth Circuit considered it "highly unlikely" that the Supreme Court would have relied on those statutes in *Vermont Agency* if relators seeking "precisely the same sorts of penalty bounties" lacked standing. *Id.* Under Fourth Circuit precedent, Plaintiff therefore has standing under section 32-1-20 to assert the State's alleged sovereign injury as a statutory assignee, even without a separate proprietary injury to the State.

Plaintiff's next argument—that his claim rests on an injury in law, rather than the injury in fact Article III requires, Mot. 9–11—is just the proprietary-injury argument in different clothing. When "plaintiffs su[e] to vindicate exclusively their own rights," those plaintiffs must "have themselves sustained a palpable injury in fact." *Bunk*, 741 F.3d at 403 n.13. But when "assignment" is involved, it suffices for the *assignor* to have sustained a sovereign injury. *Id.*; *see supra* p.14–15. As Plaintiff concedes, an assigned injury is then treated as "the assignees' own" for purposes of standing. Mot. 11 n.3.

**2. Alternatively, Plaintiff has standing as the statutory assignee of the bettors' claims to recover their alleged losses.**

Section 32-1-20 authorizes "any other person," after the bettor fails to sue within three months, to recover "the same and treble the value thereof" through "any such action or suit as aforesaid." S.C. Code Ann. §§ 32-1-10, -20. In doing so, the statute connects the third party's recovery to the monetary claim initially enforceable by the wagering loser. On that construction, Plaintiff asserts the loser's alleged financial injuries, which a judgment against the alleged winners would redress. *Sprint*, 554 U.S. at 286–87.

The loser's three-month exclusivity period does not defeat that construction. *Contra* Mot. 7. For more than a century, courts have confirmed that a claimant's failure to sue within a prescribed period can trigger a statutory assignment of his claim. In *Rodriguez v. Compass Shipping Co.*, for example, the Supreme Court explained that an employee's acceptance of compensation under an award and failure to sue within six months triggered an assignment that "transfer[red] the employee's entire right to commence a third-party action to the employer." 451 U.S. 596, 603 (1981). And *Plummer v. Gray* recognized that same sequence under Massachusetts's wagering-loss statute, holding that, after three months, the loser's "right of action . . . is by necessary implication devested" because "the right of action is vested in other persons." 74 Mass. 243, 244 (1857); *see DC Gambling Recovery*, 2026 WL 850330, at *5.

Nor does it help Plaintiff to rely on decisions distinguishing the loser's remedial action from the third party's penal action. *See* Mot. 8–9. To the contrary, one of those decisions, *Rorrer v. P.J. Club, Inc.*, recognizes that "the measure of . . . damages [under section 32-1-20] is the actual pecuniary loss suffered from the defendant's wrong." 556 S.E.2d 726, 729–31 (S.C. Ct. App. 2001). The recovery thus remains tied to the *loser's* financial injury; although the statute expands the remedy and changes its beneficiaries, it still effects an assignment of the underlying claim. *See*

*Hoffeld*, 186 U.S. at 277 ("an assignee by operation of law may, under certain circumstances, have greater rights than a voluntary assignee").

Plaintiff's contention that assignment "require[s] that an assignor actually intend a transfer," Mot. 8, confuses consensual assignments with assignments by operation of law. The latter do not require notice and consent. *See United States v. Aetna Cas. & Sur. Co.*, 338 U.S. 366, 375 (1949) (distinguishing "transfers by operation of law" from "voluntary transfers"). Here, the General Assembly specified the event triggering the transfer (the bettor's failure to sue within three months) and the persons entitled to pursue recovery ("any other person"). The loser's separate consent is unnecessary.[1]

* * *

History and tradition, as well as settled principles of statutory assignment, confirm that Plaintiff has Article III standing. "Third-party Statute of Anne lawsuits are 'cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process.'" *DC Gambling Recovery*, 2026 WL 850330, at *5 (quoting *Sprint*, 554 U.S. at 285). And section 32-1-20 "effects an assignment of either the loser's injury (her gambling losses) or the [State's] sovereign injury to the plaintiff who elects to pursue a claim." *Id.*

