**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| JAMES M. HUGHES,<br>*Plaintiff*,<br>v.<br>DRAFTKINGS INC.; GUS III LLC (D/B/A DRAFTKINGS PREDICTIONS, F/K/A GUS III INC.); RAILBIRD EXCHANGE, LLC (D/B/A DKEX); BLOCKRATIZE INC.; QCL QUAD CODE USA CORP.; QCX LLC (D/B/A POLYMARKET US); QC CLEARING LLC (D/B/A POLYMARKET CLEARING); CHICAGO MERCANTILE EXCHANGE INC.; NORTH AMERICAN DERIVATIVES EXCHANGE, INC. (D/B/A CRYPTO.COM DERIVATIVES NORTH AMERICA); BITNOMIAL CLEARINGHOUSE, LLC; WINTERMUTE TRADING LTD.; JUMP TRADING LLC; DRW HOLDINGS LLC; IMC-CHICAGO, LLC; GALAXY DIGITAL TRADING, LLC; VIRTU FINANCIAL INC.; and JOHN DOES 1-10,<br>*Defendants*. | Case No. 26 Civ. 03838-RMG<br>(Removed from the Court of Common Pleas, Ninth Judicial Circuit, Charleston County, South Carolina, Case No. 2026-CP-10-04063) |

**THE POLYMARKET DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION TO REMAND**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ........ ii

PRELIMINARY STATEMENT ........ 1

BACKGROUND ........ 4

A. Prediction Markets, Event Contracts, and the Commodity Exchange Act ........ 4

B. Polymarket US's Designation as a DCM and Role as a Self-Regulatory Organization ........ 5

C. Plaintiff's Claim and Defendants' Removal ........ 7

LEGAL STANDARD ........ 9

ARGUMENT ........ 9

I. THIS COURT HAS FEDERAL OFFICER JURISDICTION ........ 9

A. Polymarket US Acts Under the CFTC ........ 11

B. Polymarket US Satisfies the "For or Relating To" Requirement ........ 16

C. Polymarket US Has Colorable Federal Defenses ........ 17

II. THIS COURT HAS FEDERAL QUESTION AND DIVERSITY JURISDICTION ........ 19

A. Federal Question Jurisdiction Exists Because Plaintiff's Claim Necessarily Turns on a Substantial, Disputed Question of Federal Law ........ 19

B. The Court Has Diversity Jurisdiction Because the Parties Are Completely Diverse, and Plaintiff—Not the State—Is the Real Party in Interest ........ 22

III. PLAINTIFF HAS ARTICLE III STANDING ........ 23

CONCLUSION ........ 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agyin* v. *Razmzan*,
986 F.3d 168 (2d Cir. 2021)....16

*Akin* v. *Ashland Chemical Co.*,
156 F.3d 1030 (10th Cir. 1998) ....8

*American Agriculture Movement, Inc.* v. *Board of Trade of Chicago*,
977 F.2d 1147 (7th Cir. 1992) ....22

*Barry* v. *Cboe Global Markets, Inc.*,
42 F.4th 619 (7th Cir. 2022) ....6, 11

*United States ex rel. Bunk* v. *Gosselin World Wide Moving, N.V.*,
741 F.3d 390 (4th Cir. 2013) ....24

*Chevron USA Inc.* v. *Plaquemines Parish*,
608 U.S. 1 (2026)....9, 16

*Coinbase Financial Markets, Inc.* v. *Raoul*,
2026 WL 2969682 (N.D. Ill. Oct. 2, 2026)....18

*In re Commonwealth's Motion to Appoint Counsel Against or Directed to Defender Ass'n of Philadelphia*,
790 F.3d 457 (3d Cir. 2015)....15

*County Board of Arlington County* v. *Express Scripts Pharmacy, Inc.*,
996 F.3d 243 (4th Cir. 2021) .... *passim*

*D'Alessio* v. *New York Stock Exchange, Inc.*,
258 F.3d 93 (2d Cir. 2001)....6

*DC Gambling Recovery LLC* v. *American Wagering, Inc.*,
2026 WL 850330 (D.D.C. Mar. 26, 2026), *appeal docketed*, No. 26-7046 (D.C. Cir. Apr. 13, 2026) ....4, 24

*Effex Capital, LLC* v. *National Futures Ass'n*,
2018 WL 1635851 (N.D. Ill. Apr. 5, 2018), *aff'd*, 933 F.3d 882 (7th Cir. 2019) ....13

*FCC* v. *Consumers' Research*,
606 U.S. 656 (2025)....14

*Flaherty* v. *KalshiEX, LLC*,
No. 26-299 (U.S. *petition for cert. filed* Sept. 2, 2026) ....................21

*Franchise Tax Board of California* v. *Construction Laborers Vacation Trust for Southern California*,
463 U.S. 1 (1983)....................19

*Georgia Gambling Recovery LLC* v. *Kalshi Inc.*,
2026 WL 279375 (M.D. Ga. Feb. 3, 2026)....................18, 20

*Government of Puerto Rico* v. *Express Scripts, Inc.*,
119 F.4th 174 (1st Cir. 2024)....................15

*Grable & Sons Metal Products, Inc.* v. *Darue Engineering & Manufacturing*,
545 U.S. 308 (2005)....................3, 20

*Gunn* v. *Minton*, 568 U.S. 251 (2013) ....................19, 20, 21

*H & R Block Eastern Enterprises, Inc.* v. *Raskin*,
591 F.3d 718 (4th Cir. 2010) ....................20

*Howes* v. *Financial Industry Regulatory Authority, Inc.*,
2023 WL 2213688 (D. Md. Feb. 24, 2023) ....................13

*West Virginia ex rel. Hunt* v. *CaremarkPCS Health, L.L.C.*,
140 F.4th 188 (4th Cir. 2025) .................... *passim*

*Jefferson County* v. *Acker*,
527 U.S. 423 (1999)....................9, 10, 17

*Johnson* v. *Collins Entertainment Co.*,
199 F.3d 710 (4th Cir. 1999) ....................22

*Joytime Distributors & Amusement Co.* v. *State*,
528 S.E.2d 647 (S.C. 1999) ....................3, 17, 20, 21

*KalshiEX, LLC* v. *Flaherty*,
172 F.4th 220 (3d Cir. 2026) ....................2, 18

*KalshiEX, LLC* v. *Martin*,
793 F. Supp. 3d 667 (D. Md. 2025)....................3

*KalshiEX, LLC* v. *Martin*,
No. 25-1892 (4th Cir. argued May 7, 2026) ....................21

*KalshiEX, LLC* v. *Schuler*,
2026 WL 2884087 (6th Cir. Sept. 25, 2026) ....................19, 21

*Kircher* v. *Putnam Funds Trust*,
547 U.S. 633 (2006) ............ 10

*Martin* v. *Stewart*,
499 F.3d 360 (4th Cir. 2007) ............ 22

*Marvin* v. *Trout*,
199 U.S. 212 (1905) ............ 24

*Maryland* v. *3M Co.*,
130 F.4th 380 (4th Cir. 2025) ............ 9, 10, 17

*Mayor & City Council of Baltimore* v. *BP P.L.C.*,
31 F.4th 178 (4th Cir. 2022) ............ 12

*Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Curran*,
456 U.S. 353 (1982) ............ 11

*Messer* v. *American Gems, Inc.*,
612 F.2d 1367 (4th Cir. 1980) ............ 4, 23

*Moor* v. *County of Alameda*,
411 U.S. 693 (1973) ............ 4, 23

*Morgan Keegan & Co.* v. *Silverman*,
706 F.3d 562 (4th Cir. 2013) ............ 6

*Mulcahey* v. *Columbia Organic Chemicals Co.*,
29 F.3d 148 (4th Cir. 1994) ............ 10

*Navarro Savings Ass'n* v. *Lee*,
446 U.S. 458 (1980) ............ 3, 23

*Nevada ex rel. Nevada Gaming Control Board* v. *Blockratize Inc.*,
2026 WL 579376 (D. Nev. Mar. 2, 2026) ............ 13

*North American Derivatives Exchange, Inc.* v. *Nevada*,
No. 26-344 (U.S. *petition for cert. filed* Sept. 11, 2026) ............ 21