[1] Relying on Tennessee law, the Sixth Circuit stated that "[a]n assignor cannot . . . assign a right without consenting to the transfer." *Burt*, 132 F.4th at 404. Not only is that against the great weight of federal authority, *see supra* p.13, but it has never been the law in South Carolina, *see, e.g.*, *PCS Nitrogen, Inc. v. Cont'l Cas. Co.*, 871 S.E.2d 590, 595 (S.C. 2022) ("insurer consent is not required for an assignment of liability insurance coverage rights"); *Cohen v. Gibbes*, 19 S.C.L. 206, 207 (S.C. Ct. App. 1833) ("property may be vested by operation of law without the party's assent"); *Krebbs' Assignees v. Miller*, 15 S.C.L. 406, 407 (S.C. Ct. App. 1827) ("assignment is effected by operation of law" or through "voluntary act of the party").

## II. This Court Has Diversity Jurisdiction Under 28 U.S.C. § 1332.

The Notice of Removal establishes—and Plaintiff does not dispute—that the amount in controversy exceeds $75,000 and that the named parties are completely diverse: Plaintiff is a South Carolina citizen, while Defendants are citizens of other States or of foreign countries.[2] Notice ¶¶ 8, 12–33; 28 U.S.C. § 1332(a)(3). Plaintiff nevertheless seeks to avoid removal by arguing that section 32-1-20's resemblance to a *qui tam* statute necessarily makes South Carolina a real party in interest. Mot. 19–20. Plaintiff is wrong.

Diversity turns on the citizenship of the "real and substantial parties to the controversy." *Navarro*, 446 U.S. at 460. This inquiry is a functional one, examining both whether a party can "control the litigation" or "the disposition of th[e] action," *id.* at 465, and whether a party has a financial "stake in the litigation," *Messer*, 612 F.2d at 1370. Here, the State lacks any statutory control of the litigation or any financial interest in it. The State therefore is not a real party in interest, and this Court has diversity jurisdiction.

**1.** To start, section 32-1-20 affords the State no "right to enforce the claim." *Coliseum Cartage Co., Inc. v. Rubbermaid Statesville, Inc.*, 975 F.2d 1022, 1024 (4th Cir. 1992). That is, the statute requires no state authorization to sue. And it assigns the State no "duties to perform," *Messer*, 612 F.2d at 1374, no right to "control the litigation," and no power to "dispos[e] of th[e] action"—say, through compelling dismissal or entering into a settlement, *Navarro*, 446 U.S. at 465. Indeed, Plaintiff, "if [he] chose to, could settle the action, with or without consulting [South Carolina]." *Messer*, 612 F.2d at 1371.

**2.** Nor would South Carolina receive any of Plaintiff's recovery. As the Fourth Circuit

[2] Each Defendant is a citizen of one or more of Nevada, Massachusetts, Delaware, New York, New Jersey, Illinois, Wisconsin, Wyoming, China, France, Russia, Singapore, and the United Kingdom. Notice ¶ 8.

has held, a party that has no "real (or) substantial interest in the outcome of the litigation," "possesses no stake in the litigation," and "has nothing to gain by the suit" (or, "if the suit is lost, nothing to lose") is not a real party in interest. *Messer*, 612 F.2d at 1370; *see Mo., Kan. & Tex. Ry. Co. of Kan. v. Hickman*, 183 U.S. 53, 60–61 (1901) (State was not a party in interest because it lacked "a direct, pecuniary interest in the result of the litigation" and any recovery in the action "would not inure to the benefit of the state as a state in any degree"); *AU Optronics Corp. v. South Carolina*, 699 F.3d 385, 391 (4th Cir. 2012) (recognizing continued validity of the *Hickman* principle). Although the legislature created the enforcement right—based in part on a sovereign injury—the statute assigns that interest, along with any recovery, to third-party plaintiffs and "the county in which the offense shall have been committed." S.C. Code Ann. § 32-1-20; *see* Compl., Prayer for Relief ¶ C.