*Old Dominion Electric Cooperative* v. *PJM Interconnection, LLC*,
24 F.4th 271 (4th Cir. 2022) ............ 21

*Proctor* v. *Whitlark & Whitlark, Inc.*,
778 S.E.2d 888 (S.C. 2015) ............ 3, 17

*Ray* v. *Tabriz*,
110 F.4th 949 (7th Cir. 2024) ............ 16

*Robinhood Derivatives, LLC* v. *Dreitzer*,
No. 26-338 (U.S. *petition for cert. filed* Sept. 10, 2026) ....................21

*Sawyer* v. *Foster Wheeler LLC*,
860 F.3d 249 (4th Cir. 2017) ....................1, 10, 16

*Thole* v. *U.S. Bank N.A.*,
590 U.S. 538 (2020)....................24

*United States* v. *Minnesota*,
2026 WL 2150211 (D. Minn. July 27, 2026) ....................5, 18

*Vermont Agency of Natural Resources* v. *United States ex rel. Stevens*,
529 U.S. 765 (2000)....................24

*Watson* v. *Philip Morris Cos.*,
551 U.S. 142 (2007).................... *passim*

*West Virginia State University Board of Governors* v. *Dow Chemical Co.*,
23 F.4th 288 (4th Cir. 2022) ....................12, 15

*Willingham* v. *Morgan*,
395 U.S. 402 (1969)....................17

*Wisconsin Department of Corrections* v. *Schacht*,
524 U.S. 381 (1998)....................9

**Statutes**

Commodity Exchange Act, 7 U.S.C. § 1 *et seq.* .................... *passim*

7 U.S.C. § 1a....................5, 18

7 U.S.C. § 2....................2, 5, 11, 18, 22

7 U.S.C. § 5....................2, 6, 11

7 U.S.C. § 7.................... *passim*

7 U.S.C. § 7a-2.................... *passim*

7 U.S.C. § 7b....................7, 14

7 U.S.C. § 8....................6, 7, 14

7 U.S.C. § 12a....................14

7 U.S.C. § 12c....................7, 13

7 U.S.C. § 13a .......... 14

7 U.S.C. § 13a-1 .......... 14

28 U.S.C. § 1331 .......... 3, 8, 19

28 U.S.C. § 1332 .......... 3, 8, 22

28 U.S.C. § 1441 .......... 8, 10

28 U.S.C. § 1442 .......... *passim*

28 U.S.C. § 1446 .......... 8, 9

S.C. Code Ann. § 32-1-10 .......... 7

S.C. Code Ann. § 32-1-20 .......... 3, 4, 7

S.C. Code Ann. § 32-1-60 .......... *passim*

**Other Authorities**

17 C.F.R. § 1.3 .......... 2, 6

17 C.F.R. § 38.3 .......... 14

17 C.F.R. § 38.5 .......... 7, 14

17 C.F.R. § 40.2 .......... 7, 12, 14

17 C.F.R. § 40.3 .......... 12

17 C.F.R. § 40.6 .......... 14

17 C.F.R. § 40.11 .......... 12

17 C.F.R. § 45.2 .......... 7, 14

*In re Application of QCX LLC for Designation as a Contract Market*, Order of Designation (CFTC July 9, 2025) .......... 6

CFTC Press Release No. 9206-26 (Apr. 2, 2026) .......... 5

CFTC Staff Letter No. 26-08, *DMO Staff Advisory Regarding Prediction Markets* (Mar. 12, 2026) .......... 6, 13

*Further Definition of "Swap"—Inclusions*, 91 Fed. Reg. 66,022 (proposed Oct. 19, 2026) .......... 5

*Further Definition of "Swap" To Exclude Casino-Style Gambling Products*, 91 Fed. Reg. 65,969 (Oct. 19, 2026) ........ 5

*In re NBA and WNBA Prop Contracts*, Order (CFTC Oct. 22, 2026) ........ 14

*In re NFL Weekly Scorigami Contracts*, Order (CFTC Oct. 21, 2026) ........ 14

*Position Limits for Derivatives: Certain Exemptions and Guidance*, 81 Fed. Reg. 38,458 (June 13, 2016) ........ 13

*Prediction Markets; Public Interest Determinations*, 91 Fed. Reg. 35,806 (proposed June 12, 2026) ........ 5, 6

Heath P. Tarbert, *Self-Regulation in the Derivatives Markets: Stability Through Collaboration*, 41 Nw. J. Int'l L. & Bus. 175 (2021) ........ 13

Defendants Blockratize Inc., QCL Quad Code USA Corp., QCX LLC (d/b/a Polymarket US) ("Polymarket US"), and QC Clearing LLC (d/b/a Polymarket Clearing) (collectively, the "Polymarket Defendants") respectfully submit this opposition to Plaintiff's motion to remand (Dkt. 40-1) ("Pl. Br.").[1]

## PRELIMINARY STATEMENT

This case belongs in federal court. Plaintiff challenges the legality of federally regulated derivatives traded on federally licensed exchanges. He argues that certain event contracts, a type of swap, traded on these exchanges constitute illegal gambling. He asserts a single claim under South Carolina's Statute of Anne, which permits third parties to recover a bettor's losses from illegal gambling, and he seeks to control the operation of these federally licensed exchanges by demanding an injunction ending Defendants' "operations in the state" and damages for four times the alleged losses of "thousands" of South Carolinians. Compl. (Dkt. 1-1) ("Complaint") ¶ 149, Prayer for Relief ¶¶ C, F. Federal court is the only appropriate forum for this claim, and his motion to remand should be denied on each of three independent grounds.[2]

*First*, the Court has jurisdiction under the federal officer removal statute, 28 U.S.C. § 1442(a)(1). Section 1442(a)(1), which the Fourth Circuit construes liberally, gives those who act under delegated federal authority the right to have their federal defenses heard in federal court. *Sawyer* v. *Foster Wheeler LLC*, 860 F.3d 249, 254–55 (4th Cir. 2017). Polymarket US acts under the authority of the Commodity Futures Trading Commission ("CFTC") and asserts a federal

[1] Unless otherwise indicated, all emphasis is added and all internal quotation marks and citations are omitted.

[2] The Polymarket Defendants adopt and expressly incorporate the arguments against remand in the separate opposition filed today by other defendants, Dkt. 55 (hereinafter "Other Removing Defendants' Opp."), and, in the interest of efficiency, set forth their arguments regarding federal question and diversity jurisdiction and standing in summary form. The Polymarket Defendants write separately to explain why this case cannot be remanded under the federal officer removal statute, 28 U.S.C. § 1442(a)(1).

preemption defense based in part on Congress's grant of "exclusive jurisdiction" to the CFTC over swaps traded on designated contract markets ("DCMs") under the Commodity Exchange Act ("CEA"). *See* 7 U.S.C. § 2(a)(1)(A). Polymarket US operates one of those markets, and the CFTC designated it a contract market in July 2025. As a DCM operator, Polymarket US does not merely comply with federal law; it operates as a self-regulatory organization and exercises regulatory authority that the CEA delegates to it, under the CFTC's direct oversight. *See id.* §§ 5(b), 7(d); 17 C.F.R. § 1.3. More specifically, Polymarket US "acts under" the CFTC by performing work the CFTC would otherwise do—setting access rules, certifying contracts, surveilling for manipulation, and disciplining participants. *See* 7 U.S.C. §§ 7(d)(2), (4), (13), 7a-2(c); *Watson* v. *Philip Morris Cos.*, 551 U.S. 142, 151–54 (2007); *West Virginia ex rel. Hunt* v. *CaremarkPCS Health, L.L.C.*, 140 F.4th 188, 197–98 (4th Cir. 2025). Plaintiff's only response—that Polymarket US merely "compl[ies]" with federal law and has no contract with the CFTC (Pl. Br. 21–22)—attacks an argument Polymarket US does not make and a requirement the Fourth Circuit has rejected. Plaintiff's claim targets the delegated functions Polymarket US performs—how the exchange sets contract terms, resolves contracts, and controls who may trade, Compl. ¶ 88—and seeks to enjoin them statewide. *Id.*, Prayer for Relief ¶ F. A state-court order shutting down a federally designated exchange is precisely the "interference with [federal] operations" that § 1442 guards against. *Watson*, 551 U.S. at 150. And Polymarket US's preemption defense is more than colorable: the Third Circuit has endorsed it, multiple district courts have accepted it, and the CFTC presses it. *See, e.g.*, *KalshiEX, LLC* v. *Flaherty*, 172 F.4th 220, 228–29 (3d Cir. 2026). Plaintiff does not argue otherwise.