This assignment dooms Plaintiff's efforts to defeat diversity jurisdiction. Each South Carolina county is a separate "body politic and corporate . . . [t]o sue and be sued." S.C. Code Ann. § 4-1-10(1). And each is a citizen of South Carolina for diversity purposes. *See Moor*, 411 U.S. at 717–18 ("for purposes of diversity of citizenship, political subdivisions are citizens of their respective States" (quotation marks omitted)). Thus, even if the South Carolina counties that stood to benefit from Plaintiff's lawsuit were real parties in interest, the parties would still be completely diverse. The Ninth Circuit illustrated this point in *Bates v. Mortgage Electronic Registration System, Inc.*, upholding diversity jurisdiction over a statutory enforcement action because the counties were the beneficiaries and the State would receive no benefit. 694 F.3d 1076, 1080 (9th Cir. 2012).

In short, section 32-1-20—unlike the statutes at issue in the cases Plaintiff cites, *see* Mot.

20—reserves the State neither a share of the recovery nor authority to direct this action.[3] The statutory assignment supporting Article III standing therefore does not establish a retained state interest sufficient to make South Carolina a real party in interest and overcome diversity jurisdiction.

## III. This Court Has Federal-Question Jurisdiction Because Plaintiff's Claim Turns On Whether Federal Law Authorizes The Challenged Event Contracts.

The Supreme Court has long held "that in certain cases federal-question jurisdiction will lie over state-law claims that implicate significant federal issues." *Grable*, 545 U.S. at 312. "[F]ederal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting" the congressionally approved balance of "federal and state judicial responsibilities." *Gunn v. Minton*, 568 U.S. 251, 258 (2013) (cleaned up). This case belongs in federal court because it necessarily turns on disputed and substantial questions of federal law.

### A. Plaintiff's Claim Necessarily Raises A Federal Issue.

A federal issue is necessarily raised when an element of the state-law claim requires the plaintiff to apply federal law to prevail. *Gunn*, 568 U.S. at 259. Plaintiff's claim satisfies that test: South Carolina requires unlawful wagering as a prerequisite to recovery, and Plaintiff cannot

[3] *See Indiana ex rel. Harmeyer v. Kroger Co.*, 2017 WL 2544111, at *1 (S.D. Ind. June 13, 2017) (Indiana statute "entitle[d] the State of Indiana to recover the majority of money damages awarded"); *New Mexico ex rel. Nat'l Educ. Ass'n of N.M., Inc. v. Austin Cap. Mgmt. Ltd.*, 671 F. Supp. 2d 1248, 1251 (D.N.M. 2009) (under New Mexico statute, State could "intervene and take over a lawsuit filed by a relator," and "any monies recovered belong[ed] to the State, after the *qui tam* plaintiff receive[d] its share"); *United States ex rel. Mohajer v. Omnicare, Inc.*, 525 F. Supp. 3d 447, 451 (S.D.N.Y. 2021) (federal government entitled under False Claims Act to 70% to 85% of recovery by relator); *California ex rel. Servs. Disabled Veterans Telecomm. v. MCI Telecomm. Corp.*, 185 F.3d 868 (9th Cir. 1999) (lawsuit involving the California False Claims Act, which is analogous to the federal Act); *In re Fresenius Granuflo/NaturaLyte Dialysate Prods. Liab. Litig.*, 76 F. Supp. 3d 268, 271 (D. Mass. 2015) (Mississippi unfair trade practices law authorized State to bring *parens patriae* actions to vindicate State interests and obtain recovery therefrom).

establish that element without addressing whether the CEA authorizes the challenged event contracts.

**1.** To recover under section 32-1-20, Plaintiff must (but cannot) establish that the supposed losses underpinning his claim were incurred in illegal transactions. That is because section "32-1-20 . . . appl[ies] only to those gambling activities not authorized by law." S.C. Code Ann. § 32-1-60.

That was not always the law. South Carolina's wagering-loss statutes once allowed recovery without proof that the wagering was illegal. In *Berkebile*, a wagering loser sued a video-poker operator under section 32-1-10 to recover her losses. 426 S.E.2d at 761. The South Carolina Supreme Court reversed the dismissal of the loser's claim, explaining that—under the statute as then written—"no requirement for an illegal game exist[ed] *as an element for recovery*." *Id.* at 763 (emphasis added). And the General Assembly "ha[d] not provided a statutory modification" requiring illegality as a basis for recovery. *Id.* at 762.