*Second*, the Court also has federal question and diversity jurisdiction. The Court has federal question jurisdiction because federal courts may hear state-law claims that necessarily raise

disputed and substantial federal questions, *Grable & Sons Metal Products, Inc.* v. *Darue Engineering & Manufacturing*, 545 U.S. 308, 314 (2005), as Plaintiff's claim does here. South Carolina's Statute of Anne reaches only "gambling activities not authorized by law," S.C. Code Ann. § 32-1-60, and permits recovery "only where the gambling activity which resulted in the loss is unlawful," *Joytime Distributors & Amusement Co.* v. *State*, 528 S.E.2d 647, 655 (S.C. 1999). To prevail, Plaintiff must therefore demonstrate that the event contracts at issue were illegal. And whether the contracts listed on the federally regulated exchanges are lawful swaps within the CFTC's exclusive jurisdiction is a question of federal law. This is not simply an affirmative defense; Plaintiff must prove illegality to prevail on his claim. *Proctor* v. *Whitlark & Whitlark, Inc.*, 778 S.E.2d 888, 893 (S.C. 2015) (explaining that South Carolina's Statute of Anne allows for recovery of "losses sustained by illegal gambling"). Plaintiff's own Complaint confirms the point: it devotes an entire section to disputing that the contracts are swaps, that the CEA permits them, and that the CEA preempts state law. Compl. ¶¶ 140–46 & n.7. That disputed and substantial federal question—one that has divided the courts of appeals and is now before the Fourth Circuit—supports federal question jurisdiction under 28 U.S.C. § 1331. *See KalshiEX, LLC* v. *Martin*, 793 F. Supp. 3d 667 (D. Md. 2025), *appeal docketed*, No. 25-1892 (4th Cir. Aug. 6, 2025) (argued May 7, 2026).

There is also diversity jurisdiction: Plaintiff is a South Carolina citizen, no Defendant is, and the amount in controversy far exceeds $75,000. 28 U.S.C. § 1332. Plaintiff disputes none of this. His only response—that the State becomes a real party in interest if Section 32-1-20 is a qui tam statute—fails. *See* Pl. Br. 12. The diversity jurisdiction analysis looks to the "real and substantial parties to the controversy," *Navarro Savings Ass'n* v. *Lee*, 446 U.S. 458, 460 (1980), which does not include parties with "nothing to gain" and "nothing to lose" from the action.

*Messer* v. *American Gems, Inc.*, 612 F.2d 1367, 1370 (4th Cir. 1980). South Carolina does not qualify. It has nothing to gain and nothing to lose from this action because, even if Plaintiff were to prevail, he would split his recovery with the counties where the purported illegal gambling losses occurred, not the State. S.C. Code Ann. § 32-1-20. Plaintiff and the relevant counties are citizens of South Carolina for diversity purposes. *See Moor* v. *County of Alameda*, 411 U.S. 693, 717–18 (1973) ("[A] political subdivision of a State, unless it is simply the arm or alter ego of the State, is a citizen of the State for diversity purposes.").

*Third*, Plaintiff's standing argument fails. Plaintiff leads his motion with the claim that he lacks Article III standing to pursue his own lawsuit. Pl. Br. 2–11. That is a forum-selection tactic, not a jurisdictional defect. Plaintiff's own Complaint describes the Statute of Anne as "deputizing" "any person" to sue and as making private plaintiffs "private Attorneys General," Compl. ¶¶ 19, 21, 74. The statute assigns an injury to the plaintiff who sues: it authorizes a third party to sue only after the loser fails to act, measures recovery by the loser's own losses, and directs half of any recovery to the county. S.C. Code Ann. § 32-1-20. Rejecting the same argument Plaintiff makes here, the District Court for the District of Columbia held that such a statute "effects an assignment" of the gambler's or the sovereign's injury to the plaintiff who sues. *See DC Gambling Recovery LLC* v. *American Wagering, Inc.*, 2026 WL 850330, at *5 (D.D.C. Mar. 26, 2026), *appeal docketed*, No. 26-7046 (D.C. Cir. Apr. 13, 2026). Plaintiff has standing, and his effort to disclaim it supplies no basis for remand.

## BACKGROUND

### A. Prediction Markets, Event Contracts, and the Commodity Exchange Act

Prediction markets are national exchanges where participants trade event contracts—derivatives where two parties agree to exchange payments based on the outcome of a specified future event. Because event contracts are "dependent on the occurrence, nonoccurrence, or the

extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence," 7 U.S.C. § 1a(47)(A)(ii), they are "swaps" under the CEA.

Through the CEA, Congress placed these markets within a comprehensive federal regulatory regime and granted the CFTC "exclusive jurisdiction" with respect to transactions involving swaps (like event contracts) traded on such exchanges. *See* 7 U.S.C. §§ 2(a)(1)(A), 7(d). The CFTC has regulated event contracts since the early 1990s,[3] and prediction markets that offer event contracts[4] for trading by the general public must register with the CFTC as a DCM.[5] As the CFTC has explained, "DCMs play a vital role in the national economy,"[6] and uniform national regulation is essential to their proper functioning. Indeed, the CFTC has recently enforced its exclusive jurisdiction by suing several States to stop them from restricting federally regulated prediction markets,[7] cautioning that these state efforts would subject CFTC-regulated exchanges to "a fragmented patchwork of state regulations."[8]

**B. Polymarket US's Designation as a DCM and Role as a Self-Regulatory Organization**

On July 9, 2025, the CFTC approved QCX LLC (d/b/a Polymarket US) as a DCM under the CEA, reflecting a federal finding that Polymarket US satisfies the requirements governing

---

[3] *Further Definition of "Swap" To Exclude Casino-Style Gambling Products*, 91 Fed. Reg. 65,969, 65,974 (Oct. 19, 2026).

[4] Sports-related event contracts—like those challenged by Plaintiff here—are swaps. *See Prediction Markets; Public Interest Determinations*, 91 Fed. Reg. 35,806, 35,815–16 (proposed June 12, 2026). The CFTC has also issued rulemakings confirming that sports-related event contracts fall within the statutory definition of "swap" and that casino-style gambling products do not. *See Further Definition of "Swap"—Inclusions*, 91 Fed. Reg. 66,022 (proposed Oct. 19, 2026); *Further Definition of "Swap" To Exclude Casino-Style Gambling Products*, 91 Fed. Reg. 65,969 (Oct. 19, 2026).

[5] *See Prediction Markets*, 91 Fed. Reg. at 35,809–10.

[6] *Id.* at 35,843.

[7] *See, e.g.*, *United States* v. *Minnesota*, 2026 WL 2150211, at *1 (D. Minn. July 27, 2026) (enjoining state interference).

[8] CFTC Press Release No. 9206-26 (Apr. 2, 2026).

derivatives trading on federal exchanges, including market integrity, transparency, financial safeguards, surveillance, and customer protection. *See* Order of Designation, *In re Application of QCX LLC for Designation as a Contract Market*, at 1–3 (CFTC July 9, 2025); 7 U.S.C. §§ 7(a), 7(d), 8(a).