In the wake of *Berkebile*, video-poker operators objected that state licensing and compliance with the former Video Game Machines Act should shield them from liability. *See Mullinax v. J.M. Brown Amusement Co.*, 508 S.E.2d 848, 850 (S.C. 1998). Against that backdrop—*i.e.*, as a direct response to *Berkebile*'s statement that the Statute of Anne lacked an illegality requirement "as an element for recovery," 426 S.E.2d at 763—the General Assembly enacted section 32-1-60 in 1999. Section 32-1-60 expressly limited claims to "gambling activities not authorized by law," 1999 S.C. Acts No. 125, § 18, and served as the very "statutory modification" whose absence was dispositive in *Berkebile*. 426 S.E.2d at 762. The South Carolina Supreme Court promptly described section 32-1-60 as "amend[ing] S.C. Code Ann. §§ 32-1-10 to -30, to allow for recovery of gambling losses only where the gambling activity which resulted in

the loss is unlawful." *Joytime Distribs. & Amusement Co. v. State*, 528 S.E.2d 647, 655 (S.C. 1999). And the court later confirmed in *Proctor* that section 32-1-60 "limit[s] [the recovery provisions'] application to losses sustained by illegal gambling." 778 S.E.2d at 893; *see also id.* (endorsing *Joytime*'s description of the amendment).

In other words, under the amended Statute of Anne, "illegal gambling" is now "a prerequisite to recovery." *Proctor*, 778 S.E.2d at 894. Section 32-1-60 thus supplies the "element" that *Berkebile* found missing, requiring Plaintiff to plead and prove that the losses he seeks to recover arose from unlawful wagering. 426 S.E.2d at 763.

Plaintiff tries to play down these on-point authorities. For example, Plaintiff characterizes *Proctor* as holding "only that cases seeking to remedy losses from illegal gambling must be brought under the Statute of Anne," Mot. 14. That was not *Proctor*'s "only" holding, and the exclusivity holding Plaintiff references relied on the court's finding that section 32-1-60 narrows the statutory right to recover to illegal gambling. Plaintiff discusses pre-amendment decisions, *see id.* at 13–14, even though statutory amendments affirmatively changed the law. *See Key Corp. Cap., Inc. v. Cnty. of Beaufort*, 644 S.E.2d 675, 678 (S.C. 2007) ("We have long acknowledged the presumption that in adopting an amendment to a statute, the Legislature intended to change the existing law."). Plaintiff points to the omission of section 32-1-60 in *Rorrer*, a decision from 2001, *see* Mot. 14, but neglects to mention that the case concerned a claim for gambling losses that predated the 1999 amendments, *see* 556 S.E.2d at 728–29 (listing dates of losses); *id.* at 728 n.1, 729 n.3 (citing the 1991 edition of the South Carolina Code). And Plaintiff does not explain how "dictum" he cites about what "'gamblers'" are "'referred to'" has anything to do with the elements he must prove to succeed on his claim. Mot. 14 (quoting *Town of Mount Pleasant v. Chimento*, 737 S.E.2d 830, 837 (S.C. 2012)).

Plaintiff next insists that "illegality [is] an affirmative defense." Mot. 14. It is not. An affirmative defense "assumes all elements of the plaintiff's case have been established." *O'Neal v. Carolina Farm Supply of Johnston, Inc.*, 309 S.E.2d 776, 779 (S.C. Ct. App. 1983). Plaintiff does not dispute that he must prove the elements of sections 32-1-10 and 32-1-20. And *Proctor* explains that section 32-1-60 "*expressly amended* sections 32-1-10 and 32-1-20." 778 S.E.2d at 893 (emphasis added); *see supra* p.22–23. That is why Plaintiff's own Complaint describes "S.C. Code Ann. § 32-1-10" as permitting a loser to recover for "an *illegal* bet," and section 32-1-20 as a "provision" allowing a third party "to recover *illegal* gambling losses." Compl. ¶¶ 19–20 (emphasis added). Under long-settled law, "it is the obligation of [a] plaintiff, seeking recovery under the terms of a statute, both to plead and prove that his claim falls within the terms of the enabling statute." *Compton v. Alton Steamship Co.*, 608 F.2d 96, 101 (4th Cir. 1979). Plaintiff is therefore "plainly wrong" to argue "that the failure of [a] plaintiff's claim to fit the terms of [the] statute is an affirmative defense that must be plead[ed] by a defendant." *Id.*; *see KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 120 (2004) (similar); *Hill v. Ibarra*, 954 F.2d 1516, 1522 (10th Cir. 1992) (it is "virtually tautological that when a statute imposes conditions or qualifications on any right or benefit granted therein, such prerequisites must be satisfied before any enforceable statutory entitlement can be said to exist").