Although the CFTC has exclusive jurisdiction over prediction markets, an important part of Congress's regulatory regime is the self-regulation component; the CEA establishes "a system of effective self-regulation of trading facilities," including prediction markets, "under the oversight of the" CFTC. 7 U.S.C. § 5(b). As part of this regulatory regime, DCMs "are required to operate as self-regulatory organizations, subject to Commission oversight, with statutory duties to enforce the rules adopted by their own governing bodies."[9]

As a DCM, Polymarket US is one such self-regulatory organization ("SRO") and exercises authority delegated by the CFTC. *See* 17 C.F.R. § 1.3; *Barry* v. *Cboe Global Markets, Inc.*, 42 F.4th 619, 625 (7th Cir. 2022). Polymarket US performs "regulatory oversight" of other market participants, *see Morgan Keegan & Co.* v. *Silverman*, 706 F.3d 562, 563 (4th Cir. 2013), and, when exercising that authority, it "stands in the shoes of" its federal regulator, the CFTC. *See D'Alessio* v. *New York Stock Exchange, Inc.*, 258 F.3d 93, 105 (2d Cir. 2001). In that capacity, Polymarket US performs work the CFTC would otherwise have to complete itself. For example, Polymarket US sets and enforces access rules, certifies contracts for listing, monitors trading for manipulation, and adopts rules protecting participants. *See* 7 U.S.C. §§ 7(d)(2), (4), (12), 7a-2(c)(1); CFTC Staff Letter No. 26-08, *DMO Staff Advisory Regarding Prediction Markets*, at 1 (Mar. 12, 2026).

---

[9] *Prediction Markets*, 91 Fed. Reg. at 35,843.

Polymarket US has "reasonable discretion" in how to use this delegated authority, 7 U.S.C. § 7(d)(1)(B), but the CFTC retains extensive supervisory authority over how Polymarket US exercises it. For example, the CFTC may demand ongoing demonstrations of compliance, conduct rule-enforcement reviews, stay or amend listed contracts, prohibit event contracts contrary to the public interest, and suspend or revoke a designation. 7 U.S.C. §§ 7(d), 7a-2(c)(5)(C)(i), 7b, 8(b); 17 C.F.R. §§ 38.5(b), 40.2(c), 45.2(h). And if an exchange fails to enforce its own rules, the CFTC may enforce them instead. 7 U.S.C. § 12c(a)(1).

**C. Plaintiff's Claim and Defendants' Removal**

Plaintiff, a citizen of South Carolina residing in Charleston County, filed this action in the Charleston County Court of Common Pleas (Case No. 2026-CP-10-04063) on July 29, 2026.[10] Plaintiff asserts a single claim under South Carolina's "Statute of Anne," which allows an individual to recover gambling losses if they lose at least $50 during one "sitting . . . playing at cards . . . or any other game whatsoever," S.C. Code Ann. § 32-1-10, and gives third parties the power to "recover the same" and treble damages if the loser does not bring a claim in three months. S.C. Code Ann. § 32-1-20. Half of any third-party recovery is shared with "the county in which the offense shall have been committed," *id.*, and Section 32-1-60 limits potential recoveries to losses from unlawful gambling. S.C. Code Ann. § 32-1-60. Plaintiff alleges that the sports-related event contracts offered by Defendants are unlawful gambling, Compl. ¶¶ 83, 147–52, and that "thousands of individuals within South Carolina have lost—and continue to lose—more than $50 at any time or sitting" by "gambling" with Defendants. *Id.* ¶ 149. He seeks "damages four times that value," an accounting, and "injunctive relief enjoining Defendants from continuing their

[10] Plaintiff has since voluntarily dismissed four defendants without prejudice, DRW Holdings LLC (Aug. 27, 2026) (Dkt. 1 at 9 n.3), IMC-Chicago, LLC (Aug. 31, 2026) (*id.*), Galaxy Digital Trading, LLC (Sept. 25, 2026) (Dkt. 14), and Wintermute Trading Ltd. (Sept. 28, 2026) (Dkts. 18, 19).

illegal operations in the state." *Id.*, Prayer for Relief ¶¶ B, C, F. Half of any recovery would go to the county. *Id.* ¶¶ 19, 21.

Plaintiff argues that the event contracts at issue are not lawful swaps traded under a comprehensive federal regulatory regime. Rather, he asserts that the Polymarket US exchange is "dedicated almost exclusively to sports gambling" and that South Carolinians use Defendants' platforms to place "illegal wagers." Compl. ¶¶ 5–6, 16, 83, 140. He argues that core exchange functions—like setting contract terms, determining how contracts resolve, providing for dispute resolution, and controlling who may trade—are merely the facilitation of illegal gambling. *Id.* ¶ 88. He seeks to hold Defendants liable as gambling "winners" because, among other things, Defendants collect transaction fees on each trade and Defendants that serve as clearinghouses for the transactions are novated counterparties to every contract. *Id.* ¶¶ 89, 121–22.

On September 2, 2026, with the consent of all then-named Defendants, Defendants DraftKings Inc., GUS III LLC, and Railbird Exchange, LLC (collectively, the "DraftKings Entities") removed this action under 28 U.S.C. §§ 1331, 1332, 1441(a), and 1446. *See* Notice of Removal, Dkt. 1 ("DraftKings' Notice" or "DK Notice") ¶¶ 7–46, 51. On September 8, 2026, the Polymarket Defendants timely adopted DraftKings' Notice in full and asserted an additional ground for removal: federal officer removal under 28 U.S.C. § 1442(a)(1). *See* Notice of Joinder and Removal, Dkt. 5 ("Polymarket Notice") ¶¶ 8–9, 20–23.[11] On October 15, 2026, Plaintiff filed the instant motion. Dkt. 40.

[11] Removal under § 1442(a) does not require co-defendant consent. Polymarket Notice ¶ 44 (citing *Akin* v. *Ashland Chemical Co*., 156 F.3d 1030, 1034 (10th Cir. 1998)).

## LEGAL STANDARD

A notice of removal need contain only a "short and plain statement" of the grounds for removal. 28 U.S.C. § 1446(a). Courts "credit plausible factual allegations by the removing party," *Chevron USA Inc.* v. *Plaquemines Parish*, 608 U.S. 1, 12 (2026), and, for federal officer removal, credit the defendant's "theory of the case," *Jefferson County* v. *Acker*, 527 U.S. 423, 432 (1999); *accord Maryland* v. *3M Co.*, 130 F.4th 380, 389 (4th Cir. 2025) ("*3M*"). A removing party that "plausibly allege[s] that federal jurisdiction through 28 U.S.C. § 1442(a)(1) is proper" carries its burden. *Hunt,* 140 F.4th at 194. And if any defendant may remove under any theory, the entire action is removable. *Wisconsin Department of Corrections* v. *Schacht*, 524 U.S. 381, 386 (1998); *Hunt*, 140 F.4th at 193 n.2.

## ARGUMENT

Plaintiff's motion rests on a single premise: that a suit seeking to shut down a federally designated exchange is an ordinary state-law gambling case. It is not. Polymarket US acts under the CFTC and is entitled to have its federal defenses heard in a federal forum. Independently, Plaintiff's claim necessarily turns on a substantial and disputed question of federal law, the parties are completely diverse, and Plaintiff has Article III standing to pursue this action.

### I. THIS COURT HAS FEDERAL OFFICER JURISDICTION

The federal officer removal statute authorizes "any officer (or any person acting under that officer) of the United States or of any agency thereof" to remove all state suits "for or relating to any act under color of such office" to federal court. 28 U.S.C. § 1442(a)(1). The statute "protect[s] the Federal Government from state-court interference with its operations" by "giv[ing] federal courts jurisdiction over some suits against federal officers or those acting under them." *Plaquemines*, 608 U.S. at 5.

To enforce these protections, federal officer removal is "liberally construed," *Sawyer*, 860 F.3d at 254–55, and "[g]eneral removal principles are . . . inverted." *3M*, 130 F.4th at 388. There is no "presumption against removal," *County Board of Arlington County* v. *Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 251 (4th Cir. 2021) ("*Express Scripts*"), and federal officer removal is an exception to the well-pleaded complaint rule. Plaintiff's insistence that removal jurisdiction be "strictly construe[d]" and that "any doubt" requires remand, Pl. Br. 2 (quoting *Mulcahey* v. *Columbia Organic Chemicals Co.*, 29 F.3d 148, 151 (4th Cir. 1994)), states the rule for ordinary removals under § 1441—not the rule that governs federal officer removal. Courts look to the defendant's well-pleaded facts of removal "despite the nonfederal cast of the complaint," *Kircher* v. *Putnam Funds Trust*, 547 U.S. 633, 644 n.12 (2006), and credit the defendant's "theory of the case" to evaluate federal officer removal jurisdiction, *Acker*, 527 U.S. at 432.