Plaintiff gets no further reimagining section 32-1-60 as an "exemption," "exception," or "safe harbor" that defendants must prove. Mot. 13–14. *Cunningham v. Cornell University*, 604 U.S. 693 (2025), which Plaintiff cites, illustrates the argument's deficiencies. According to *Cunningham*, "when a statute has exemptions laid out apart from the prohibitions, and the exemptions expressly refer to the prohibited conduct as such, the exemptions ordinarily constitute affirmative defenses." 604 U.S. at 701 (cleaned up). But the South Carolina Supreme Court treats

section 32-1-60 as an "amend[ment]" of "sections 32-1-10 and 32-1-20," not as an exemption from them. *Proctor*, 778 S.E.2d at 893; *see supra* p.22–23. Section 32-1-20 itself refers to the unlawful nature of the alleged conduct—requiring payment to "the county in which *the offense* shall have been committed" (emphasis added)—thereby undermining the notion that the illegality requirement lies outside the prohibition. *See* Compl. ¶ 19 ("The other half goes to the county in which the illegal bets were placed."). And section 32-1-60 does not "refer to" gambling (illegal or not) as "prohibited conduct." *Cunningham*, 604 U.S. at 701. Plaintiff flunks the *Cunningham* test. Again, the section is a qualification on the statutory right to recover, not an exemption from otherwise established liability.

The two out-of-Circuit district court cases Plaintiff cites, *see* Mot. 15, further illustrate how poorly supported Plaintiff's position is. One case determined that legality was an affirmative defense based on a reading of a state court decision—precisely what Plaintiff has been unable to supply here. *See Ky. Gambling Recovery LLC v. Kalshi Inc.*, 2026 WL 596107, at *5 (E.D. Ky. Mar. 4, 2026). That same decision took the approach the Fourth Circuit has described as "plainly wrong," *Compton*, 608 F.2d at 101: treating a "defense which points out a defect in the plaintiff's prima facie case [as] an affirmative defense," *Keeler Brass Co. v. Cont'l Brass Co.*, 862 F.2d 1063, 1066 (4th Cir. 1988); *see Kalshi*, 2026 WL 596107, at *4–5 (conflating a "Rule 12(b)(6) defense" for failure to state a claim and "an affirmative defense"). And the other decision was forced to make an *Erie* guess "because no party cited" relevant "Ohio case law." *Ohio Gambling Recovery, LLC v. Kalshi Inc.*, 2026 WL 865788, at *4 (N.D. Ohio Mar. 30, 2026). Here, South Carolina law decisively supports Defendants.

**2.** Plaintiff must establish unlawfulness to recover and cannot do so without confronting questions of federal law. Whether the challenged event contracts are authorized by

law necessarily requires construing the CEA. Section 32-1-60 does not limit its authorization inquiry to South Carolina law. So the question of legality must "be deemed to include United States law." *World Fuel Servs. Trading, DMCC v. Hebei Prince Shipping Co.*, 783 F.3d 507, 521 (4th Cir. 2015) (collecting cases). And, the Fourth Circuit has explained, it is the CEA that determines whether an exchange-traded contract is "legally enforceable." *Salomon Forex, Inc. v. Tauber*, 8 F.3d 966, 978 (4th Cir. 1993). Naturally so: It is the CEA that defines covered contracts, 7 U.S.C. § 1a(47)(A), and establishes the procedures and restrictions for listing new contracts, *id.* § 7a-2(c)(1), (4)–(5). "As a result, whether the contracts at issue are unlawful gambling contracts—or instead federally authorized event contracts—cannot be resolved by reference to [South Carolina] law alone." *Ga. Gambling Recovery LLC v. Kalshi Inc.*, 2026 WL 279375, at *3 (M.D. Ga. Feb. 3, 2026). Under any "legal theory" for recovery, then, Mot. 17, "Plaintiff's ability to sustain a claim upon which relief may be granted necessarily depends on the interpretation and application of the CEA." *Ga. Gambling*, 2026 WL 279375, at *3.