Federal officer removal is appropriate when a defendant alleges: "(1) that it acted under a federal officer, (2) that it has a colorable federal defense, and (3) that the charged conduct was carried out for or in relation to the asserted official authority." *3M*, 130 F.4th at 388. Polymarket US satisfies all three requirements: it acts under the CFTC because federal law delegates to it regulatory functions the CFTC would otherwise perform, subject to the CFTC's close supervision; Plaintiff's claim relates to those functions because Plaintiff challenges actions Polymarket US has taken under its delegated authority; and Polymarket US has colorable federal defenses, including that its conduct was lawful under federal law and that federal law preempts Plaintiff's claim. Plaintiff challenges only the first element. *See* Pl. Br. 20–22. He does not dispute that his claim relates to Polymarket US's delegated functions, and he does not dispute that Polymarket US's federal defenses are colorable.

### A. Polymarket US Acts Under the CFTC

A private person or entity "acts under" a federal officer or agency when it engages in "an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Watson*, 551 U.S. at 152 (emphasis in original). Merely complying with federal law is not enough, but exercising delegated legal authority that helps federal officers fulfill basic governmental tasks the government would otherwise have to perform itself is sufficient. *Id.* at 153–54, 156–57. A private party "may act under a superior federal entity when the relationship is an unusually close one involving detailed regulation, monitoring, or supervision." *Hunt*, 140 F.4th at 197. And like the rest of the statute, the "acting under" requirement "must . . . benefit from a broad interpretation." *Id.* Polymarket US acts under the CFTC on both grounds: federal law delegates to it regulatory authority the CFTC would otherwise exercise, and the CFTC closely supervises how that authority is used.

*First*, Polymarket US does more than comply with the CEA; as a DCM, Polymarket US exercises "delegated" federal authority, *Barry*, 42 F.4th at 625, and "promulgate[s] rules and regulations" governing its markets, *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Curran*, 456 U.S. 353, 382 (1982). *See id.* at 393 (federal law has "imposed a stringent duty upon exchanges to police the trading activities in the markets that they are authorized by statute to regulate"). Like the private pharmacies in *Express Scripts*, Polymarket US performs "the day-to-day administration" of a federal program—here, derivatives market regulation—"pursuant to a lengthy and detailed" set of regulations. 996 F.3d at 253–54.

Congress vested the CFTC with "exclusive jurisdiction" over swaps traded on DCMs, 7 U.S.C. § 2(a)(1)(A), and established "a system of effective self-regulation of trading facilities . . . under the oversight of the [CFTC]," *id.* § 5(b). As part of this system, Polymarket US—like all DCMs—must "establish, monitor, and enforce compliance with [its] rules." 7 U.S.C.

§ 7(d)(2)(A). These rules must, for example, specify who can access the market, what can be traded on it, and how disputes will be resolved; prohibit abusive practices; and minimize conflicts of interest. *Id.* §§ 7(d)(2), (12), (14), (16). Polymarket US must also prevent manipulation and market disruption through surveillance and enforcement, *id.* § 7(d)(4); maintain trade records to prevent customer and market abuse, *id.* § 7(d)(10); promote fair and equitable trading, *id.* § 7(d)(12); and certify event contracts for listing, subject to the CFTC's power to stay, amend, or prohibit them, *id.* § 7a-2(c); 17 C.F.R. §§ 40.2, 40.3, 40.11.

This is not, as Plaintiff suggests (Pl. Br. 21–22), mere compliance with the law. Plaintiff relies on the principle that compliance does not suffice "no matter how detailed the government regulation," Pl. Br. 21 (quoting *Mayor & City Council of Baltimore* v. *BP P.L.C.*, 31 F.4th 178, 229 (4th Cir. 2022) ("*BP*")), but Polymarket US does not rest on how heavily it is regulated. It rests on the regulatory authority it exercises over others. That distinction is dispositive. In *BP* and in *West Virginia State University Board* of *Governors* v. *Dow Chemical Co.*, 23 F.4th 288 (4th Cir. 2022) ("*Dow Chemical*"), the defendants relied on federal regulation of their own products and operations, and the relationship was simply "one of statutory compliance." *Dow Chemical*, 23 F.4th at 302. By contrast, Polymarket US's obligations—like those to prevent manipulation through surveillance *and enforcement*—include delegated authority (and obligations) to regulate third parties. *Compare BP*, 31 F.4th at 230–32 (rejecting federal officer removal where oil companies relied on federal leases to drill for oil and gas and on contracts to sell a "standardized consumer product," gasoline, to the Navy—arrangements that conferred no authority over anyone but the defendants themselves and that, if sufficient, "would bring every seller of contracted goods and services within the ambit of § 1442 when the government is a customer"), *and Dow Chemical*, 23 F.4th at 304 (rejecting federal officer removal where chemical companies relied on a federal

environmental permit requiring them to clean up contamination at their own plant, which reflected only their "adherence to minimum remedial measures to operate the facility for their own purpose"), *with* 7 U.S.C. § 7(d)(12) (requiring DCMs to "establish and enforce rules" "to protect markets and market participants from abusive practices committed by any party, including abusive practices committed by a party acting as an agent for a participant").

This regulation of third parties is a task that, without Polymarket US's assistance, the CFTC "would otherwise have to undertake" itself. *Effex Capital, LLC* v. *National Futures Ass'n*, 2018 WL 1635851, at *1 (N.D. Ill. Apr. 5, 2018), *aff'd*, 933 F.3d 882 (7th Cir. 2019); *see also* Heath P. Tarbert, *Self-Regulation in the Derivatives Markets: Stability Through Collaboration*, 41 Nw. J. Int'l L. & Bus. 175, 182 (2021) (exchanges serve as "the first line of defense").[12] Congress said as much in the statute itself. If a designated contract market like Polymarket US fails to police trading on its market and enforce its rules, the CFTC steps in: when an exchange "fails to act," the CFTC "may suspend, expel, or otherwise discipline any person who is a member of that exchange . . . in accordance with the rules of that exchange." 7 U.S.C. § 12c(a)(1).[13]

---

[12] *See also Position Limits for Derivatives: Certain Exemptions and Guidance*, 81 Fed. Reg. 38,458, 38,465–66 (June 13, 2016) (designated contract markets "carry[] out regulatory functions"); CFTC Staff Letter No. 26-08, *supra*, at 1 (contract markets have "self-regulatory obligations"); *cf. Howes* v. *Financial Industry Regulatory Authority, Inc.*, 2023 WL 2213688, at *5 (D. Md. Feb. 24, 2023) (securities SROs "discharge . . . regulatory responsibilities").

[13] The Court should reject the decision in *Nevada ex rel. Nevada Gaming Control Board* v. *Blockratize Inc.*, 2026 WL 579376, at *3–4 (D. Nev. Mar. 2, 2026)—currently under appeal—which treated Polymarket US's exchange-oversight duties as "simple compliance" on the theory that the CFTC "has the ability to override" Polymarket US's decisions. This flawed reasoning inverts *Watson*, which identifies "subjection, guidance, or control" as the hallmark of the acting-under relationship. 551 U.S. at 151. In other words, the CFTC's override authority confirms, rather than negates, the acting-under relationship. Moreover, the District of Nevada's decision conflicts with the Fourth Circuit's test in *Hunt*, which holds that a defendant "acts under" a federal agency when the agency "exerts some control over" it, "reserves the right to monitor and supervise" it, and the party "helps carry out" the agency's "duties," 140 F.4th at 198 (cleaned up), and the Constitution's private-nondelegation doctrine, which requires that an agency that assigns functions to a private entity "retain[] decision-making power" to approve, disapprove, or modify

*Second*, Polymarket US exercises the delegated authority described above subject to the CFTC's "subjection, guidance, or control." *Watson*, 551 U.S. at 151. Polymarket US and other designated contract markets obtain and retain their designation only by complying with twenty-three statutory core principles and additional CFTC rules. 7 U.S.C. §§ 7(a), 7(d), 8(a); 17 C.F.R. § 38.3. Moreover, the CFTC "exerts some control" over Polymarket US and other designated contract markets by "reserv[ing] the right to monitor and supervise" them. *Hunt*, 140 F.4th at 198 (cleaned up). For example, the CFTC may request "a written demonstration . . . that the designated contract market is in compliance with one or more core principles . . . to show that the designated contract market satisfies its obligations under the [CEA]." 17 C.F.R. § 38.5(b). The CFTC also conducts regular rule-enforcement and record reviews and may enforce compliance by staying trading, delisting contracts, instituting enforcement proceedings, and suspending or revoking a contract market's designation. *See* 7 U.S.C. §§ 7a-2(c), 7b, 8(b), 12a(9), 13a, 13a-1; 17 C.F.R. §§ 40.2(c), 40.6(c), 45.2(h).[14] Each element of the Fourth Circuit's test in *Hunt* is thus present here: the CFTC exerts some control over Polymarket US, reserves the right to monitor and supervise it, and relies on it to help carry out the CFTC's duties. 140 F.4th at 198.