Plaintiff's own allegations identify the federal questions on which his claim turns. He disputes that the contracts are swaps and that the CEA permits them even if they are swaps. Compl. ¶ 140 n.7. Paragraphs 140–146 develop those assertions, paragraph 146 invokes a federal event-contract regulation, and paragraph 147 incorporates those allegations into the sole statutory count. These "repeated[] referenc[es]" to the CEA confirm that, "although [Plaintiff's] claim[] for relief may invoke state law," the claim "necessarily raises disputed issues of federal [derivatives] law." *NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1022 (2d Cir. 2014).

In response, Plaintiff once more runs afoul of Fourth Circuit precedent. The plaintiff in *Old Dominion Electric Cooperative v. PJM Interconnection, LLC*, like Plaintiff here, recast the embedded federal question "as a preemptive affirmative defense." 24 F.4th 271, 286 (4th Cir.

2022); *see* Mot. 15. Rejecting that effort, the court explained that a substantial federal question is necessarily raised when "determining" whether the plaintiff "enjoys . . . a right" to relief "in the first place requires consulting" federal law. 24 F.4th at 285–86. It is only where the "right to the relief" can "be established *without* any resort to federal law" that the "possibility of [federal law] cutting off the . . . ability to recover" constitutes an affirmative preemption defense. *Id.* at 286 (emphasis added).

Again, Plaintiff cannot establish that he enjoys a right to relief "in the first place" without "consulting" the CEA to determine the contracts' legality. *Old Dominion*, 24 F.4th at 286; *see Salomon Forex*, 8 F.3d at 977–78; *supra* p.25. That is why, even *before* Congress in 1974 gave the CEA preemptive force, courts looked beyond a trader's home-state law to determine an exchange contract's validity. *See, e.g., Hoyt v. Wickham*, 25 F.2d 777, 779 (8th Cir. 1928) (holding that Chicago Board of Trade contracts were governed by Illinois law or the Federal Grain Futures Act, rather than Iowa law). Federal law "is part and parcel of" Plaintiff's claim. *Old Dominion*, 24 F.4th at 286.

### B. The Other *Grable* Requirements Are Easily Satisfied.

*Actually disputed*. The lawfulness of the contracts under the CEA is "the central point of dispute" here. *Gunn*, 568 U.S. at 259. Plaintiff alleges that the contracts are not swaps and would not be permissible under the CEA even if they were. Compl. ¶¶ 140 n.7, 141–46. Defendants contend that the contracts are lawful swaps traded within the CFTC's exclusive jurisdiction. Notice ¶¶ 37–45. That is precisely the federal-law dispute "that *Grable* envisioned." *Gunn*, 568 U.S. at 259.

*Substantial*. The federal-law dispute is substantial because it is "importan[t]" to "the federal system as a whole." *Gunn*, 568 U.S. at 260. Plaintiff seeks damages and an injunction against trading conducted through the CEA's listing process under CFTC oversight. His claim

directly questions the scope of the Commission's authority and the legal effect of that process. Compl. ¶ 9. As in *Old Dominion*, then, Plaintiff "seeks to have a state court circumvent [the agency's] exclusive authority to regulate," and "a maneuver of that nature poses an issue of 'substantial' significance to the federal government." 24 F.4th at 288. And the CFTC's absence as a party, *see* Mot. 16, changes nothing: *Grable* itself involved private parties disputing the legal effect of federal agency action. 545 U.S. at 310–11, 315.