*Third*, contrary to Plaintiff's assertions (Pl. Br. 21–22), federal officer removal does not require a contractual relationship between Polymarket US and the CFTC. Indeed, in *Express Scripts* the Fourth Circuit explained that "the absence of a direct contractual relationship with the federal government is not a bar to removing an action under § 1442(a)(1)." 996 F.3d at 254

---

its actions. *FCC* v. *Consumers' Research*, 606 U.S. 656, 692 (2025).

[14] For example, just last week, the CFTC stayed the listing of sports-event contracts self-certified by two other DCMs (ProphetX and Ludlow Exchange (d/b/a Novig)) and instituted proceedings to determine whether their certifications were false. *See* CFTC, *In re NFL Weekly Scorigami Contracts*, Order at 5–7 (Oct. 21, 2026); CFTC, *In re NBA and WNBA Prop Contracts*, Order at 5–10 (Oct. 22, 2026).

(cleaned up). Federal officer removal was available in *Express Scripts* and *Hunt* not because the defendants were government subcontractors, but because each exercised authority to administer a federal program while bound by mandatory federal standards, subject to agency oversight, and open to federal audits—the "unusually close" relationship that goes beyond "simply complying with the law." *Express Scripts*, 996 F.3d at 251–54 (private pharmacies acted under a federal officer by running a federal military health-care pharmacy program on the Department of Defense's behalf); *Hunt*, 140 F.4th at 197–98 (private company acted under a federal officer by administering federal employees' health benefits under the supervision of the federal agency charged with running that program). Polymarket US's relationship with the CFTC is closer still: its authority is conferred by statute, and the CFTC directly oversees Polymarket US's exercise of that authority.

*Watson* and *Dow Chemical* similarly recognize that a contractual relationship with the government is not required and that delegation and contract are distinct bases for acting-under status. Quoting *Watson*, the *Dow Chemical* court explained that the "acting under" analysis looks for "a delegation of legal authority . . . *or* evidence of any contract, payment, employer/employee relationship, or principal/agent arrangement." *Dow Chemical*, 23 F.4th at 305 (quoting *Watson*, 551 U.S. at 143–44). Indeed, imposing a contractual requirement would be inconsistent with a wealth of precedent across the circuits holding that a statutory delegation suffices to invoke federal officer removal. *See, e.g.*, *Government of Puerto Rico* v. *Express Scripts, Inc.*, 119 F.4th 174, 182 & n.2, 190, 194 (1st Cir. 2024) (reversing district court's grant of remand and holding that a pharmacy benefit manager could properly invoke federal officer removal because it was supervised by the Office of Personnel Management, despite not having a contract with it); *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Defender Ass'n of*

*Philadelphia*, 790 F.3d 457, 469 (3d Cir. 2015) (Federal Community Defender acted under the federal government because it was "delegated the authority to provide representation under the [Criminal Justice Act]" to indigent defendants, not services to the government itself); *Ray* v. *Tabriz*, 110 F.4th 949, 956–57 (7th Cir. 2024) (the "government delegated [its] responsibility" to insurance carriers for pursuing subrogation claims); *Agyin* v. *Razmzan*, 986 F.3d 168, 176–78 (2d Cir. 2021) (upholding federal officer removal by a physician employed by a federally supported community health center because his treatment of patients helped carry out the federal government's responsibility to provide medical care to underserved populations).

**B. Polymarket US Satisfies the "For or Relating To" Requirement**

Plaintiff's motion does not contest this element at all. *See* Pl. Br. 20–22. Nor could he. The "for or relating to" element "sweeps broadly": "[o]ne thing can relate to another even if the connection is indirect," and a removing defendant "need not show that his federal duties specifically required or strictly caused the challenged conduct." *Plaquemines*, 608 U.S. at 11; *see also Sawyer*, 860 F.3d at 258 (holding that it was error to require "a strict causal connection"). A removing defendant need allege only a connection "that is not tenuous, remote, or peripheral." *Plaquemines*, 608 U.S. at 12; *see also Express Scripts*, 996 F.3d at 256 (this prong asks whether there is "a connection or association between the act in question and the federal office").

Here, the "for or relating to" requirement is easily satisfied because Plaintiff's claim targets the same powers that federal law delegates to Polymarket US. The Complaint attacks Polymarket US for setting contract terms, determining how contracts resolve, and controlling who may trade on Polymarket US (Compl. ¶ 88)—each a delegated function, *see* 7 U.S.C. §§ 7(d)(2)(A), (4), (14), 7a-2(c). Plaintiff's suit is, in substance, an objection that Polymarket US has not adopted a market-access rule excluding South Carolinians and has certified contracts Plaintiff deems unlawful. *See*

Compl. ¶¶ 94–98, 140–46. Moreover, the relief that Plaintiff seeks—to enjoin Polymarket US's operations statewide (Compl., Prayer for Relief ¶ F)—is "inextricably related to" Polymarket US's exercise of delegated authority, *3M*, 130 F.4th at 392, because an injunction would impact who may access Polymarket US and which of its certified contracts may be traded on it. Plaintiff's complaint does not merely relate to Polymarket US's federal functions; it seeks to override them.

**C. Polymarket US Has Colorable Federal Defenses**

"One of the primary purposes of the [federal officer] removal statute . . . was to have [federal defenses raised by federal officers] litigated in the federal courts" and therefore a defendant "need not win his case before he can have it removed"; the defendant need articulate only a colorable federal defense. *Willingham* v. *Morgan*, 395 U.S. 402, 407 (1969). A defense is colorable even if a court "ultimately reject[s] it." *Acker*, 527 U.S. at 431. This is "a low bar"; the defense need "only be plausible." *Hunt*, 140 F.4th at 198–99. Polymarket US's defenses easily clear this low bar, and Plaintiff does not argue otherwise.

*First*, as set forth in the brief of the Other Removing Defendants (Dkt. 55 at 21–29),[15] Plaintiff cannot prevail on the merits without establishing that the challenged event contracts are unlawful under federal law. South Carolina's Statute of Anne "appl[ies] only to those gambling activities not authorized by law," S.C. Code Ann. § 32-1-60, and the South Carolina Supreme Court has explained that the statute "allow[s] for recovery of gambling losses only where the gambling activity which resulted in the loss is unlawful," *Joytime*, 528 S.E.2d at 655; *accord Proctor*, 778 S.E.2d at 893 (South Carolina's Statute of Anne allows for recovery of "losses sustained by illegal gambling"). Plaintiff pleads illegality as the premise of his sole claim, *see* Compl. ¶¶ 10, 139, and to prevail he must establish that the event contracts at issue are illegal

[15] Which, as noted, the Polymarket Defendants expressly incorporate. *See supra*, n.2.

under federal law. Ultimately, the question raised by Plaintiff's Complaint is "whether the contracts at issue are unlawful gambling contracts—or instead federally authorized event contracts—[which] cannot be resolved by reference to [state] law alone." *Georgia Gambling Recovery LLC* v. *Kalshi Inc.*, 2026 WL 279375, at *3 (M.D. Ga. Feb. 3, 2026). If the sports event contracts underlying Plaintiff's Complaint are "swaps" subject to the CFTC's exclusive jurisdiction, they cannot be the "illegal gambling" on which his Statute of Anne claim depends. Plaintiff recognizes as much: he devotes an entire section of the Complaint to the legality of the contracts under the CEA. Compl. ¶¶ 140–46. Polymarket US is entitled to have this defense—that its conduct was lawful under federal law—heard in federal court.