Plaintiff maintains that any federal issues are "fact-bound and situation-specific." Mot. 18 (quoting *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 701 (2006)). But unlike the individualized reimbursement dispute in *Empire*, the federal questions here do not turn on highly fact-bound issues. Instead, those questions implicate the scope of a federal agency's jurisdiction and require the Court to determine whether federal law applies to an entire category of federally regulated exchange trading, conducted on multiple designated contract markets. And that determination will bear on the legality of the same kinds of contracts nationwide.

As the CFTC itself has explained, efforts to wield state gaming law against exchanges have "led to overreach that risks indiscriminate disruption—or the outright dismantling—of federally regulated event contract markets" and "threaten[ed] to expose large areas of . . . CFTC jurisdiction to incursion." 91 Fed. Reg. at 65976. Plaintiff's remark that exchanges could simply stop operating "in South Carolina," Mot. 17, exemplifies that threat and is irrelevant under *Grable*.

The federal questions would also be dispositive of this case if resolved in Defendants' favor. *Contra* Mot. 17. If the CEA authorizes these contracts, they cannot be "gambling activities not authorized by law," and section 32-1-60 would foreclose Plaintiff's recovery. The meaning and application of the CEA—"the central question of statutory construction"—is thus a "paradigmatic 'substantial' federal issue." *Bauer v. Elrich*, 8 F.4th 291, 297 (4th Cir. 2021).

Federal-state balance. A federal forum is consistent with "the sound division of labor between state and federal courts." *Grable*, 545 U.S. at 313. Congress gave the CFTC "exclusive jurisdiction" over covered exchange trading, 7 U.S.C. § 2(a)(1)(A), "to bring the markets under a uniform set of regulations" and avoid "conflicting regulatory demands." *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992). So, far from "disrupt[ing] Congress's intended division of labor between state and federal courts," "removal could best be said to have righted that intended division." *Old Dominion*, 24 F.4th at 288.

Plaintiff leans heavily on the State's interest in regulating gambling. Mot. 18 (citing *Johnson v. Collins Ent. Co.*, 199 F.3d 710, 720 (4th Cir. 1999)). But "*Collins* did not create" some rule "that forever insulates South Carolina statutes regulating gambling" from federal court review. *Martin v. Stewart*, 499 F.3d 360, 370 (4th Cir. 2007). Nor does this case involve an ordinary state-wagering dispute: Plaintiff brings a claim that affirmatively requires adjudication of an important federal question. "Suits seeking to interpret . . . a federal law like" the CEA "are properly brought in federal court and do not undermine state courts' ability to resolve questions of state law." *Bauer*, 8 F.4th at 297.

* * *

Plaintiff's claim rises or falls on whether the challenged event contracts are "gambling activities not authorized by law"—a question that will require Plaintiff to address the meaning and scope of the CEA. S.C. Code Ann. § 32-1-60. Because that federal question is necessarily raised, actually disputed, substantial, and capable of resolution in federal court without disrupting the federal-state balance, this Court has federal-question jurisdiction over Plaintiff's claim. *See Gunn*, 568 U.S. at 258.

## CONCLUSION

The Court should deny Plaintiff's motion and exercise jurisdiction over this case.

Dated: October 29, 2026

Respectfully submitted,


/s/ J. Rutledge Young, III
J. Rutledge Young, III (Federal Bar No. 10399)
C. Wilson Daniel (Federal Bar No. 13579)
DUFFY & YOUNG, LLC
96 Broad Street
Charleston, South Carolina 29401
Telephone: (843) 720-2044
Fax: (843) 720-2047
ryoung@duffyandyoung.com
wdaniel@duffyandyoung.com

Timothy P. Crudo*
Charmaine G. Yu*
Marcia V. Valente*
Rachel R. Suhr*
COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000
San Francisco, California 94104
Telephone: (415) 391-4800
tcrudo@coblentzlaw.com
cyu@coblentzlaw.com
mvalente@coblentzlaw.com
rsuhr@coblentzlaw.com

Orin Snyder*
GIBSON DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
osnyder@gibsondunn.com

Jacob T. Spencer*
Adam I. Steene*
GIBSON DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
jspencer@gibsondunn.com
asteene@gibsondunn.com


**Applications for pro hac vice admission forthcoming*

*Attorneys for Defendants DraftKings Inc.; GUS III LLC; and Railbird Exchange, LLC*