*Second*, Plaintiff's state-law claim is also preempted. The CEA classifies event contracts as "swaps," 7 U.S.C. § 1a(47)(A)(ii), and grants the CFTC "exclusive jurisdiction" over swaps "traded or executed on a contract market designated" under the Act, *id.* § 2(a)(1)(A). The CFTC, not state lawmakers, determines whether event contracts may be listed on federally regulated exchanges. *Id.* § 7a-2(c)(5)(C). Applying South Carolina's Statute of Anne to bar such contracts is therefore preempted, both expressly and through the CFTC's comprehensive regulatory regime, as the Third Circuit has held. *Flaherty*, 172 F.4th at 226, 228–30 (holding that the CEA "preempts state laws that directly interfere with swaps traded on DCMs" and that "sports-related event contracts are swaps traded on a CFTC-licensed DCM"). Several district courts are in accord. *See, e.g.*, *Minnesota*, 2026 WL 2150211, at *12–14; *Coinbase Financial Markets, Inc.* v. *Raoul*, 2026 WL 2969682, at *11–12 (N.D. Ill. Oct. 2, 2026).[16]

[16] The question is also pending before the Fourth Circuit and is the subject of multiple petitions for certiorari. *See infra* n.19.

Contrary decisions do not change the analysis. The Sixth Circuit's ruling in *KalshiEX, LLC* v. *Schuler*, 2026 WL 2884087 (6th Cir. Sept. 25, 2026), for example, shows only that the relevant preemption questions have divided the courts of appeals. Defenses that have divided the courts of appeals are, by definition, colorable. The Court need not—and should not—decide the merits of preemption, the central question in this case, in the guise of a jurisdictional inquiry. That question belongs in the federal forum § 1442 guarantees.

## II. THIS COURT HAS FEDERAL QUESTION AND DIVERSITY JURISDICTION

Remand should also be denied for two further, independent reasons: this Court has federal question jurisdiction and diversity jurisdiction. The Polymarket Defendants join in, adopt, and incorporate by reference the Other Removing Defendants' Opposition on these points (Dkt. 55) and briefly summarize them here.

### A. Federal Question Jurisdiction Exists Because Plaintiff's Claim Necessarily Turns on a Substantial, Disputed Question of Federal Law

The Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiff's claim raises federal issues that are "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn* v. *Minton,* 568 U.S. 251, 258 (2013).

*First*, the federal issue is necessarily raised because, as discussed above in Section I.C, Plaintiff cannot prevail on the merits without establishing that the challenged event contracts are unlawful under federal law, and this analysis requires the "construction of federal law." *Franchise Tax Board of California* v. *Construction Laborers Vacation Trust for Southern California*, 463 U.S. 1, 9 (1983).

Plaintiff's argument that § 32-1-60 is merely an affirmative defense, and therefore federal question jurisdiction is not present (Pl. Br. 13–15), fails. Plaintiff acknowledges that where state

precedent makes illegality an element of a loss-recovery claim, the federal question is necessarily raised, *id.* at 15 (distinguishing *Georgia Gambling* on that basis), and *Joytime* establishes that illegality *is* an element of Plaintiff's claim under South Carolina law. *See also* Other Removing Defendants' Opp. at 21–23. As Plaintiff concedes, in *Joytime* the South Carolina Supreme Court described recovery as available "only where the gambling activity which resulted in the loss is unlawful," Pl. Br. 14 (quoting *Joytime*, 528 S.E.2d at 655).[17] This federal issue is also not a preemption defense in disguise, Pl. Br. 15: whether these contracts are lawful under the CEA, the law governing their validity, must be answered before any preemption analysis. *See H & R Block Eastern Enterprises, Inc.* v. *Raskin*, 591 F.3d 718, 723–24 (4th Cir. 2010) (holding that courts must "first independently determin[e]" applicability of statutes prior to preemption analysis); *see also* Other Removing Defendants' Opp. at 23–27.[18]

*Second*, the federal issue is actually disputed. Plaintiff "disputes that Defendants' 'event contracts' are swaps" and "that they would be permissible under the Commodity Exchange Act even if they were swaps," Compl. ¶ 140 n.7, while the Polymarket Defendants—and the CFTC—maintain the contrary, *see supra* Section I.C. This is exactly the sort of federal-law dispute "that *Grable* envisioned," *Gunn*, 568 U.S. at 259 (quoting *Grable*, 545 U.S. at 313), and Plaintiff does not argue otherwise. *See also* Other Removing Defendants' Opp. at 27.

*Third*, the federal issue is substantial: it implicates the CFTC's exclusive authority and the legality of millions of transactions nationwide, has divided the courts of appeals, and is pending

---

[17] The Kentucky and Ohio decisions on which Plaintiff relies, Pl. Br. 15, construed different statutes and treated illegality as an affirmative defense. *See* Other Removing Defendants' Opp. at 25. *Joytime* establishes that, under South Carolina law, illegality is an element of Plaintiff's claim.

[18] As set forth above in Section I.C, whether Plaintiff can establish his claim—which requires a showing of illegality under federal law—and whether his claim is preempted by federal law are two related, but separate defenses.

before the Fourth Circuit and on petitions for certiorari.[19] *See also* Other Removing Defendants' Opp. at 27–28. Plaintiff's observation that the CFTC is not a party, Pl. Br. 16, is a non sequitur. Substantiality turns on "the importance of the issue to the federal system as a whole," *Gunn*, 568 U.S. at 260, and a suit that "seeks to have a state court circumvent [a federal agency's] exclusive authority to regulate" "poses an issue of 'substantial' significance to the federal government," *Old Dominion Electric Cooperative* v. *PJM Interconnection, LLC*, 24 F.4th 271, 288 (4th Cir. 2022). Nor is the question "fact-bound," Pl. Br. 18: whether sports-related event contracts listed on designated contract markets are swaps within the CFTC's exclusive jurisdiction is a question of federal statutory interpretation that the CFTC and the United States are litigating in federal courts nationwide. *See supra* Background, Section A.

Plaintiff's remaining substantiality arguments fare no better. Plaintiff contends that nothing in the CEA requires Defendants to operate in South Carolina. Pl. Br. 17 (citing *Schuler*, 2026 WL 2884087, at *26). That is a merits argument about preemption, and it confirms that the federal question is disputed rather than answering whether it is substantial. Plaintiff also contends that the federal question would not be dispositive. *Id.* But it would be. If the contracts are lawful swaps within the CFTC's exclusive jurisdiction, they are not gambling "not authorized by law," S.C. Code Ann. § 32-1-60, and Plaintiff's sole claim fails. The Kentucky and Ohio decisions on which Plaintiff relies construed different statutes and reached a different conclusion because they treated the legality question as an affirmative defense. *See* Pl. Br. 15–17. Under *Joytime*, by contrast, illegality is an element of his claim.

---

[19] *See, e.g.*, *KalshiEX, LLC* v. *Martin*, No. 25-1892 (4th Cir. argued May 7, 2026); Petition for Writ of Certiorari, *Flaherty* v. *KalshiEX, LLC*, No. 26-299 (U.S. Sept. 2, 2026); Petition for Writ of Certiorari, *Robinhood Derivatives, LLC* v. *Dreitzer*, No. 26-338 (U.S. Sept. 10, 2026); Petition for Writ of Certiorari, *North American Derivatives Exchange, Inc.* v. *Nevada*, No. 26-344 (U.S. Sept. 11, 2026).

*Finally*, the federal issue is capable of resolution in federal court without disrupting the federal-state balance approved by Congress. Congress structured the CEA to provide a "comprehensive regulatory structure" for derivatives markets and "to bring the markets under a uniform set of regulations," *American Agriculture Movement, Inc.* v. *Board of Trade of Chicago*, 977 F.2d 1147, 1155–56 (7th Cir. 1992), and it later extended that structure to swaps, giving the CFTC "exclusive jurisdiction" over swaps traded on designated contract markets to achieve that uniformity, 7 U.S.C. § 2(a)(1)(A). Federal courts are the natural forum for deciding the scope of that federal grant, and they are already doing so. *See supra* Background, Section A. By contrast, allowing each state's courts to hear these issues and potentially declare federally regulated swaps unlawful threatens to fracture national derivatives markets and undermine the uniformity Congress secured by granting the CFTC exclusive jurisdiction. Plaintiff's invocation of the State's police power over gambling, Pl. Br. 18 (quoting *Johnson* v. *Collins Entertainment Co.*, 199 F.3d 710, 720 (4th Cir. 1999)), does not change the analysis, because "a strong state interest alone" does not displace federal jurisdiction. *Cf. Martin* v. *Stewart*, 499 F.3d 360, 369 (4th Cir. 2007). *See also* Other Removing Defendants' Opp. at 29.

### B. The Court Has Diversity Jurisdiction Because the Parties Are Completely Diverse, and Plaintiff—Not the State—Is the Real Party in Interest

The Court also has diversity jurisdiction under 28 U.S.C. § 1332. The parties are completely diverse: Plaintiff, who sues in his own name, is a citizen of South Carolina, and no Defendant is a citizen of South Carolina. Each Defendant is a citizen of one or more of Nevada, Massachusetts, Delaware, New York, Illinois, New Jersey, Wisconsin, Wyoming, or a foreign state. Polymarket Notice ¶ 12; DK Notice ¶¶ 11–28. The amount in controversy also far exceeds $75,000: Plaintiff seeks four times the losses of "thousands" of South Carolinians, together with an accounting and a statewide injunction whose cost to Defendants would itself exceed the $75,000

threshold. Compl. ¶ 149, Prayer for Relief ¶¶ B, C, F; DK Notice ¶¶ 29–33; Polymarket Notice ¶ 13. Plaintiff disputes none of this. *See* Pl. Br. 19–20.

Plaintiff's only response is conditional: if the Statute of Anne is a qui tam statute, he says, the State of South Carolina is a real party in interest whose presence destroys diversity. Pl. Br. 19–20. That argument fails. As set forth in Other Removing Defendants' Opp. at 19–21, diversity jurisdiction turns on whether there is diversity of citizenship among the "real and substantial parties to the controversy," *Navarro*, 446 U.S. at 460, and South Carolina is not a real party in interest because it lacks any statutory control over the action and does not have any financial stake in the litigation, *see Messer*, 612 F.2d at 1370. The State does not have any right to enforce the claim. *See* Other Removing Defendants' Opp. at 19. Moreover, South Carolina would not receive any recovery from the action. *Id.* at 19–20. Rather, the South Carolina statute directs half of any recovery to the county, not the State, Compl. ¶¶ 19, 21. And even if South Carolina counties are real parties in interest here, they are South Carolina citizens and complete diversity remains. *See Moor*, 411 U.S. at 718 ("political subdivisions" are "citizens of their respective States" for diversity purposes). *See also* Other Removing Defendants' Opp. at 20.

## III. PLAINTIFF HAS ARTICLE III STANDING

Plaintiff contends that he lacks Article III standing. Pl. Br. 2–11. The argument is a bid to keep federal questions out of federal court, but, as set forth in the Other Removing Defendants' Opposition at 8–18, this argument fails and Plaintiff has Article III standing for at least two reasons.[20]

[20] The Polymarket Defendants join in, and adopt and incorporate by reference, the Other Removing Defendants' standing arguments, Other Removing Defendants' Opp. at 8–18, which are briefly summarized here to avoid duplicative briefing.

*First*, history and tradition establish that federal courts may adjudicate third-party Statute of Anne litigation. *See* Other Removing Defendants' Opp. at 8–12. The Supreme Court has recognized that so-called "informer" statutes such as the Statute of Anne "have been in existence for hundreds of years in England, and in this country ever since the foundation of our government," *Marvin* v. *Trout*, 199 U.S. 212, 225 (1905). Here, Plaintiff sues under South Carolina's version of that same statute, and his suit is the kind of action courts have heard for centuries.

*Second*, a plaintiff need not have suffered an injury himself: he may sue on an injury assigned to him, including one assigned by statute. *See* Other Removing Defendants' Opp. at 12–16; *see also Vermont Agency of Natural Resources* v. *United States ex rel. Stevens*, 529 U.S. 765, 773–74 (2000) (holding that a qui tam relator had standing to pursue a claim under the False Claims Act based on an assignment theory); *Thole* v. *U.S. Bank N.A.*, 590 U.S. 538, 543 (2020) (recognizing that a plaintiff has Article III standing when its "right to sue has been legally or contractually assigned to [it by] another party"). Here, Plaintiff has standing to sue as either the statutory assignee of the purported sovereign injury set forth in Plaintiff's Complaint or as the statutory assignee of the "bettors'" claims to recover their alleged losses. *See* Other Removing Defendants' Opp. at 16–18; *DC Gambling*, 2026 WL 850330, at *5 (a Statute of Anne "effects an assignment of either the loser's injury (her gambling losses) or the [State's] sovereign injury to the plaintiff who elects to pursue a claim"); *accord United States ex rel. Bunk* v. *Gosselin World Wide Moving, N.V.*, 741 F.3d 390, 403 (4th Cir. 2013) (rejecting argument that only a proprietary injury, and not a sovereign one, may support an assignee's standing). This Court should adopt the reasoning of *DC Gambling*, which rejected the very arguments Plaintiff makes here and held that a plaintiff who suffered no gambling losses had standing to sue under a loss-recovery statute. 2026

WL 850330, at *3–5 ("[t]hird-party Statute of Anne lawsuits" are "'cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process'").

## CONCLUSION

Plaintiff asks a state court to declare federally regulated swaps illegal and to shut down a federally designated exchange, and he disclaims any injury to keep a federal court from deciding whether he may. Federal officer jurisdiction, federal question jurisdiction, and diversity jurisdiction each independently foreclose that result. The Court should deny Plaintiff's motion to remand.

Dated: October 29, 2026

Respectfully submitted,

**COOPER TIERNEY**
*/s/ M. Linsay Boyce*
Lindsey W. Cooper Jr. (Fed. Bar ID 9909)
Charlie Patrick (Fed. Bar ID 13029)
Linsay Boyce (Fed. Bar ID 11952)
COOPER | TIERNEY
36 Broad Street
Charleston, SC 29401
Telephone: (843) 375-6614
lwc@coopertierney.com
cwp@coopertierney.com
linsay@coopertierney.com

**CAHILL GORDON & REINDEL LLP**
Samson A. Enzer*
Edward N. Moss*
Miles C. Wiley*
Gregory Mortenson*
Lauren A. Riddell*
32 Old Slip
New York, NY 10005
Telephone: (212) 701-3000
senzer@cahill.com
emoss@cahill.com
mwiley@cahill.com
gmortenson@cahill.com
lriddell@cahill.com
**Admitted pro hac vice*

*Attorneys for Defendants Blockratize Inc.; QCL Quad Code USA Corp.; QCX LLC (d/b/a Polymarket US); and QC Clearing LLC (d/b/a Polymarket Clearing)*

**CERTIFICATE OF SERVICE**

I hereby certify that the within document has been electronically filed and served with the Court on October 29, 2026, and that I sent a copy of the foregoing document via email and first-class mail to the following:

T. David Hoyle
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, S.C. 29464
dhoyle@motleyrice.com

William H. Narwold
MOTLEY RICE LLC
20 Church St., 17th Floor
Hartford, CT 06103
bnarwold@motleyrice.com

Previn Warren
Abigail Burman
Nelson Drake
MOTLEY RICE LLC
401 9th Street NW Suite 630
Washington, DC 20004
pwarren@motleyrice.com
aburman@motleyrice.com
ndrake@motleyrice.com

*Attorneys for Plaintiff*